# Exhibit A to Notice of Removal

(TO PLAINTIFF'S ATTORNEY: *Please Circle Type of Action Involved:* - TORT - MOTOR VEHICLE TORT - CONTRACT - EQUITABLE RELIEF - OTHER.)

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                                                     SUPERIOR COURT
                                                              CIVIL ACTION
                                                              No.

Robert P. Mauley ........................................, Plaintiff(s)

v.

Mortgage Electronic Registration Syt ........., Defendant(s)

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve upon Robert P. Mauley - Pro-se plaintiff's attorney, whose address is 16 Lakeview Dr. Lynnfield MA 01940 an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at 56 Federak St, Salem 01970 either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WITNESS, Judith Fabricant, Esquire, at Salem, the
day of                              , in the year of our Lord two thousand

Thomas H. Driscoll Jr.

*Clerk*

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

NOTICE TO DEFENDANT - You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein *and* also file the original in the Clerk's Office.

## PROOF OF SERVICE OF PROCESS

    I hereby certify and return that on ___Feb___ _10_____ , 20 1 6, I served a copy of
the within summons, together with a copy of the complaint in this action, upon the within-named
defendant, in the following manner (see Mass. R. Civ. P. (d) (1-5):

_By order of the Court, by sending the Petition + App. Certified_
_Mail to, MERS, 1901 E Voorhees St, Suite C_
_Danville, IL 61834, Legal Dept._

Dated: _Feb 10_____ , 20 16                    _Robert P. Murley_

N.B.    TO PROCESS SERVER:-
        PLEASE PLACE <u>DATE</u> YOU MAKE SERVICE ON DEFENDANT IN
        THIS BOX <u>ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.</u>

|  |
|---|
| , 20 . |

COMMONWEALTH OF
MASSACHUSETTS

ESSEX, SS.

SUPERIOR COURT
CIVIL ACTION
No.

_Robert P. Murley_
Plaintiff(s)

v

_Mortg. Electronic Reg. System AKA MERS_
Defendant(s)

SUMMONS
(Mass. R. Civ. P. 4)

COMMENWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT

ESSEX, SS                                   DOCKET NO: <u>1677CV00077</u>


Robert P. Marley,
Petitioner

## **EXPEDITED VERIFIED PETITION FOR JUDICIAL DISCHARGE OF MORTGAGE**

Now comes the petitioner, Robert P. Marley ("Petitioner"), and respectfully moves this
Honorable Court pursuant M.G.L.c. 240 §15 (a) and (b), for a decree discharging a certain
mortgage recorded on December 6, 2004 in the Southern Essex County Registry of Deeds, at
Book 23716, Page252, from Robert P. Marley to Omega Mortgage Corp. ("Omega"), for the
property located at 18 Lakeview Drive, Lynnfield, County of Essex.

## **INTRODUCTION**

The Petitioner entered into a purported Mortgage Contract with Omega on December 4,
2004.  As an initial matter, Omega would have been the assignor of the first written assignment
of mortgage, and indorsement, negotiation, sale, and delivery of the Promissory Note that the
Mortgage at issue would secure, to the purported assignee. Since 2009, after the demand for full
performance of the condition of the Note, not one entity the Petitioner has dealt with has been
able to produce a verifiable chain of title in the Note and Mortgage and obfuscation has been the
tactic.

The Promissory Note has one signature upon it, the Petitioners. Omega was required by law,
to transfer ownership of the mortgage in writing, and required to sign over the Note. Omega
never performed their duties and then alas, they died, without ever performing said duties.
Charlatans took over and attempted to create a chain of title in the Note with a forgery, the
Allonge to the Promissory Note. The only document that has a signature from an Omega official
is on the Allonge to the Note and that document is void *ab initio* as a matter of law and of no
effect. Because of the forgery and alteration, the Note is unenforceable as a matter of law, and
the Petitioner's responsibility on the obligation has been relieved.

No money is due or owing on the Note at issue. In addition, no entity recorded and affidavit,
extension, or acknowledgement declaring the purported obligation had not been satisfied after
accelerating the maturity date of the Note in the Registry of Deeds as required by law to prevent
the mortgage from becoming obsolete.

Accordingly, based on the lack of evidence demonstrating ownership in the purported Note
and Mortgage at issue, and the fact that a demand issued for the full performance of the alleged

1

debt[1] more than five-years ago, and no enforcement action has been taken or initiated by any party claiming an interest in said Note and Mortgage, and the Promissory Note is unenforceable for the reasons stated infra, the Petitioner is entitled to a Judicial Discharge of said mortgage.

## JURISDICTION/VENUE

1.  This Honorable Court has jurisdiction pursuant to M.G.L. c. 240 § 15 (b) whereas the Petitioner has been in uninterrupted possession for more than one-year after the demand for full performance of the condition of the purported note. Sub-section (a) and (b) of § 15 provides for procedures to judicially discharge a mortgage both in cases where there is "direct" evidence of payment or satisfaction and in cases where there is no "direct" evidence of payment or satisfaction but the mortgagor or the mortgagor's successors have been in certain periods of uninterrupted possession without any enforcement activity by the mortgagee

2.  Venue is appropriate in this Court whereas this matter does not concern Registered Land and the Petitioner and his property are located in Essex County.

## PARTIES

3.  The petitioner, Robert P. Marley, is a resident of Massachusetts and resides at 18 Lakeview Drive, Lynnfield, Massachusetts, County of Essex.

4.  There are no named respondents whereas no entity may come forward claiming an interest in the supra property. To name a respondent would be to admit an entity exists and has a claim. Furthermore, the Registry of Deeds is absent a complete, verifiable, and authentic unbroken chain of assignments in the mortgage and any entity that might come forward would have to demonstrate said chain of assignment to claim mortgagee status by assignment to meet the Conditions Precedent. The Petitioner will not name a respondent however, if the Court so orders, Petitioner will issue a public notice in the newspaper inviting any interested parties to come forward and if an entity comes forward, Petitioner will challenge their standing to enter the Court on this matter. Furthermore, said entity would be committing fraud upon the court, if it appeared as an interested party or Mortgagee by assignment. [2]

---

[1] See, Purported Note attached to addendum at Tab "Y" at page 3, Paragraph 7 (b) and (c). In 2009 when the default notice issued, the Petitioner demanded to know whom money was owed. No one would tell him therefore, to mitigate harm to himself after discovering the Ponzi scheme, he stop paying on the purported mortgage loan. The Petitioner would also direct the Courts attention to page 5 of the Note; there was plenty of room for signatures however, there are none. This signifies that no transfer, negotiation, or delivery of the Note ever took place. In addition, Omega could not assign any rights or title after it died in 2010.

[2] M.G.L.c 244 § 14 provides in pertinent part that, "For purposes of this section and section 21 of chapter 183, in the event a mortgagee holds a mortgage pursuant to an assignment, no notice under this section shall be valid unless (i) at the time such notice is mailed, an assignment, or a chain of assignments, evidencing the assignment of the mortgage to the foreclosing mortgagee has been duly recorded in the registry of deeds for the county or district where the land lies and (ii) the recording information for all

Allonge to the Promissory Note was an intentional voluntary act and a deliberate destruction and mutilation of said Note. The purported Promissory Note has no indorsements upon it that would signify a sale, negotiation, and delivery to any party or entity. See Forged Allonge attached herewith at Tab "R" with the real signatures included thereat.[6] The Allonge to the Note was falsely made with the intent to defraud the Petitioner. The Petitioners obligation has been discharged as a matter of law because of the fraudulent alteration and forgery; therefore, no money is due to any party.

15. Alternatively, the concealed, undisclosed third party co-obligators to the debt have satisfied the Promissory Note. See settlement notice from BYN Mellon dated April 25, 2014, attached herewith at Tab "P" of the addendum. Alternatively, even if it were not, G.L.c. 240 § 15 (b) applies;

16. Any entity or person who might claim an interest in this matter has aided and abetted in the commission of inter alia, the following criminal activity: fraud, forgery, uttering, has falsifying documents, committed fraud on the public record and would come to the court with *dirty hands* and therefore, entitled to nothing in equity for violating the "Clean Hands Doctrine";

17. The Petitioner was granted Bankruptcy protection in September of 2008 and all debt was discharged and extinguished as a matter of law. Again no money is due or owing;

18. The Southern Essex County Registry of Deeds lacks a complete, unbroken chain of assignments from Omega to any party making them mortgagee by assignment that could overcome the Conditions Precedent to foreclose or even notice a foreclosure on the Petitioner's property;

19. No entity can legally claim an interest or for that matter appear in a court of law in Massachusetts whereas; any entity would lack the requisite standing to enter the court. Particularly, the would-be purported entity has suffered no harm or injury in fact, and are not real parties in interest. The purported Note Owners have been paid and therefore have not suffered injury. See attached notice of settlement at Tab "P" of the addendum;

20. On January 21, 2014, the Petitioner sent a certified letter to the ones claiming an interest in his property pursuant to M.G.L.c. 183 §§ 54C, 55; the party refused to respond. They have had six years to respond and have not; This Honorable Court should not allow them to be heard here, as they have waived that right. See letter attached herewith at Tab "R" in the addendum. Petitioner has been unable to find a lawyer to file the mortgagors discharge. Therefore, this petition now follows;

21. The Petitioner and his family have existed in limbo since December of 2008, literally prisoners of financial terrorists. In a previous action brought in this Honorable Court in May of 2010, subsequently removed to the Federal Forum, the District Court held *Eaton*

---

(i) by an intentional voluntary act, such as surrender of the instrument to the party, destruction, mutilation"....

[6] See, *O'Connell* supra

was not applicable to the instant Petitioner; however, the First Circuit Court of Appeals said *Eaton* was applicable, but not ripe, but that the Petitioner could bring the claim back when ripe. What is not ripe about forgery and fraud? See Judgment attached herewith at Tab "Y" of the addendum; Because of the judgment, no entity can or will attempt a foreclosure.

22. Attached herewith is a colloquy, an addendum in tabbed order, with those that are attempting to deceive and defraud the Petitioner. The Petitioner incorporates the entire addendum by reference herein as though fully set forth hereat, whereas it includes Prima Facie Evidence. Also included in the addendum is a paper the Petitioner wrote for a few attorneys the day after the *Bassman* case came down. See addendum at Tab "Q". "Securitization, The Trust and Trustee". The addendum will assist the Court in better understanding this matter. Kindly read and take judicial notice.

## PRAYER FOR RELIEF

**Wherefore**, the Petitioner prays that this Honorable Court agree that the contingent liability has ceased to exist based on the foregoing and that the mortgage be discharged and thereby, issues a decree discharging the supra mortgage and that said decree be recorded in the Southern Essex County Registry of Deeds.

**Alternatively**, if this Honorable Court requires notice be given because a controversy exists, and an entity appears, then this matter be treated as one for declaratory judgment pursuant to M.G.L.c. 231A et seq. Further, allowing the Petitioner the right to amend accordingly and that the Court declares the rights of the parties after full discovery and a full-blown evidentiary hearing and then, discharge the Mortgage at issue and refer this matter to the United States District Attorney, the Massachusetts Attorney General, and the Essex County District Attorney's Office for criminal investigation and prosecution.

Respectfully Submitted

Dated: January 20, 2016

Robert P. Marley, Pro-se
18 Lakeview Drive
Lynnfield, MA 01940
781-844-3044
robertmarley1958@verizon.net

This verified petition is signed under the pains and penalties of perjury and the facts put forth are true to the best of the Petitioner's knowledge. Signed on this 20th day of January, 2016

Robert P. Marley

6

(TO PLAINTIFF'S ATTORNEY: *Please Circle Type of Action Involved:* -  TORT  -  MOTOR VEHICLE TORT -
CONTRACT  -  EQUITABLE RELIEF  -  OTHER.)

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT
CIVIL ACTION
No.

*Robert P. Mauley* , Plaintiff(s)

v.

*Mortgage Electronic Registration Syt* , Defendant(s)

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve upon *Robert P. Mauley - Pro-se*
plaintiff's attorney, whose address is *15 Lakeview Dr, Lynnfield MA 01940* an answer to the

complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the

day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the

complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at

*56 Federal St, Salem* either before service upon plaintiff's attorney or within a reasonable time thereafter.
*01970*

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim any claim which you may
have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's
claim or you will thereafter be barred from making such claim in any other action.

WITNESS, Judith Fabricant, Esquire, at Salem, the
day of                              , in the year of our Lord two thousand

*Thomas H. Driscoll Jr.*

*Clerk*

NOTES:
1.  This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2.  When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each
    defendant, each should be addressed to the particular defendant.

NOTICE TO DEFENDANT - You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein *and* also file the original in the Clerk's Office.

| CLERK'S NOTICE | 1677CV00077 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| CASE NAME:<br>Marley, Robert P vs. | Thomas H. Driscoll, Jr., Clerk of Courts |
|---|---|

| TO:<br>Robert P Marley<br>18 Lakeview Drive<br>Lynnfield, MA 01940 | COURT NAME & ADDRESS<br>Essex County Superior Court - Salem<br>J. Michael Ruane Judicial Center<br>56 Federal Street<br>Salem, MA 01970 |
|---|---|

You are hereby notified that on 02/02/2016 the following entry was made on the above referenced docket:

Endorsement on Motion to allow notice by publication or certified mail (#3.0): Other action taken

Service may be made by certified mail only of summons, in the form provided by the Office of the Clerk Magistrate w/o charge to the plaintiff.

| DATE ISSUED | ASSOCIATE JUSTICE/ ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|
| 02/04/2016 | Hon. Thomas Drechsler | (978)825-4800 |

# COMMONWEALTH OF MASSACHUSETTS
## SUPERIOR COURT DEPARTMENT

ESSEX, SS                                     DOCKET NO: 1677CV00077

Robert P. Marley,

           Petitioner

## MOTION TO ALLOW NOTICE BY PUBLIC NOTICE OR CERTIFIED MAIL

Now comes the Petitioner and respectfully requests that this Honorable Court allow Petitioner to provide notice on all those instructed to notify, by the Court, by either Public Notice or USPS Certified Mail pursuant to M.G.L. c. 223A § 6 (a)(3). As reasons therefore:

1) The last sentence of Rule 4(c) makes clear that whenever a statute, such as, G.L.c. 223A, authorizes service by certified or registered mail, it is not necessary to enlist the aid of a process server to do the mailing. However, M.G.L.c. 240 § 15 (a) and (b) both provide that, …."may file a petition in the land court or, except in the case of registered land, in the superior court for the county in which the land is located; and if, *after such notice by publication* or otherwise as the court orders,".… (emphasis added)

2) To follow the Courts instruction to the letter would cost a significant amount of money, which the Petitioner cannot afford. Moreover, the Courts order would create a significant hardship and burden if He were to make service on the people he has communicated with especially in light of the fact they have no interest. In the Petition, the Petitioner did not request costs and fees in his prayer for relief;

3) Respectfully, the Courts, January 25, 2016, order has the effect of denying the Petitioner access to justice and recourse under our laws where the statue provides for mere public notice;[1]

4) The Petitioner had requested a hearing prior to any order related to service or public notice, so there would be no ambiguity related to what is required. For instance, in what

---

[1] Article XI of the Constitution of the Commonwealth of Massachusetts provides that, "Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character. **He ought to obtain right and justice freely, and without being obliged to purchase it; completely, and without any denial; promptly, and without delay;** conformably to the laws". (emphasis added)

1



**Shellpoint**
Mortgage Servicing

| | | *Hours of Operation* |
|---|---|---|
| 55 Beattie Place, Suite 110 | Toll Free Phone 1-866-316-4706 | Monday-Friday 8:00AM-10:00PM |
| Greenville, SC 29601 | Toll Free Fax 1-866-467-1137 | Saturday 8:00AM-3:00PM |

December 28, 2015

Robert P. Marley
18 Lakeview Drive
Lynnfield, MA 01940

RE: Reference Number: 0535444565

Dear Mr. Marley:

This letter is in response to your several letters of correspondence dated November 29, 2015, November 30, 2015, December 2, 2015, December 3, 2015, December 4, 2015, December 6, 2015, December 7, 2015, December 11, 2015, December 15, 2015, and December 18, 2015, regarding the above referenced loan.

**Our records indicate you have previously submitted to this office a notice demanding that we cease communication with you.  Thus, this notice is for the limited purpose of responding to your dispute and notifying you of the results of our investigation.**

The Bank of New York Mellon FKA The Bank of New York as Trustee for the certificate holders Of CWMBS, Inc., CHL Mortgage Pass-Through Trust 2004-29, Mortgage Pass Through Certificates, Series 2004-29 (**"BONY"**).

Please be advised that Shellpoint's records indicate the loan was discharged through a Chapter 7 Bankruptcy. Shellpoint is not attempting to collect the debt, as your personal liability was discharged. However, **the mortgage lien survived the discharge** and Shellpoint is continuing to service the loan according to the original agreement and protect the creditor's rights in the associated property, which may include foreclosure.

Please be advised we have reviewed your additional correspondence and our records indicate that we have already responded to previous inquiries substantially the same as your most recent letters referenced above.  Shellpoint has previously responded to the same concerns with letters dated December 23, 2014, November 25, 2015, and December 7, 2015. The Consumer Financial Protection Bureau ("CFPB") was also copied on our response dated December 7, 2015, which included over one hundred pages of supporting documentation.

Shellpoint maintains that we have provided sufficient information and documentation to validate the debt, address your concerns related to the "servicing" of the loan, and show that we are the current servicer on behalf of BONY. Shellpoint has also provided a full accounting of the loan since origination. Please note that Shellpoint will not provide any information that is considered proprietary, such as our procedures. However, Shellpoint would like to assure you that we are servicing the loan in accordance with all applicable laws and regulations.

DE12292015B

Shellpoint acquires the rights to service a mortgage loan from an investor/owner of the loan through a document called an Assignment, Assumption and Recognition Agreement, which is a private corporate contract and not available to the public. We are not at liberty to release that document, since it contains significant contractual arrangements between us and our client. However, any information that is a matter of public record, such as the Pooling and Servicing Agreement or the Assignment, can be easily obtained through either the country recorder's office or by visiting www.sec.gov. Although the Assignment is not directly related to the servicing of a loan, Shellpoint has already provided you with this document.

As stated in previous responses, Shellpoint does not have knowledge of the loan closing or any other aspects of the loan unrelated to the *servicing*. As the servicer, Shellpoint is not required to respond to inquiries related to origination, underwriting, subsequent sale or securitization, or determination to sell, assign, or transfer the servicing of the mortgage loan. However, in our response to you dated November 25, 2015, Shellpoint asked that if you believe this loan is fraudulent, we will gladly assist BONY with an investigation by requiring the following documentation from you:

- Legible copies of your picture identification and social security card.
- Completed Identity Theft Affidavit regarding your allegations and any loan documents you believe might reflect your unauthorized signature. Please ensure that the Affidavit is notarized by a Notary Public, in order for it to be valid.
- Copy of the police report filed regarding this alleged fraud/identity theft. If you have not filed a police report but intend to, do not hesitate sending the remaining documents. A copy of the police report can be sent to us at a later date.
- Completed Denial of Financial Responsibility Declaration (enclosed).
- Copies of any additional documentation that you may have in connection with your allegation.

To date, Shellpoint has not received a response to the above request. Shellpoint has also not received any new or specific information regarding **servicing errors** on which we can form the basis for a new investigation. Therefore, Shellpoint has determined that your disputes are frivolous or irrelevant and we will not be conducting another investigation of the dispute. Should you have additional, relevant information, please provide it and we will gladly assist you.

As of the date of this letter, the loan is past due for the February 1, 2010 installment. **This debt is not paid in full or satisfied**. Shellpoint is committed to assisting borrowers in exploring their options for mortgage assistance to retain their homes. Should you wish to work with Shellpoint and discuss your options, please contact our Loss Mitigation department at 866-825-2174.

You have the right to request documentation supporting our determination that no error has occurred in the servicing of this loan. If you would like to request a copy of our previous responses, please call our Customer Service department at 866-316-4706.

If you have any additional questions or concerns regarding the servicing of the loan, you may call our Customer Service department at the number shown above.

Sincerely,

Customer Service
Shellpoint Mortgage Servicing

DE12292015B

P.O. BOX 1410
TROY, MI 48099-1410
RETURN SERVICE REQUESTED





Mon - Thurs: 8:00AM-10:00PM
Fri: 8:00AM-10:00PM
Sat: 8:00AM-3:00PM

**Phone Number: 866-316-4706**
**Fax: 866-467-1137**
www.shellpointmtg.com

S-SFRECS20  L-158  R-117
P54XYB00200049 - 673451887 I00098
ROBERT P MARLEY
18 LAKEVIEW DR
LYNNFIELD MA 01940-1450

12/09/2015

**RE:  Loan Number: 0535444565**
**Borrower:     Robert P Marley**

Dear Robert P Marley:

This letter is in response to your recent inquiry regarding the above-referenced loan serviced by Shellpoint Mortgage Servicing .

We are working to gather the requested information and will forward it to you within the allotted time frame.

If you have any additional questions or concerns, please contact our Customer Service department at 866-316-4706.

Si usted no entiende el contenido de esta carta, por favor contacte a uno de nuestros representantes que hablan español al número 866-316-4706.

**Customer Service**
**Shellpoint Mortgage Servicing**

**SEE REVERSE SIDE OR ATTACHED FOR AN IMPORTANT STATEMENT OF YOUR RIGHTS.**

P I000001  A-0535444565 001480101 I0400

P.O. BOX 1410
TROY, MI 48099-1410
RETURN SERVICE REQUESTED



**Shellpoint**
Mortgage Servicing

**Mon - Thurs:** 8:00AM-10:00PM
**Fri:** 8:00AM-10:00PM
**Sat:** 8:00AM-3:00PM

**Phone Number:** 866-316-4706
**Fax:** 866-467-1137
www.shellpointmtg.com

S-SFRECS20 L-158 R-117
P506WI00200044 - 673362734 l00088
ROBERT P MARLEY
18 LAKEVIEW DR
LYNNFIELD MA 01940-1450

10/29/2015

**RE: Loan Number: 0535444565**
**Borrower:    Robert P Marley**

Dear Robert P Marley:

This letter is in response to your recent inquiry regarding the above-referenced loan serviced by Shellpoint Mortgage Servicing .

We are working to gather the requested information and will forward it to you within the allotted time frame.

If you have any additional questions or concerns, please contact our Customer Service department at 866-316-4706.

Si usted no entiende el contenido de esta carta, por favor contacte a uno de nuestros representantes que hablan español al número 866-316-4706.

**Customer Service**
**Shellpoint Mortgage Servicing**

CCF11032015

**SEE REVERSE SIDE OR ATTACHED FOR AN IMPORTANT STATEMENT OF YOUR RIGHTS.**

Robert P. Marley
18 Lakeview Drive
Lynnfield, MA 01940
781-844-3044
robertmarley1958@verizon.net

Jack Navarro
Jerry Schianov
Bruce Williams
Saul Sanders
Lewis Ranieri
Scott Shay
Yale Stark

Shellpoint Mortgage Servicing
55 Beattie Place, Suite 110
Greenville, SC 29601
P: 866-316-4706
F: 866-467-1137

Shellpoint Partners
Two Grand Central Tower
140 E. 45th Street, 37th Floor
New York, NY 10017
P. 212-850-7700
F: 212-850-7770

SENT VIA FAX

DATED: DECEMBER 30, 2015

RE: **RESPONSE TO LETTER DATED DECEMBER 28, 2015**

Dear Above-Named Individuals:

Be it known, that I have put you on notice through your agents and employees, with evidence, that BOA had no authority to assign, sell, convey, set over in any legal form, the servicing rights to a loan that once existed but no longer does. There was no lawful assignment to BOA from a lawful assignor granting any rights or title nor was there a negotiation of the note and delivery thereof. Further, there was no written assignment of the mortgage to BOA from any entity as assignor. What I demanded was that you *demonstrate your assertions by way of authentic, verifiable documentation, which you have failed to do.*

Accordingly, your position now is that no money is due and you are not trying to collect on a debt, even though you have sent me dozens of bills trying to collect, but that there is a valid lien.

You are required by state and federal law to produce proof of ownership in the note and mortgage to me, by way of a verifiable chain of title in the note and mortgage. That means all written assignments, negotiations, and proof of delivery.

1

Today you say BONY has a lien, one day some other charlatan will claim they have a valid lien and so on. That's like a stranger approaching you on the street and telling you that you owe him/her $10,000.00. Are you going to pay that sum to that stranger? I think not. You and BONY are strangers to me. There is no contract that binds us.

By mere happenstance, you acquired this matter as one of the high risk loans pursuant to the MBIA settlement, however, this purported mortgage should not have been included whereas, the law mandated it be removed from the bogus pool of assets many years ago because of its purported delinquent status. Check the deal data sheets. For years, 360-days delinquent. However, if it is still in there, then that just proves my assertion that no money is due, the certificate holders can never suffer a loss because the undisclosed third party co-obligator to the debt must make all payments. See the advance clause. Therefore, the real note owners have never suffered a loss or more importantly, suffered injury. Therefore, that being one of the litmus tests for standing to sue, you're done. How could BONY sue as trustee; they have been paid, correct? The only party that might have suffered a loss would be the hustlers. So be it. There will be no free house for you.

One simple point for you to ponder: If CWMBS was the depositor, then why was there an assignment from MERS to BONY six and one half years after the trust funded, and after the cutoff date, and not one from CWMBS as required by law. Keeping in mind of course that CWMBS was not and is not a member of MERS. MERS could not have any attachment to the assets of that trust. MERS does not and did not represent CWMBS in any legal capacity nor is that a legal possibility. The only assignment that exists is a forgery however, it carries no force of law whereas, it came from one without authority as assignor to assign the note and mortgage. The assignment is void as a matter of law. Notwithstanding, there was no lawful assignment to Countrywide and/or BOA nor have you produced a chain of assignments as required by law, such as I have demanded. In other words, you have not produce a scintilla of verifiable evidence to demonstrate your claim. What you sent me is unauthenticated and self-serving. The real word I'm looking for is, Counterfeit. If you chose to communicate with me again, make sure you include a verifiable chain of title in the note and mortgage. From the first hustler to the last in the Ponzi scheme that is asset-backed securities.

Your false statement related to the lien surviving my bankruptcy is a fallacy at best. No lien survived because no entity perfected a lien prior to said bankruptcy. Moreover, the mortgage at issue is obsolete and unenforceable, and you are statutorily barred from bringing any action.

I am not going around in circles with you. Return the note to me stamped paid in full, and file the satisfaction of mortgage as required by law. That is what I demand. Furthermore, you have not addressed any of the issues I presented and obfuscation is the usual tactic and the word of the day.

If BOA had no rights, then you have no rights and BONY certainly has no rights in my property.

Therefore, I am finished with this charade. In addition, I demanded that a living person sign any communication from you to me. I will not be coming after your company; I will be coming after the individuals named above in their official and unofficial capacities and those that attempt to deceive me. Any communication from customer service shall be disregarded unless signed by an individual who has prepared the communication, is that understood.

2

If you attempt to unlawfully foreclose on my property based on some fictitious lien with the information and evidence, I provided previously, I will bring criminal charges against the above named individuals whereas, I have put them/you on notice of the fraud and forgeries. The attempt would be an attempt at larceny, *inter alia.*

Since you people collapsed my economy, I have been hell bent on putting the ilk in prison. Maybe it will be you.

The only thing frivolous here is your claimed charlatan status. You are not, a servicers of BONY where I am concerned, and you have no legal relationship with me. Any rights assigned to you came from an assignor without any authority to assign said rights. You have no more rights than BOA had and they had none. You are a stranger to my and the material false assignment recorded on July 13, 2011 is a cloud on my title and the ones responsible for that assignment have trespassed.

I will not deal with the peons at your institution. They are putting you in jeopardy. I seriously suggest that you instruct your agents and employees to read Reg. Z and X, RESPA, the CFPB servicers compliance manual along with Massachusetts General Laws, *inter alia.*

One of Countrywide's vice presidents shut down six offices in the Boston area for cutting and coping signatures on notes and mortgages. She was fired, however, became a whistle-blower and received over 8-million dollars for her troubles. The point is the note and mortgage you copied to me are not the documents that I signed in 2004. Moreover, the collateral loan file has been tampered with and the loan application has forged signatures on it which is [T]he foundation to this house of cards.

Lastly, you are in possession of a counterfeit mortgage and promissory note. You are in possession of forged allonge to that note. You also have in your possession, a material false assignment of mortgage recorded knowing it was false and misleading when recorded. I put you on notice in a previous letter and now again. Your failure to perform an adequate investigation related to the evidence, which I submitted to you, is a violation of law.

Good day to you all

*Robert P. Marley*
Robert P. Marley

Robert P. Marley
18 Lakeview Drive
Lynnfield, MA 01940
781-844-3044
robertmarley1958@verizon.net

Jack Navarro
Jerry Schianov
Bruce Williams
Saul Sanders
Lewis Ranieri
Scott Shay
Yale Stark

Shellpoint Mortgage Servicing
55 Beattie Place, Suite 110
Greenville, SC 29601
P: 866-316-4706
F: 866-467-1137

Shellpoint Partners
Two Grand Central Tower
140 E. 45th Street, 37th Floor
New York, NY 10017
P. 212-850-7700
F: 212-850-7770

Sent VIA Fax

Dated: January 1, 2016

RE:  **Follow up to Follow-up to my response dated December 30, 2015**

Dear Officials:

It is not my intent to educate your agents and employees however; it is my intent to put you on notice of your violations.

Your agents and employees are untrained; you do not have safe and sound banking procedures in place and I submit that you are intentionally attempting to harm me. The Comptroller has all the laws laid out for your people and explanations where the laws are concerned. An idiot-proof road map for Dummies as it were.  See a sample attached herewith. A wealth of knowledge is at their fingertips, should they choose to follow the law. Or not. Your choice.

I further submit, that you train and make your agents and employees familiar with the relevant regulations and state law governing mortgages and foreclosures and what is required to initiate a foreclosure in Massachusetts. I have set you on your way by including, in previous communication, the laws, and regulations in Massachusetts for your convenience; a helping hand, as it were.

Also, instruct your agents and employees to produce for me the documentation I have requested.

1

Furthermore, I want to make it perfectly clear that you accepted this purported loan after it was in default and that makes you essentially, mere debt collectors. Moreover, BONY purportedly accepted the transfer of this purported loan, after it was purportedly declared delinquent.


Thank you for your prompt attention to this time sensitive matter.


Robert P. Marley

2

Regulatory guidance consistently encourages lenders to work constructively with distressed RRE borrowers to the greatest extent possible within prudent banking practices to avoid unnecessary foreclosures. The bank should not, however, use workout strategies to defer identifiable losses. The lender, while working with a borrower, should always follow regulatory guidance for classification of, and loss recognition on, problem loans. Lenders also should follow appropriate income recognition or use of nonaccrual status, if appropriate, and accurate accounting of the loan's condition based on the circumstances consistent with call report instructions and GAAP. Working with distressed borrowers does not result in regulatory forbearance from long-standing and proven regulatory asset classification and loss recognition standards.

## Mortgage Loan Foreclosures

When a borrower defaults, the lender follows the specific requirements under state law to obtain its interest in the property and gain title through a foreclosure process. Each state has laws and regulations on perfecting a security interest in the collateral and for obtaining title to the property through the secured interest if a borrower defaults on a loan. Depending on the state, security interest perfection occurs through the recording of a security deed of trust or a mortgage in the appropriate jurisdiction, usually the county where the property is located. The foreclosure process (whether judicial or nonjudicial) takes place between the perfection and obtaining title. Once title has been obtained, the lender then works to sell the property to recoup the losses suffered from the borrower's default on the loan. In some states, if the lender's sale of the property does not sufficiently cover the bank's losses and associated expenses of collection, the bank may pursue a deficiency judgment against the borrower for the amount remaining. Borrowers have certain rights under state law, including a right of redemption in some states. (A right of redemption gives property owners who pay off the taxes or liens on their property the ability to prevent foreclosure, sometimes even after the auction or sale has occurred.)

During periods of financial stress, the banking and mortgage industry may suffer a high level of financial and reputational harm because many lenders, or their contracted servicers of loans, are unable to manage the large volume of defaulted RRE loans and fail to diligently follow state foreclosure requirements. The "Interagency Review of Foreclosure Policies and Practices," published by bank regulatory agencies in April 2011, identifies deficiencies in the administration of delinquent mortgage loans, loss mitigation practices, and foreclosure processing requirements, including

- inadequate oversight, controls, policies and procedures, and audits of mortgage collection functions.
- insufficient resources to ensure proper administration of loss mitigation and foreclosure processes.
- failure to properly oversee outside counsel and other third-party providers of foreclosure-related services.
- submission of affidavits that improperly asserted personal knowledge of facts contained within foreclosure case files.
- lack of or improper notarization of documents.

- failure to ensure proper endorsement of promissory notes or mortgage documents.

Because of such banking industry deficiencies, new laws and regulations were enacted at both the federal and state level to improve consumer safeguards. In addition, certain borrowers may be entitled to additional protections in the foreclosure process because they (1) are covered by the Servicemembers Civil Relief Act of 2003; (2) filed for bankruptcy shortly before the foreclosure action; or (3) qualified for or were paying in accordance with a trial modification.

New safeguards were adopted to prevent harm to borrowers that may result from inappropriate servicing practices. For instance, as of January 2014, under Regulation X, a servicer may not make the first notice or filing for any judicial or nonjudicial foreclosure process until the borrower is more than 120 days delinquent. If a borrower submits a complete loss mitigation application before the bank has begun the foreclosure process, the bank may not begin the foreclosure process until one of the following occurs:

- The bank sends the borrower a notice that the borrower is not eligible for any loss mitigation option, and the consumer has exhausted the appeal process.
- The borrower rejects all loss mitigation options the bank offers.
- The borrower fails to perform under an agreement on a loss mitigation option.[47]

In addition to any new legal obligations, the OCC specifically expects banks that service residential mortgages to act responsibly in their administration of delinquent mortgages and cases involving borrowers at imminent risk of foreclosure. Banks must comply with safe and sound banking practices; applicable federal, state, and local laws; third-party investor requirements; and the Home Affordable Modification Program requirements, if applicable, as well as other existing contractual and programmatic commitments.

Prudent business practices in servicing residential mortgage loans include ensuring, before proceeding to a foreclosure sale, that

- the loan is in default under terms of the note.
- any borrower complaints, appeals, or escalations have been considered and addressed.
- the borrower is not subject to specific legal protections such as those afforded under the Servicemembers Civil Relief Act and bankruptcy law.
- the bank has appropriate legal authority to foreclose.
- all appropriate notices have been provided to the borrower.
- appropriate outreach and other loss mitigation efforts have been made.
- the loan is not currently in an active loss mitigation program.
- the borrower is not currently qualified or being considered for a loss mitigation action.
- the bank is in compliance with all applicable federal, state, and local legal requirements, contractual requirements, and other legal and regulatory requirements.

---

[47] Refer to 12 CFR 1024.41.

Appendix E of the "Mortgage Banking" booklet of the *Comptroller's Handbook* contains the OCC's guidelines that establish minimum standards for the handling and prioritization of borrower files that are subject to an imminently scheduled (within 60 days) foreclosure sale.[48] These minimum review criteria are intended to ensure a level of consistency across servicers and should be used to determine whether a scheduled foreclosure sale should be postponed, suspended, or cancelled because of critical foreclosure defects in the borrower's file. The purpose of these guidelines is to ensure that borrowers do not lose their homes without their files first receiving pre-foreclosure sale reviews conducted according to the standards listed in the guidelines. These standards are applicable to all OCC-supervised banks. As part of examinations of RRE lending activities, examiners determine if these standards have been effectively implemented. Failure to effectively implement and adhere to standards such as those provided in the guidelines may be criticized in supervisory letters and ROEs.

For banks that service and collect loans held in their portfolios, the decision to foreclose on the property often comes after extensive negotiations with the borrower. While the bank is pursuing a foreclosure action, there are some additional measures to mitigate loss that may be pursued to avoid a protracted foreclosure period. These actions include pre-foreclosure or short sale, in which the lender agrees to accept the proceeds of the sale in satisfaction of the loan even though the proceeds may be less than the amount owed on the mortgage. Another potential option would be a deed in lieu of foreclosure, in which the borrower voluntarily conveys the property to the lender to avoid a lengthy process with additional accruals of interest and legal expenses and in many cases satisfying any remaining debt.[49] Some banks provide cash payments to encourage borrowers to agree to a deed in lieu of foreclosure, and banks have found that this can be more cost-effective than proceeding through foreclosure and also can limit the negative impact on neighboring home values. These loss mitigation efforts may be used in addition to other attempts to sell the property before foreclosure.[50]

The state laws governing foreclosure vary, and the services of an attorney specializing in foreclosure law may be necessary and, in some states, required. State laws govern the time period that a lender must wait before initiating foreclosure proceedings, govern whether there is a right to redemption, and prescribe a judicial proceeding necessary for a deficiency judgment. In some states, foreclosing requires a judicial proceeding, while in other states, no judicial proceeding is required.

For banks that service loans for third-party investors, banks must follow the investors' standards as well as applicable laws pertaining to collection, loss mitigation, and foreclosure

---

[48] Refer also to 12 CFR 1024.41 (loss mitigation procedures under Regulation X/RESPA). Small servicers are not subject to most of 12 CFR 1024.41 but are subject to the 120-day ban on foreclosures.

[49] Examiners should consider consulting with district accountants or Accounting Policy regarding applicability of FASB Accounting Standards Update No. 2014-04, "Reclassification of Residential Real Estate Collateralized Consumer Mortgage Loans Upon Foreclosure."

[50] Refer to the "Managing Foreclosed Properties" section in the "Other Real Estate Owned" booklet of the *Comptroller's Handbook.*

actions. If a mortgage loan is part of a government loan guaranty program, such as the VA's or the FHA's program, the servicer must follow additional regulations and guidelines in the collections process. (For more information, refer to the "Mortgage Banking" booklet of the *Comptroller's Handbook.*)

## Home Equity Lending Delinquent Loan Collections

The collection process for home equity loans and lines is operationally similar to that for mortgage loans. Depending on the size and nature of the bank's home equity lending activities, collections are handled by loan officers, a consumer loan collection staff, or specialists within a consumer loan collection staff. The primary distinctions between collections on mortgage loans and home equity loans and lines depend on the lien position of the bank. If the bank's home equity loan or line has a first-lien position, then collection activities closely resemble those for first-mortgage loans. If, however, the bank's home equity loan or line is subordinate or has a second-lien position, then collection activities have some additional areas of focus.

When a HELOC becomes delinquent, management should first act according to its predefined processes or standards to determine if the customer's access to the line should be, and legally can be, suspended. While many banks automatically terminate line access at a certain number of days past due (15, 30, 45, or 60), proactive managers of credit risk seek to terminate access sooner rather than later, such as through an evaluation of the customer's credit situation through a credit score or credit report. Proactive managers would also likely include some type of update of current collateral value. Based on evaluation of this information against the standards, management may act to terminate line access in compliance with Regulation Z requirements.

In the early stages of delinquency (less than 90 days), the loan officer or collections staff uses phone calls and letters to contact the borrower and attempt to obtain a loan payment and current financial information. Staff should also ascertain and document the borrower's willingness and ability to return the loan or line to a current status. Finally, the lender should obtain an updated estimate of the collateral's current value as well as the amount of the first lien and its repayment status. This information is used to determine the potential need to classify the loan or line, recognize any loss, discontinue income recognition, and decide the next steps in the collection process.

Under the interagency "Uniform Retail Credit Classification and Account Management Policy," the loans and lines are subject to classification when they become 90 days or more past due. The loans and lines are subject to loss recognition when identified or generally no later than when the loan becomes 180 days or more past due. Loss recognition involves charging the loan or line down to available value of the collateral less the cost to sell the property, if repossession of collateral is assured and in process. In cases when there is no available equity in the collateral, the bank's loss is 100 percent of the loan or line amount. Management may maintain the lien on the property to negotiate some amount of recovery in response to releasing the lien.

| | | | | |
|---|---|---|---|---|
| | 12 CFR 1026.41? | | | |
| | – Any Web site the financial institution maintains in connection with the servicing of the loan? and | | | |
| | – Any notice required pursuant to 12 CFR 1024.39 (early intervention) or 1024.41 (loss mitigation) that includes contact information for assistance? (12 CFR 1024, Supp. I., Comment 1024.36(c)-2) | | | |
| | • Does the financial institution designate the same address for receiving information requests pursuant to section 1024.35(c)? (12 CFR 1024.36(b)) | | | |
| | • If the financial institution established an electronic method for submitting information requests that is its exclusive online intake process, is the electronic process in addition to, and not in lieu of any process for receiving information requests by mail? (12 CFR 1024, Supp. I., Comment 1024.36(c)-4) | | | |
| 57. | If the institution has not established a specific address to which information requests should be sent, does the financial institution respond to information requests sent to any of its offices? (12 CFR 1024, Supp. I., Comment 1024.36(b)-1) | | | |
| **Acknowledgment of Information Requests** | | **Yes** | **No** | **NA** |
| 58. | Does the financial institution: | | | |
| | • Properly acknowledge the information request by providing written acknowledgment to the borrower within five days (excluding legal public holidays, Saturdays, and Sundays) after receiving the information request? (12 CFR 1024.36(c)) or | | | |
| | • Acknowledgment was not required because | | | |
| | – the financial institution provided the borrower with the information requested and contact information (including telephone number) for further assistance within five days (excluding legal public holidays, Saturdays, and Sundays)? (12 CFR 1024.36(e)) or | | | |
| | – the financial institution determined that it was not required to respond and provided written notice with the basis for its determination not to respond to the request to the borrower within five days (excluding legal public holidays, Saturdays, and Sundays) after making that determination? (12 CFR 1024.36(f)) | | | |
| **Response to Information Requests** | | **Yes** | **No** | **NA** |
| 59. | Does the financial institution properly respond to the information request by | | ✓ | ✓ |
| | • providing the requested information and contact information for further assistance? (12 CFR 1024.36(d)(1)(i)) | | ✓ | |
| | • conducting a reasonable search for the requested information and providing the borrower with a written notice advising the borrower that the financial institution has determined that the requested information is not available to it, the basis for the financial institution's determination, and contact information for further assistance? (12 CFR 1024.36(d)(1)(ii)) (note: information is not available to the financial institution if the information is not in the financial institution's control or possession or if it cannot be retrieved in the ordinary course of business through reasonable efforts such as, for example, if electronic back-up media is not normally accessible to the financial institution's personnel and would take an extraordinary effort to identify and restore. Information stored off-site but which personnel can access on request is available to the financial institution.) and | | ✓ | ✓ |
| | • undertaking one of the responses above within the following time frames? | | | ✓ |
| | – If the borrower requested the identity of or contact information for the owner or assignee of a mortgage loan, responding within 10 days (excluding legal public holidays, Saturdays, and Sundays); or | | ✓ | |
| | – For all other information requests, responding within 30 days (excluding | | | |

| | Yes | No | NA |
|---|---|---|---|
| legal public holidays, Saturdays, and Sundays) unless, before the expiration of that 30-day period, the financial institution extended the time for responding by an additional 15 days (excluding legal public holidays, Saturdays, and Sundays) by notifying the borrower in writing of the extension and the reasons for it. (12 CFR 1024.36(d)) | | | |
| **The responses in step 59 were not required because** | | | |
| • the financial institution provided the borrower with the information requested and contact information (including telephone number) for further assistance within five days (excluding legal public holidays, Saturdays, and Sundays)? (12 CFR 1024.36(e)); or | | ✓ | |
| • the financial institution determined that it was not required to respond and provided written notice with the basis for its determination not to respond to the request to the borrower within five days (excluding legal public holidays, Saturdays, and Sundays) after making that determination? (12 CFR 1024.36(f)(2)) | | | |
| **Information Requests Regarding the Identity or Contact Information of the Owner or Assignee of a Mortgage Loan** | Yes | No | NA |
| 60. If the information requested is the identity or contact information of the owner or assignee of a mortgage loan, does the financial institution comply by identifying the person on whose behalf the financial institution receives payments? (12 CFR 1024, Supp. I., Comment 1024.36(a)-2) For example, if the owner is a trust, the financial institution should identify the trust as the owner and provide the trustee's contact information. | | ✓ | |
| **Determination That No Response Was Required** | Yes | No | NA |
| 61. If the financial institution determined that it was exempt from the requirement to respond, did the financial institution reasonably determine that one of the following five exemptions applied? | | ✓ | |
| • The information requested is substantially the same as information the borrower previously requested for which the financial institution has already complied with the requirements for responding to written information requests (12 CFR 1024.36(f)(1)(i)); | | ✓ | |
| • The information requested is confidential, proprietary, or privileged (12 CFR 1024.36(f)(1)(ii)); | | ✓ | |
| • The information requested is not directly related to the borrower's mortgage loan account (12 CFR 1024.36(f)(1)(iii)); | | ✓ | |
| • The information request is overbroad or unduly burdensome. A request is overbroad if the financial institution requests that the financial institution provide an unreasonable volume of documents or information. A request is unduly burdensome if a diligent financial institution could not respond within the time periods set forth in 12 CFR 1024.46(d)(2) or would incur costs (or have to dedicate resources) that would be unreasonable in light of the circumstances (12 CFR 1024.36(f)(1)(iv)); or | | ✓ | |
| • The information request is sent more than one year after either the mortgage loan balance was discharged or the financial institution transferred the mortgage loan to another servicer. (12 CFR 1024.36(f)(1)(v)) A mortgage loan is discharged when both the debt and all corresponding liens have been extinguished or released, as applicable. | | ✓ | Not yet |
| **Determination That Information Request Was Overbroad** | Yes | No | NA |
| 62. If the financial institution determined that a submitted request was overbroad or unduly burdensome, could the financial institution reasonably have identified a valid information request in the submission and did the institution do so? (12 CFR 1024.36(f)(1)(iv)) | | ✓ | |
| **Impermissible Fees and Conditions** | Yes | No | NA |
| 63. Does the financial institution refrain from charging a fee, or requiring a borrower to make any payment that was owed on the borrower's account, as a condition of | | | |

| | Yes | No | NA |
|---|---|---|---|
| 77. If the financial institution mailed any of the written initial, reminder, or renewal notices (12 CFR 1024.37(c)(1)(i), (c)(1)(ii), or (e)(1)), does the servicer use a class of mail not less than first-class mail? (12 CFR 1024.27(f)) | | | |
| 78. If the financial institution received evidence that the borrower had required hazard insurance coverage in place, did the financial institution do the following within 15 days: | | | ` |
| • Cancel the force-placed insurance; | | · | |
| • Refund force-placed insurance premiums charges and fees for the period of overlapping coverage; and | | | |
| • Remove all force-placed charges and fees from the borrower's account for the period of overlapping coverage? (12 CFR 1024.37(g)) | | | |
| 79. Are all fees or charges assessed on the borrower related to force-placed insurance bona fide and reasonable (except charges subject to State regulation and charges authorized by the *Flood Disaster Protection Act of 1973*)? A "bona fide and reasonable charge" is one that is reasonably related to the institution's cost of providing the service and is not otherwise prohibited by law. (12 CFR 1024.37(h)) | | | |
| **General Servicing Policies, Procedures, and Requirements (12 CFR 1024.38)** Applicability: The general servicing policies, procedures, and requirements apply to all mortgage loans, as that term is defined in 12 CFR 1024.31, except that the requirements do not apply to (i) small servicers, as that term is defined in 12 CFR 1026.41(e);[1] (ii) reverse mortgage transactions, as that term is defined in 12 CFR 1026.33(a); and (iii) qualified lenders, as defined under the *Farm Credit Act of 1971* and accompanying regulations. | | | |
| **Policies and Procedures–Accessing and Providing Timely and Accurate Information** | **Yes** | **No** | **NA** |
| 80. Does the financial institution have policies and procedures that are reasonably designed to ensure that it has access to and provides timely and accurate information? (12 CFR 1024.38(a) & (b)(1)) This includes policies and procedures that are reasonably designed to ensure the following: | | | |
| • Providing accurate and timely disclosures to the borrower; | | ✓ | |
| • Investigating, responding to, and making corrections in response to borrowers' complaints, including promptly obtaining information from service providers to investigate and if applicable correct errors resulting from actions of service providers; | | ✓ | |
| • Providing borrowers with accurate and timely information and documents in response to borrower requests for information with respect to the borrower's mortgage loan; | | ✓ | |
| • Providing owners and assignees of mortgage loans with accurate and current information and documents about all the mortgage loans they own, including information about the financial institution's evaluations of borrowers for loss mitigation options and loss mitigation agreements with borrowers; | | | ✓ |
| • Submitting accurate and current information and documents that comply | | ✓ | |

[1] An institution generally qualifies as a small servicer if it services, together with any affiliates, 5,000 or fewer mortgage loans, as that term is used in 12 CFR 1026.41(a)(1), for all of which the institution (or an affiliate) is the creditor or assignee. The following mortgage loans are not considered in determining whether a servicer qualifies as a small servicer: (a) mortgage loans voluntarily serviced by the servicer for a creditor or assignee that is not an affiliate of the servicer and for which the servicer does not receive any compensation or fees; (b) reverse mortgage transactions; and (c) mortgage loans secured by consumers' interests in timeshare plans (12 CFR 1026.41(e)(4)(iii)).

| | | | |
|---|---|---|---|
| with applicable law during the foreclosure process; and | | | |
| • Upon learning of a borrower's death, promptly communicating with the borrower's successor in interest concerning the secured property. | | | |
| **Policies and Procedures—Proper Evaluation of Loss Mitigation Applications** | Yes | No | NA |
| 81. Does the financial institution have policies and procedures that are reasonably designed to ensure that its personnel properly evaluate loss mitigation applications? (12 CFR 1024.38(a) & (b)(2)) This includes policies and procedures that are reasonably designed to ensure the following: | | | |
| • Providing accurate information regarding available loss mitigation options from the owner or assignee of the borrower's loan; . | | | |
| • Identifying with specificity all loss mitigation options for which a borrower may be eligible, including identifying, with respect to each owner or assignee, all of the loss mitigation options the financial institution may consider when evaluating a borrower, as well as the criteria the financial institution should apply for each option; | | | |
| • Providing the loss mitigation personnel assigned to the borrower's mortgage loan pursuant to 12 CFR 1026.40 with prompt access to all of the documents and information that the borrower submitted in connection with a loss mitigation option; | | | |
| • Identifying the documents and information a borrower must submit to complete a loss mitigation application; and | | | |
| • In response to a complete loss mitigation application, properly evaluating the borrower for all eligible loss mitigation options pursuant to any requirements established by the owner or assignee of the mortgage loan, even if those requirements are otherwise beyond the requirements of 12 CFR 1024.41. | | | |
| **Policies and Procedures—Oversight of Servicer Providers** | Yes | No | NA |
| 82. Does the financial institution have policies and procedures that are reasonably designed to facilitate oversight of and compliance by, service providers? (12 CFR 1024.38(a) & (b)(3)) This includes policies and procedures that are reasonably designed to ensure the following: | | ✓ | |
| • Providing appropriate personnel with access to accurate and current documents and information concerning the service providers' actions; | | ✓ | |
| • Facilitating periodic reviews of service providers; and | | | |
| • Facilitating the sharing of accurate and current information regarding the status of a borrower's loss mitigation application and any foreclosure proceeding among appropriate financial institution personnel, including the loss mitigation personnel assigned to the borrower's mortgage loan, and appropriate service provider personnel, including service provider personnel responsible for handling foreclosure proceedings. | | ✓ | |
| **Policies and Procedures—Transfer of Information** | Yes | No | NA |
| 83. Does the financial institution have policies and procedures that are reasonably designed to facilitate the transfer of information during servicing transfers? (12 CFR 1024.38(a) & (b)(4)) This includes policies and procedures that are reasonably designed to ensure the following: | | | |
| • For a transferor servicer, the timely and accurate transfer of all information and documents in its possession and control related to a transferred mortgage loan to the transferee servicer in a manner that ensures its accuracy and that allows the transferee to comply with the terms of the mortgage loan and applicable law, including any information about the status of any loss mitigation agreements or discussions with the borrower and any analysis performed with respect to potential recovery from non-performing mortgage loans; and | | ✓ | ✓ |
| • For a transferee servicer, identifying necessary documents or information that may not have been transferred, obtaining such missing documentation | | ✓ | ✓ |

| | Yes | No | NA |
|---|---|---|---|
| or information from the transferor servicer (for documents and information *related to loss mitigation, the transferee's policies and procedures must* address obtaining missing documents from the transferor servicer before attempting to obtain such documents from the borrower). | | | |
| **Policies and Procedures—Notifying Borrowers of Error Notice and Information Request Procedures** | **Yes** | **No** | **NA** |
| 84. Does the financial institution have policies and procedures that are reasonably designed to inform borrowers of procedures for submitting written error notices and written information requests? (12 CFR 1024.38(a) and (b)(5)) This includes policies and procedures reasonably designed to ensure that the financial institution informs borrowers who are dissatisfied with the financial institution's response to complaints or information requests submitted orally of the procedures for submitting written error notices under 12 CFR 1024.35 and written information requests under 12 CFR 1024.36. | | ✓ | ✓ |
| **Records Maintenance—Accurate Records** | **Yes** | **No** | **NA** |
| 85. Does the financial institution retain accurate records that document actions with respect to the mortgage loan account (which includes any mortgage loan that has been transferred or paid in full)? The financial institution must retain these records *until* one year after the loan is discharged or the financial institution transfers servicing for the mortgage loan to a transferee servicer. (12 CFR 1024.38(c)(1)) | | ✓ | ✓ |
| **Records Maintenance—Facilitating Aggregation of Information** | **Yes** | **No** | **NA** |
| 86. For documents or information created on or after January 10, 2014, does the financial institution maintain the following five items for each mortgage loan file in a manner that allows the financial institution to aggregate these items into a servicing file within five days? | | | |
| • A schedule of all credits and debits to the account (including escrow accounts and suspense accounts); | | | |
| • A copy of the security instrument that establishes the lien securing the mortgage loan; | | ✓ | ✓ |
| • Any notes created by financial institution personnel reflecting communications with the borrower concerning the account; | | | |
| • A report of the data fields relating to the borrower's account created by the institution's electronic systems (if applicable); and | | | |
| • Copies of any information or documents provided by the borrower to the financial institution in connection with written error notices or loss mitigation. (12 CFR 1024.38(c)(2)) | | ✓ | |
| **Early Intervention Requirements for Certain Borrowers (12 CFR 1024.39)** **Applicability:** The early intervention requirements apply to only those mortgage loans, as that term is defined in 12 CFR 1024.31, that are secured by the borrower's principal residence (12 CFR 1024.30(c)(2)). The requirements do not apply to (i) small servicers, as that term is defined in 12 CFR 1026.41(e),[2] (ii) reverse mortgage transactions, as that term is defined in 12 CFR 1026.33(a), and (iii) qualified lenders, as defined under the Farm Credit Act of 1971 and accompanying regulations (12 CFR 1024.30(b)). Additionally, financial institutions are not required to comply with the live contact and written notice requirements if doing so would violate applicable | **Yes** | **No** | **NA** |

[2] An institution generally qualifies as a small servicer if it either (a) services, together with any affiliates, 5,000 or fewer mortgage loans, for all of which the institution (or an affiliate) is the creditor or assignee. (12 CFR 1026.41(e)(4)(ii)). The following mortgage loans are not considered in determining whether a servicer qualifies as a small servicer: (a) mortgage loans voluntarily serviced by the servicer for a creditor or assignee that is not an affiliate of the servicer and for which the servicer does not receive any compensation or fees; (b) reverse mortgage transactions; and (c) mortgage loans secured by consumers' interests in timeshare plans (12 CFR 1026.41(e)(4)(iii)).

| | Yes | No | NA |
|---|---|---|---|
| law. (12 CFR 1024.39(c)) Finally, financial institutions are exempted from the early intervention requirements (i) as to borrowers who are in bankruptcy,[3] and (ii) if the financial institution is subject to the FDCPA and the borrower has sent an FDCPA "cease communication" notification with respect to the mortgage loan. (12 CFR 1024.39(d))<br><br>Complete the following for any delinquent borrowers (which, for purposes of section 1024.39, do not include borrowers performing as agreed under a loss mitigation agreement). | | | |
| **Live Contact** | **Yes** | **No** | **NA** |
| 87. Does the financial institution make good faith efforts to establish live contact with the borrower within 36 days after each time the borrower became delinquent? (12 CFR 1024.39(a)) A delinquency begins each time a borrower fails to make a payment sufficient to cover principal, interest, and (if applicable) escrow for a given billing cycle. | | | |
| 88. After the financial institution establishes live contact, does the financial institution promptly inform the borrower of loss mitigation options, if appropriate (as determined based on the financial institution's reasonable discretion)? (12 CFR 1024.39(a)) | | | |
| **Written Notice** | **Yes** | **No** | **NA** |
| 89. Does the financial institution send a written notice to the borrower within 45 days after the borrower becomes delinquent? (12 CFR 1024.39(b)(1)) The financial institution does not need to send the notice to a borrower more than once in a 180-day period. | | | |
| 90. Does the notice include the following items? (12 CFR 1024.39(b)(2)) (Sample language for the notice is contained in appendix MS-4(A), MS-4(B), and MS-4(C) to 12 CFR 1024.) | | | |
| • A statement encouraging the borrower to contact the financial institution; | | | |
| • The telephone number to access assigned loss mitigation personnel; | | | |
| • A brief description of examples of loss mitigation options that may be available to the borrower (if applicable); | | | |
| • Loss mitigation application instructions or instructions as to how to obtain more information about loss mitigation options (such as by contacting the financial institution), if applicable; and | | | |
| • Either the CFPB's or HUD's Web site to access homeownership counselors or counseling organizations lists and HUD's toll-free number to access homeownership counselors or counseling organizations. | | | |
| **Continuity of Contact (12 CFR 1024.40)** | **Yes** | **No** | **NA** |
| **Applicability:** The continuity of contact requirements apply to only those mortgage | | | |

---

[3] With respect to any portion of the mortgage debt that is not discharged through bankruptcy, a servicer must resume compliance with the early intervention requirement after the first delinquency that follows the earliest of the following: (i) the borrower's bankruptcy case is dismissed; (ii) the borrower's bankruptcy case is closed; or (iii) the borrower receives a general discharge of debts under the Bankruptcy Code (11 USC 101 et seq.). A servicer is not required, however, to communicate with a borrower in any way that would violate applicable bankruptcy law or a court order in a bankruptcy case, and a servicer may adapt the early intervention requirement in any manner believed necessary. A servicer also is not required to comply with the early intervention requirement for any portion of the mortgage debt that was discharged under the Bankruptcy Code or if a bankruptcy case is revived (12 CFR 1024.39(d)). The bankruptcy exception applies if two or more borrowers are joint obligors with primary liability on a mortgage loan and any one of the borrowers is in bankruptcy. For example, if a husband and wife jointly own a home and the husband files for bankruptcy, the servicer is exempt from the early intervention requirements as to both the husband and wife (12 CFR 1024, Supp. I., Comment 1024.39(d)(1)-3)).

| | | | |
|---|---|---|---|
| loans, as that term is defined in 12 CFR 1024.31, that are secured by the borrower's principal residence. (12 CFR 1024.30(c)(2)) The requirements do not apply to (i) small servicers, as that term is defined in 12 CFR 1026.41(e),[4] (ii) reverse mortgage transactions, as that term is defined in 12 CFR 1026.33(a), and (iii) qualified lenders, as defined under the Farm Credit Act of 1971 and accompanying regulations. (12 CFR 1024.30(b)) | | | |
| 91. Does the financial institution have policies and procedures reasonably designed to assign personnel to a delinquent borrower by the time the written early intervention notice was provided, and in any event, within 45 days after the borrower became delinquent? (12 CFR 1024.40(a)) | | | |
| 92. Does the financial institution have policies and procedures reasonably designed to ensure that the assigned personnel are available, via telephone, to answer the borrower's questions and (as applicable) assist the borrower with available loss mitigation options until the borrower has made, without incurring a late charge, two consecutive mortgage payments in accordance with the terms of a permanent loss mitigation agreement? (12 CFR 1024.40(a)(2)) | | | |
| 93. Does the financial institution have policies and procedures reasonably designed to ensure that, if a borrower contacts the assigned personnel and does not immediately receive a live response, the institution can provide a live response in a timely manner? (12 CFR 1024.40(a)(3)) | | | |
| 94. Does the financial institution maintain policies and procedures reasonably designed to ensure that the assigned personnel can perform, among others, the following tasks: | | | |
| • Provide the borrower with accurate information about available loss mitigation options, including the steps the borrower must take to be evaluated for such options, including how to complete a loss mitigation application or appeal a denial of a loan modification option (if applicable); | | | |
| • Provide the borrower with accurate information about the status of any loss mitigation application submitted; | | | |
| • Provide the borrower with accurate information about the circumstances under which the financial institution may refer the account to foreclosure; | | | |
| • Provide the borrower with accurate information about applicable loss mitigation deadlines; | | | |
| • Timely retrieve a complete record of the borrower's payment history and all written information the borrower has provided to the financial institution (or the financial institution's predecessors) in connection with a loss mitigation application, and provide these documents to other persons required to evaluate the borrower for available loss mitigation options; and | | | |
| • Provide the borrower with information about submitting a written error notice or written request for information? (12 CFR 1024.40(b)) | | | |
| **Loss Mitigation Procedures (12 CFR 1024.41)** | | | |
| **Applicability:** The loss mitigation procedure requirements apply to only those mortgage loans, as that term is defined in 12 CFR 1024.31, that are secured by the borrower's principal residence. (12 CFR 1024.30(c)(2)) Except for the requirements | | | |

---

[4] An institution generally qualifies as a small servicer if it services, together with any affiliates, 5,000 or fewer mortgage loans, for all of which the institution (or an affiliate) is the creditor or assignee. (12 CFR 1026.41(e)(4)(ii)). The following mortgage loans are not considered in determining whether a servicer qualifies as a small servicer: (a) mortgage loans voluntarily serviced by the servicer for a creditor or assignee that is not an affiliate of the servicer and for which the servicer does not receive any compensation or fees; (b) reverse mortgage transactions; and (c) mortgage loans secured by consumers' interests in timeshare plans (12 CFR 1026.41(e)(4)(iii)).

of 1024.41(j), the loss mitigation procedure requirements do not apply to (i) small servicers, as that term is defined in 12 CFR 1026.41(e),[5] (ii) reverse mortgage transactions, as that term is defined in 12 CFR 1026.33(a), and (iii) qualified lenders, as defined under the Farm Credit Act and accompanying regulations. (12 CFR 1024.30(b))

**Calculating time periods:** 12 CFR 1024.41 provides borrowers certain protections depending on whether the financial institution receives a complete loss mitigation application at least a specified number of days before a foreclosure sale. See, e.g., 12 CFR 1024.41(c)(1) (37 days); 12 CFR 1024.41(e) & (h) (90 days). These time periods are calculated as of the date the servicer receives a complete loss mitigation application. Thus, scheduling or rescheduling a foreclosure sale after the servicer receives the complete loss mitigation application does not affect the borrower's protections (12 CFR 1024, Supp. I., Comment 1024.41(b)(3)-2). If no foreclosure sale is scheduled as of the date the servicer receives a complete loss mitigation application, the application is considered received more than 90 days before a foreclosure sale. (12 CFR 1024, Supp. I., Comment 1024.41(b)(3)-1)

**Definition of first notice or filing:** 12 CFR 1024.41 includes certain prohibitions on making the first notice or filing for a judicial or non-judicial foreclosure, and provides borrowers certain protections depending on whether such a notice or filing has been made. Whether a particular document qualifies as the first notice or filing depends on the foreclosure process under the applicable state law at issue:

- **Judicial foreclosure.** When foreclosure procedure requires a court action or proceeding, the first notice or filing is the earliest document required to be filed with a court or other judicial body to commence the action or proceeding. Depending on the particular foreclosure process, examples of these documents could be a complaint, petition, order to docket, or notice of hearing;
- **Non-judicial foreclosure—recording or publication requirement.** When foreclosure procedure does not require an action or court proceeding (such as under a power of sale), the first notice or filing is the earliest document required to be recorded or published to initiate the foreclosure process; or
- **Non-judicial foreclosure—no recording or publication requirement.** When foreclosure procedure does not require an action or court proceeding and also does not require any document to be recorded or published, the first notice or filing is the earliest document that establishes, sets, or schedules a date for the foreclosure sale.

Note: A document provided to the borrower but not initially required to be filed, recorded, or published is not considered the first notice or filing on the sole basis that the documents must later be included as an attachment accompanying another document that is required to be filed, recorded, or published to carry out a foreclosure. (12 CFR 1024, Supp. I., Comment 1024.41(f)-1)

| | Yes | No | NA |
|---|---|---|---|
| **Applications Received at Least 45 Days Before a Foreclosure Sale (Review for Completeness)**<br>Complete the following for any loss mitigation application that the financial institution received at least 45 days before a foreclosure sale: | | | |

---

[5] An institution qualifies as a small servicer if it either (a) services, together with any affiliates, 5,000 or fewer mortgage loans, for all of which the institution (or an affiliate) is the creditor or assignee, or (b) is a Housing Finance Agency, as defined in 24 CFR 266.5 (12 CFR 1026.41(e)(4)(ii)). The following mortgage loans are not considered in determining whether a servicer qualifies as a small servicer: (a) mortgage loans voluntarily serviced by the servicer for a creditor or assignee that is not an affiliate of the servicer and for which the servicer does not receive any compensation or fees; (b) reverse mortgage transactions; and (c) mortgage loans secured by consumers' interests in timeshare plans (12 CFR 1026.41(e)(4)(iii)).

| | Yes | No | NA |
|---|---|---|---|
| 95. Does the financial institution promptly determine whether the application was complete? (12 CFR 1024.41(b)(1)) A loss mitigation application is viewed expansively and includes oral inquiries by the borrower when the borrower also provides information the financial institution would use to evaluate loss mitigation applications, or when a borrower requests that the financial institution determines whether the borrower is "prequalified" for a loss mitigation application by evaluating the borrower against preliminary criteria. (12 CFR 1024, Supp. I., Comment 1024.41(b)(1)-2) A financial institution is required to comply with the loss mitigation procedures for only a single complete loss mitigation application for a borrower's mortgage loan account. (12 CFR 1024.41(i)) | | | |
| **Complete Applications–Written Acknowledgment**<br>Complete the following if the application was complete. | Yes | No | NA |
| 96. Does the financial institution provide written acknowledgment to the borrower within five days (excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application? The acknowledgment must state that the application was complete and include a statement that the borrower should consider contacting servicers of any other mortgage loans secured by the same property to discuss available loss mitigation options. (12 CFR 1024.41(b)(2)(1)(B)) | | | |
| **Facially Complete Applications–Additional Information or Corrected Documents Required**<br>Complete the following if the application was facially complete and the financial institution later discovered that additional information or corrections to a previously submitted document were required to complete the application. A loss mitigation application is facially complete if either (i) the financial institution's initial notice under section 1024.41(b) advised the borrower that the application was complete, or (ii) the financial institution's initial notice under section 1024.41(b) requested additional information from the borrower to complete the application and the borrower submitted such additional information. | Yes | No | NA |
| 97. Does the financial institution, on discovering that additional information or corrected documents were required to complete the application, (i) promptly request the missing information or corrected documents, and (ii) give the borrower a reasonable opportunity to complete the application? (12 CFR 1024.41(c)(2)(iv)) A reasonable opportunity depends on the particular facts and circumstances, but must provide the borrower sufficient time to gather the necessary information and documents. (12 CFR 1024, Supp. I., Comment 1024.41(c)(2)(iv)-1) | | | |
| 98. Does the financial institution treat the borrower's application as complete for purposes of 12 CFR 1024.41(f)(2) ("Application received before foreclosure referral") and 12 CFR 1024(g) ("Prohibition on foreclosure sale") until the borrower is given a reasonable opportunity to submit additional information or corrected documents? (12 CFR 1024.41(c)(2)(iv)) | | | |
| **Incomplete Applications—Written Acknowledgment, Reasonable Diligence, and Short-Term Forbearance**<br>Complete the following if the application was incomplete: | Yes | No | NA |
| 99. Does the financial institution provide written acknowledgment to the borrower within five days (excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application? The acknowledgment must (1) state that the application was incomplete, (2) identify the additional information needed to complete the application, (3) identify a reasonable date by which the borrower must submit the additional information, and (4) include a statement that the borrower should consider contacting servicers of any other mortgage loans secured by the same property to discuss available loss mitigation options. (12 CFR 1024.41(b)(2)) Except when doing so would be impracticable (such as requesting a borrower to submit documentation in less than seven days), a reasonable deadline is generally one of the following that maximizes the borrower's loss mitigation protections: (a) the date by which any document or information submitted by the borrower becomes stale or invalid, (b) the 120th | | | |

| | | | |
|---|---|---|---|
| day of the borrower's delinquency, (c) 90 days before a foreclosure sale; or (d) 38 days before a foreclosure sale. (12 CFR 1024, Supp. I., Comment 1024.41(b)(2)(ii)-1) | | | |
| 100. Does the financial institution exercise reasonable diligence in obtaining documents and information to complete the application? (12 CFR 1024.41(b)(1)) Examples of reasonable diligence include: (a) when the financial institution requires additional information from the borrower (such as an address or telephone number to verify employment), promptly contacting the borrower to obtain the information; and (b) when the borrower's loan is transferred to the financial institution from another servicer, reviewing documents the financial institution received from the prior servicer to determine if the required information is contained in those documents. Additionally, if the financial institution offered the borrower a short-term forbearance plan based on information contained in an incomplete loss mitigation application, reasonable diligence would involve notifying the borrower that the borrower is being offered a payment forbearance program based on an evaluation of an incomplete loss mitigation application, and that the borrower has the option of completing the application to receive a full evaluation for all loss mitigation options available to the borrower. (12 CFR 1024, Supp. I., Comment 1024.41(b)(1)-4.iii) | | | |
| 101. If the financial institution offered the borrower a short-term forbearance plan based on information contained in an incomplete loss mitigation application, did the financial institution either (a) make the first notice or filing for any judicial or non-judicial foreclosure process, (b) move for foreclosure judgment or an order of sale, or (c) conduct a foreclosure sale while the borrower was performing under such plan? (12 CFR 1024.41(c)(2)(iii)) A short-term forbearance program allows a borrower to forgo making certain payments or portions of payments due over a period of no more than six months. (12 CFR 1024, Supp. I., Comment 41(c)(2)(iii)-1) | | | |
| **Complete Applications Received More Than 37 Days Before a Foreclosure Sale (Evaluation of Application)** Complete the following for any complete loss mitigation application that the institution received more than 37 days before a foreclosure sale. | **Yes** | **No** | **NA** |
| 102. Does the financial institution, within 30 days, (i) evaluate the borrower for all available loss mitigation options, and (ii) provide the borrower with a notice stating (a) which loss mitigation options (if any) the financial institution would offer the borrower, (b) the amount of time the borrower has to accept or reject an offered loss mitigation option pursuant to 12 CFR 1024.41(e), and (c) if applicable, that the borrower has the right to appeal a denial of a loan modification option and the time period for making any appeal pursuant to 12 CFR 1024.41(h)? (12 CFR 1024.41(c)) | | | |
| 103. If the financial institution denied the application, does the notice also state the specific reason or reasons for denying each such option, and, if applicable, that the borrower was not evaluated on other criteria? (12 CFR 1024.41(d)) | | | |
| **Denial of Loan Modification Option Based on Investor Criteria; Use of a Waterfall** Complete the following if the financial institution denied an application for a loan modification option due to a failure to meet investor guidelines. | **Yes** | **No** | **NA** |
| 104. Does the financial institution identify in its notice to the borrower (i) the owner or assignee of the mortgage loan, and (ii) the specific criteria the borrower failed to meet? (12 CFR 1024.41(d), 12 CFR 1024, Supp. I., Comment 41(d)-1) Note: If the borrower's application was evaluated under an investor's waterfall and the borrower qualified for a particular option, it is sufficient for the financial institution to inform the borrower that the investor's requirements include a ranking of options and that an offer of a loan modification option necessarily results in a denial of any other options ranked below the option for which the borrower is eligible. (12 CFR 1024, Supp. I., Comment 41(d)-1) | | | |
| **Denial Based on Net Present Value Calculation** Complete the following if the financial institution denied the application due to a net | **Yes** | **No** | **NA** |

| | | | |
|---|---|---|---|
| present value calculation. | | | |
| 105. Does the financial institution disclose the inputs used in that calculation? (12 CFR 1024, Supp. I., Comment 41(d)-2) | | | |
| **Denial Using Hierarchy of Eligibility Criteria** Complete the following if the financial institution established a hierarchy of eligibility criteria and, after reaching the first criterion that causes a denial, did not evaluate whether the borrower would have satisfied the remaining criteria. | **Yes** | **No** | **NA** |
| 106. Does the financial institution identify in the notice: (i) the specific reason or reasons why the borrower was actually rejected, and (ii) that the borrower was not evaluated on other criteria? A financial institution is not required to determine or disclose whether a borrower would have been denied based on other criteria if the servicer did not actually evaluate these additional criteria. (12 CFR 1024, Supp. I., Comment 41(d)-4) | | | |
| **Time for Acceptance of an Offered Loss Mitigation Option** Complete the following if the financial institution offered the borrower a loss mitigation option. | | | |
| **Complete Applications Received at Least 90 Days Before a Foreclosure Sale** Complete the following if the financial institution offered a loss mitigation option and had received the complete application at least 90 days before a foreclosure sale. | **Yes** | **No** | **NA** |
| 107. Does the financial institution provide the borrower with at least 14 days to accept or reject any offered loan modification option after the servicer provides notice of the offer to the borrower? (12 CFR 1024.41(e)) This acceptance period can be extended if, within 14 days, the borrower makes an appeal of a denial of any loan modification option. (12 CFR 1024.41(e)(2)(iii)) In the event of an appeal, the borrower's time for acceptance is extended to 14 days after the institution provides a notice of its determination of the appeal under 12 CFR 1024.41(e)(iii). | | | |
| **Complete Applications Received Between 37 and 90 days Before a Foreclosure Sale** Complete the following if the financial institution offered a loss mitigation option and had received the complete application fewer than 90 days before a foreclosure sale but more than 37 days before the sale. | **Yes** | **No** | **NA** |
| 108. Does the financial institution provide the borrower with at least seven days to accept or reject any offered loss mitigation options after the servicer provides notice of the offer to the borrower? (12 CFR 1024.41(e)(1)) | | | |
| **No Borrower Response to Offered Trial Loan Modification Plan** Complete the following if the financial institution offered a borrower a trial loan modification plan and the borrower did not respond within seven or 14 days (as applicable under 12 CFR 1024.41(e)(1)). | **Yes** | **No** | **NA** |
| 109. If the borrower submits payments in accordance with the offered plan, does the financial institution give the borrower a reasonable period of time to fulfill any remaining requirements to accept the plan? (12 CFR 1024.41(e)(2)(ii)) | | | |
| **Prohibitions on Commencing Foreclosure Proceedings and Dual Tracking** Complete the following for any borrower. | **Yes** | **No** | **NA** |
| 110. Does the financial institution refrain from making any first judicial or non-judicial foreclosure notices or filings without meeting one of the following conditions: (i) the borrower was more than 120 days delinquent; (ii) the foreclosure is based on a borrower's violation of a due-on-sale clause; or (iii) the financial institution is joining the foreclosure action of a subordinate lienholder? (12 CFR 1024.41(f)(1)) (Note that this requirement as applicable to small servicers is addressed below steps 116-17) | | | |
| **Complete Applications Received During the Pre-Foreclosure Period** Complete the following if the financial institution received a complete loss mitigation application either within the first 120 days of delinquency or before the institution made the first judicial or non-judicial foreclosure notice or filing. Note that the following does not apply if the foreclosure is based on a borrower's violation of a due- | **Yes** | **No** | **NA** |

| | | | |
|---|---|---|---|
| on-sale clause, or if the financial institution is joining the foreclosure action of a subordinate lienholder. | | | |
| 111. Does the financial institution make the first foreclosure notice or filing only after one of the following occurs: (i) the institution notified the borrower that the borrower is ineligible for any loss mitigation option and if an appeal is available, either the appeal period expired or the appeal had been denied; (ii) the borrower rejected all the offered loss mitigation options; or (iii) the borrower failed to perform under a loss mitigation agreement? (12 CFR 1024.41(f)(2)) | | | |
| **Complete Applications Received More Than 37 Days Before a Foreclosure Sale** Complete the following if the financial institution received a complete loss mitigation application after the financial institution initiated foreclosure but more than 37 days before a foreclosure sale. | Yes | No | NA |
| 112. Does the financial institution refrain from conducting a foreclosure sale or moving for foreclosure judgment or sale until one of the following occurs: (i) the financial institution notified the borrower that it had denied the loss mitigation application for any loss mitigation option and if an appeal is available, either the appeal period had expired or the appeal had been denied; (ii) the borrower rejected all of the offered loss mitigation options; or (iii) the borrower fails to perform under a loss mitigation agreement? (12 CFR 1024.41(g)) | | | |
| **Appeal Process** Complete the following if (a) the financial institution denied a complete loss mitigation application for any trial or permanent loan modification option, and (b) the financial institution received that complete application (i) before the borrower was more than 120 days delinquent, (ii) before the financial institution made the first judicial or non-judicial foreclosure notice or filing, or (iii) at least 90 days before a foreclosure sale. | Yes | No | NA |
| 113. For any borrower who timely appeals a denial of an available loan modification option, does the financial institution provide a notice to the borrower within 30 days stating (i) whether it will offer the borrower a loss mitigation option based on the appeal, and (ii) if applicable, how long the borrower has to accept or reject this loss mitigation option or a previously offered loss mitigation option? (12 CFR 1024.41(h)(4)) | | | |
| 114. For any appeal that the financial institution grants, does the institution afford the borrower 14 days to accept or reject any offered loan modification option? (12 CFR 1024.41(h)(4)) | | | |
| 115. Does the financial institution use different personnel to evaluate the appeal other than the personnel who evaluated the borrower's loss mitigation application? (12 CFR 1024.41(h)(3)) | | | |
| **Small Servicers** Complete the following if the institution is a small servicer as that term is defined in 12 CFR 1026.41(e). | Yes | No | NA |
| 116. If the financial institution is a small servicer, does it refrain from making the first foreclosure notice or filing (i) until the borrower is more than 120 days delinquent, (ii) unless the foreclosure is based on a borrower's violation of a due-on-sale clause, or (iii) unless the institution is joining a subordinate lienholder's foreclosure action? (12 CFR 1024.41(j)) | | | |
| 117. If the institution is a small servicer and the borrower is performing according to the terms of a loss mitigation agreement, does the financial institution refrain from (i) making the first foreclosure notice or filing, (ii) moving for a foreclosure judgment or order of sale, or (iii) conducting a foreclosure sale? (12 CFR 1024.41(j)) | | | |

Robert P. Marley
18 Lakeview Drive
Lynnfield, MA 01940
781-844-3044
robertmarley1958@verizon.net

Jack Navarro
Jerry Schianov
*Bruce Williams*
Saul Sanders
Lewis Ranieri
Scott Shay
Yale Stark

Shellpoint Mortgage Servicing
55 Beattie Place, Suite 110
Greenville, SC 29601
P: 866-316-4706
F: 866-467-1137

Shellpoint Partners
Two Grand Central Tower
140 E. 45th Street, 37th Floor
New York, NY 10017
P. 212-850-7700
F: 212-850-7770

Sent VIA Fax

Dated: January 1, 2016

RE: **Follow-up to my response dated December 30, 2015**

Dear Officials:

I forgot to state a fact: I am a third party beneficiary to the Trust Instruments. See attached.

The US Comptroller of Currency recognizes that the Borrower is the number beneficial party to asset-backed securitization. See page 8 attached herewith. The Borrower resides at the top of the list of beneficial parties.

Therefore, all that I request does not come under proprietary protection and all the undisclosed side contracts pertaining to me and my property are mine to see. Nothing is privileged. Without me, you would not exist.

Yours

Robert P. Marley



L-Sec

**Comptroller of the Currency**
**Administrator of National Banks**

# Asset Securitization

## Comptroller's Handbook

### November 1997

L

Liquidity and Funds Management

measuring and managing portfolio risk are less effective. Nonetheless, investment bankers and asset originators have proven extremely innovative at structuring cash flows and credit enhancements. Evidence of this can be seen in the market for securitized commercial real estate mortgages. Commercial real estate is one of the fastest-growing types of nonconsumer assets in the securitization markets, which fund approximately 10 percent of commercial mortgage debt.

## Benefits of Asset Securitization

The evolution of securitization is not surprising given the benefits that it offers to each of the major parties in the transaction.

### For Originators

Securitization improves returns on capital by converting an on-balance-sheet lending business into an off-balance-sheet fee income stream that is less capital intensive. Depending on the type of structure used, securitization may also lower borrowing costs, release additional capital for expansion or reinvestment purposes, and improve asset/liability and credit risk management.

### For Investors

Securitized assets offer a combination of attractive yields (compared with other instruments of similar quality), increasing secondary market liquidity, and generally more protection by way of collateral overages and/or guarantees by entities with high and stable credit ratings. They also offer a measure of flexibility because their payment streams can be structured to meet investors' particular requirements. Most important, structural credit enhancements and diversified asset pools free investors of the need to obtain a detailed understanding of the underlying loans. This has been the single largest factor in the growth of the structured finance market.

### For Borrowers

Borrowers benefit from the increasing availability of credit on terms that lenders may not have provided had they kept the loans on their balance

sheets.  For example, because a market exists for mortgage-backed securities, lenders can now extend fixed rate debt, which many consumers prefer over variable rate debt, without overexposing themselves to interest rate risk. Credit card lenders can originate very large loan pools for a diverse customer base at lower rates than if they had to fund the loans on their balance sheet. Nationwide competition among credit originators, coupled with strong investor appetite for the securities, has significantly expanded both the availability of credit and the pool of cardholders over the past decade.

# Asset Securitization                      Securitization Process

Before evaluating how a bank manages the risks of securitization, an
examiner should have a fundamental understanding of asset-backed securities
and how they are structured.  This section characterizes asset-backed
securities, briefly discusses the roles of the major parties, and describes the
mechanics of their cash flow, or how funds are distributed.

## Basic Structures of Asset-Backed Securities

A security's structure is often dictated by the kind of collateral supporting it.
Installment loans dictate a quite different structure from revolving lines of
credit.  Installment loans, such as those made for the purchase of
automobiles, trucks, recreational vehicles, and boats, have defined
amortization schedules and fixed final maturity dates.  Revolving loans, such
as those extended to credit card holders and some home equity borrowers,
have no specific amortization schedule or final maturity date.  Revolving
loans can be extended and repaid repeatedly over time, more or less at the
discretion of the borrower.

### Installment Contract Asset-Backed Securities

Typical installment contract asset-backed securities, which bear a close
structural resemblance to mortgage pass-through securities, provide investors
with an undivided interest in a specific pool of assets owned by a trust.  The
trust is established by pooling installment loan contracts on automobiles,
boats, or other assets purchased from a loan originator, often a bank.

The repayment terms for most installment contract asset-backed securities call
for investors to receive a pro rata portion of all of the interest and principal
received by the trust each month.  Investors receive monthly interest on the
outstanding balance of their certificates, including a full month's interest on
any prepayments.  The amount of principal included in each payment
depends on the amortization and prepayment rate of the underlying
collateral.  Faster prepayments shorten the average life of the issue.

**Revolving Asset Transactions**

The typically short lives of receivables associated with revolving loan products (credit cards, home equity lines, etc.) require issuers to modify the structures used to securitize the assets.  For example, a static portfolio of credit card receivables typically has a life of between five months and ten months.  Because such a life is far too short for efficient security issuance, securities backed by revolving loans are structured in a manner to facilitate management of the cash flows.  Rather than distributing principal and interest to investors as received, the securities distribute cash flow in stages — a revolving phase followed by an amortization phase.  During the revolving period, only interest is paid and principal payments are reinvested in additional receivables as, for example, customers use their credit cards or take additional draws on their home equity lines.  At the end of the revolving period an amortization phase begins, and principal payments are made to investors along with interest payments.  Because the principal balances are repaid over a short time, the life of the security is largely determined by the length of the revolving period.

## Parties to the Transaction

The securitization process redistributes risk by breaking up the traditional role of a bank into a number of specialized roles: originator, servicer, credit enhancer, underwriter, trustee, and investor.  Banks may be involved in several of the roles and often specialize in a particular role or roles to take advantage of expertise or economies of scale.  The types and levels of risk to which a particular bank is exposed will depend on the organization's role in the securitization process.

With sufficient controls and the necessary infrastructure in place, securitization offers several advantages over the traditional bank lending model.  These benefits, which may increase the soundness and efficiency of the credit extension process, can include a more efficient origination process, better risk diversification, and improved liquidity.  A look at the roles played by the primary participants in the securitization process will help to illustrate the benefits.

---

**Exhibit 1:  Parties Involved in Structuring Asset-Backed Securities**



*Borrower.*  The borrower is responsible for payment on the underlying loans and therefore the ultimate performance of the asset-backed security.  Because borrowers often do not realize that their loans have been sold, the originating bank is often able to maintain the customer relationship.

From a credit risk perspective, securitization has made popular the practice of grouping borrowers by letter or categories.  At the top of the rating scale, 'A'-quality borrowers have relatively pristine credit histories.  At the bottom, 'D'-quality borrowers usually have severely blemished credit histories.  The categories are by no means rigid; in fact, credit evaluation problems exist because one originator's 'A' borrower may be another's 'A-' or 'B' borrower.  Nevertheless, the terms 'A' paper and 'B/C' paper are becoming more and more popular.

Exhibit 2 is an example of generic borrower descriptions used by Duff and Phelps Credit Rating Corporation in rating mortgage borrowers.  The borrowers' characteristics in the exhibit are generalizations of each category's standards and fluctuate over time; however, the table does provide an illustration of general standards in use today.  For example, an 'A' quality

Robert P. Marley
18 Lakeview Drive
Lynnfield, MA 01940
781-844-3044
robertmarley1958@verizon.net

Jack Navarro
Jerry Schianov
Bruce Williams
Saul Sanders
Lewis Ranieri
Scott Shay
Yale Stark

Shellpoint Mortgage Servicing
55 Beattie Place, Suite 110
Greenville, SC 29601
P: 866-316-4706
F: 866-467-1137

Shellpoint Partners
Two Grand Central Tower
140 E. 45th Street, 37th Floor
New York, NY 10017
P. 212-850-7700
F: 212-850-7770

Sent VIA Fax

Dated: January 1, 2016

RE: **Follow-up to my response dated December 30, 2015**

Dear Officials:

One last thing: Attached herewith is the notice of the 8.5 billion that satisfied the losses in the purported trust; purportedly, [N]o money is due. Also attached is Exhibit "A" from the settlement and the Shellpoint transfers. That settlement is so outrageous it makes you want to puke. However, it is what it is. The purported note owners have been satisfied for CHL 2004-29. Therefore, they have suffered no injury. It would seem that you purportedly service that trust and the 126 loans still in there, which have all been satisfied by the undisclosed third party co-obligators to the debt that were intentionally concealed in the original mortgage contracts for all those loans. Fraud in the factum and execution of every mortgage written since the enactment of the Gramm Act of 1999, becoming effective in 2000, which effectively unleashed a monster on our citizens.

The whole settlement was a sham. I tried to file as an intervenor but the court would not allow it. No one truly represented the investors, not Real People, but corporations, (only sophisticated investors could buy the toxic paper), and all the violations related to the transfer of the assets were swept under the rug.

1

Certainly, no one represent the homeowners across this nation: nothing but a house of cards, built by slight of hand or pen.

You cannot have it both ways, if no money is due, then there is nothing to enforce.

Now, when you read the notice, principal forgiveness is included, clearly demonstrating that is and was an option for the master and sub-servicer. What happened to mine? However, you cannot forgive the debt because it has been discharged and extinguished as a matter of law. Legally there is nothing to forgive.

The most outrageous statement in that Notice is that "LPS" was engaged to perform the True Up proposal analysis. Probably [The] most corrupted organization in the financial industry along with CoreLogic. You people do what you want with impunity. There are no real checks and balances for you are there?

The mere fact that I exist and my matter has not been resolved makes the attached notice a blatant lie and you are deceiving the investor.

Therefore, unless this matter is resolved forthwith in will notify the investors each and every one of them, individually, of (in detail), the falsehood of the attached notice, inter alia.

BOA tried to resolve this by offering me the $119,000.00 I put down when I purchased our family home and the $128,000.00 I paid in interest on the bogus loan, and said the $160,000.00 I spent renovating the house after purchase was off the table. I told them to go fly a kite. Your ilk's skullduggery cost me millions. I want you to forward to me the adjustment amount of money for the affected trust CHL 2004-29 pursuant to the attached notice.

Accordingly, because I still exist, the affected trust, 2004-29, is not is not in the position it should be in, as sated in the attached notice.

Resolve this matter.


Yours

Robert P. Marley

2



BNY MELLON

**THIS NOTICE CONTAINS IMPORTANT INFORMATION FOR THE HOLDERS OF CERTIFICATES OR NOTES ("HOLDERS") ISSUED BY THE FOUR HUNDRED AND FORTY (440) COUNTRYWIDE MORTGAGE-BACKED SECURITIZATION TRUSTS LISTED IN EXHIBIT A HERETO (THE "AFFECTED TRUSTS") AND OTHER PERSONS POTENTIALLY INTERESTED IN THE AFFECTED TRUSTS.**

**NOTICE CONCERNING THE PAYMENT BY BANK OF AMERICA, N.A., AS MASTER SERVICER, OF ADJUSTMENT AMOUNTS TO THE AFFECTED TRUSTS IN CONNECTION WITH THE IMPLEMENTATION OF SUBPARAGRAPH 5(e) OF THE PROPOSED SETTLEMENT AGREEMENT, DATED JUNE 28, 2011, BETWEEN THE BANK OF NEW YORK MELLON, AS TRUSTEE OR INDENTURE TRUSTEE, ON THE ONE HAND, AND BANK OF AMERICA CORPORATION, COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE FINANCIAL CORPORATION, AND BANK OF AMERICA, N.A. (AS SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP) ON THE OTHER (THE "SETTLEMENT AGREEMENT").**

Dated:  April 25, 2014

This notice (the "Notice") is given by The Bank of New York Mellon ("Trustee"), as trustee or indenture trustee under the Pooling and Servicing Agreements and Indentures and related Sales and Servicing Agreements (collectively, the "Governing Agreements") governing the Affected Trusts. The purpose of this Notice is to provide further information regarding the additional principal collections that were paid to Holders of the Affected Trusts on the April 25, 2014 payment date in connection with adjustment amounts that Bank of America, N.A., in its capacity as Master Servicer for the Affected Trusts (the "Master Servicer"), has paid to the Affected Trusts.

The Master Servicer reported to the Trustee that during the period from July 1, 2011 through February 7, 2013, the Master Servicer completed 10,786 principal reduction modifications using valuation tools different from those prescribed by Subparagraph 5(e) of the Settlement Agreement.  As a result, certain of the aforementioned modifications resulted in principal forgiveness that was greater than contemplated by Subparagraph 5(e) of the Settlement Agreement.  The Master Servicer proposed to correct the foregoing by putting each Affected Trust in the same position that such Affected Trust would have been in had the Master Servicer completed the aforementioned principal reduction modifications using the valuation tool prescribed by Subparagraph 5(e) of the Settlement Agreement, i.e., where permissible[1], a third party broker price opinion that excludes REO and/or short sale comparative sales. The Master Servicer proposed to do so by obtaining broker price opinions excluding REO and/or short sale comparative sales as of the date of the original valuation in order to determine the appropriate adjustment amount (the "True-up Proposal").  The Trustee engaged a servicing expert that evaluated the True-up Proposal and found it reasonable. To implement the True-up Proposal, the Master Servicer engaged Lender Processing Servicer ("LPS") to perform the necessary analysis.

---

[1]  Broker price opinions are not allowed as a valuation tool for loan modifications in twenty-four jurisdictions.



# BNY MELLON

In connection with the foregoing, the Master Servicer paid adjustment amounts to the Affected Trusts which equal, in the aggregate, $111,393,300.  For the adjustment amount that was paid by the Master Servicer to any particular Affected Trust, Holders should review the April 2014 monthly report for such Affected Trust.

The Trustee neither makes any recommendation generally nor otherwise gives any investment advice herein.

709192128

**Exhibit A**

*List of Affected Trusts*

236. CWHL 2004-16
237. CWHL 2004-19
238. CWHL 2004-21
239. CWHL 2004-22
240. CWHL 2004-23
241. CWHL 2004-24
242. CWHL 2004-25
243. CWHL 2004-29    *Paid.*
244. CWHL 2004-7
245. CWHL 2004-HYB5
246. CWHL 2004-HYB7
247. CWHL 2004-HYB9
248. CWHL 2005-1
249. CWHL 2005-10
250. CWHL 2005-11
251. CWHL 2005-12
252. CWHL 2005-14
253. CWHL 2005-15
254. CWHL 2005-17
255. CWHL 2005-18
256. CWHL 2005-2
257. CWHL 2005-20
258. CWHL 2005-21
259. CWHL 2005-22
260. CWHL 2005-23
261. CWHL 2005-24
262. CWHL 2005-26
263. CWHL 2005-27
264. CWHL 2005-28
265. CWHL 2005-29
266. CWHL 2005-3
267. CWHL 2005-30
268. CWHL 2005-31
269. CWHL 2005-5
270. *CWHL 2005-7*
271. CWHL 2005-9
272. CWHL 2005-HY10
273. CWHL 2005-HYB1
274. CWHL 2005-HYB2
275. CWHL 2005-HYB3
276. CWHL 2005-HYB5
277. CWHL 2005-HYB6
278. CWHL 2005-HYB7
279. CWHL 2005-HYB8
280. CWHL 2005-HYB9
281. CWHL 2005-J2
282. *CWHL 2005-J3*

MONTHLY REPORT                                                                                        Sept 2015

## Shellpoint Servicing Transfers

| | | | | | |
|---|---|---|---|---|---|
| CWALT 2004-16CB | CWALT 2005-70CB | CWALT 2006-HY13 | CWHL 2004-3 | CWHL 2005-HYB4 | CWL 2004-SD3 |
| CWALT 2004-28CB | CWALT 2005-73CB | CWALT 2006-J4 | CWHL 2004-4 | CWHL 2005-HYB5 | CWL 2004-SD4 |
| CWALT 2004-29CB | CWALT 2005-75CB | CWALT 2006-J8 | CWHL 2004-7 | CWHL 2005-HYB8 | CWL 2005-AB1 |
| CWALT 2004-8CB | CWALT 2005-79CB | CWALT 2006-OA14 | CWHL 2004-8 | CWHL 2006-19 | CWL 2005-AB2 |
| CWALT 2004-J13 | CWALT 2005-83CB | CWALT 2006-OA16 | CWHL 2004-9 | CWHL 2006-20 | CWL 2005-AB3 |
| CWALT 2004-J9 | CWALT 2005-84 | CWALT 2006-OC1 | CWHL 2004-HYB1 | CWHL 2006-21 | CWL 2005-AB5 |
| CWALT 2005-13CB | CWALT 2005-9CB | CWALT 2007-11T1 | CWHL 2004-HYB2 | CWHL 2006-3 | CWL 2005-BC2 |
| CWALT 2005-16 | CWALT 2005-IM1 | CWALT 2007-1T1 | CWHL 2004-HYB3 | CWHL 2006-HYB2 | CWL 2005-BC5 |
| CWALT 2005-23CB | CWALT 2005-J11 | CWALT 2007-20 | CWHL 2004-HYB4 | CWHL 2006-HYB4 | CWL 2005-IM1 |
| CWALT 2005-24 | CWALT 2005-J14 | CWALT 2007-2CB | CWHL 2004-HYB5 | CWHL 2006-HYB5 | CWL 2005-IM2 |
| CWALT 2005-26CB | CWALT 2005-J4 | CWALT 2007-6 | CWHL 2004-HYB6 | CWHL 2006-OAS | CWL 2005-SD1 |
| CWALT 2005-30CB | CWALT 2006-11CB | CWALT 2007-AL1 | CWHL 2004-HYB7 | CWHL 2007-11 | CWL 2005-SD2 |
| CWALT 2005-31 | CWALT 2006-16CB | CWALT 2007-OA2 | CWHL 2004-HYB8 | CWHL 2007-15 | CWL 2005-SD3 |
| CWALT 2005-33CB | CWALT 2006-18CB | CWALT 2007-OA8 | CWHL 2004-HYB9 | CWHL 2007-21 | CWL 2006-16 |
| CWALT 2005-40CB | CWALT 2006-21CB | CWALT 2007-OA9 | CWHL 2005-1 | CWHL 2007-HY7 | CWL 2006-9 |
| CWALT 2005-41 | CWALT 2006-23CB | CWALT 2007-OH1 | CWHL 2005-2 | CWL 2004-4 | CWL 2006-BC1 |
| CWALT 2005-42CB | CWALT 2006-25CB | CWALT 2007-OH3 | CWHL 2005-24 | CWL 2004-8 | CWL 2006-BC2 |
| CWALT 2005-44 | CWALT 2006-26CB | CWHL 2004-11 | CWHL 2005-26 | CWL 2004-9 | CWL 2006-QH1 |
| CWALT 2005-47CB | CWALT 2006-39CB | CWHL 2004-14 | CWHL 2005-7 | CWL 2004-AB1 | CWL 2006-SD1 |
| CWALT 2005-49CB | CWALT 2006-40T1 | CWHL 2004-15 | CWHL 2005-HYB1 | CWL 2004-AB2 | CWL 2006-SD4 |
| CWALT 2005-50CB | CWALT 2006-46 | CWHL 2004-2 | CWHL 2005-HYB2 | CWL 2004-AB2 | CWL 2006-SPS1 |
| CWALT 2005-52CB | CWALT 2006-HY10 | CWHL 2004-22 | CWHL 2005-HYB2 | CWL 2004-8C4 | CWL 2007-SD1 |
| CWALT 2005-S3T2 | CWALT 2006-HY12 | CWHL 2004-29 | CWHL 2005-HYB3 | CWL 2004-BC5 | |

**Bank of America**

ROBERT MARLEY
18 LAKEVIEW DR.
LYNNFIELD, MA 01940
781-844-3044
robertmarley1958@verizon.net

KARA WATT
JERRY SCHIANOV
BRUCE WILLIAMS
SAUL SANDERS
LEWIS RANIERI
SCOTT SHAY
YALE STARK
SHELLPOINT MORTGAGE SERVICING
55 BEATTI PLACE, SUITE 110
GRENNVILLE, SC 29601
1-800-3657107
FAX: 1-866-467-1137

DATED: December 18, 2015

SENT VIA: FAX

RE: Case # 151122-000065

Dear Officials:

For a better understanding of one of the issue kindly read the following.

In a securitized mortgage, subrogation can never be raised because the true parties to the note are strangers and the PSA prohibits the investor (fractional owners of the promissory note) from making claims against the borrower.

It does not matter who pays the debt, or how it extinguishes, if it was satisfied, the mortgage is gone, and the property vest in the borrower.

The borrower is the maker of the note. As an initial matter, the undisclosed investors and third party co-obligators paid the note off when they purportedly purchased them from the original lender.

A mortgage of real estate is, as between the parties, a conveyance in fee, defeasible upon the performance of the conditions therein stated.) **Brown v. General Trading Co.**, 310 Mass. 263, 266,  37 N.E.2d 987; **Krikorian v. Grafton Co-**

operative Bank, 312 Mass. 272, 44 N.E.2d 665; **Cooperstein v. Bogas**, 317 Mass. 341, 58 N.E.2d 131.

The payment of the mortgage notes at or before maturity, or the due performance of any other condition that is expressed in the mortgage, terminates the interests of the mortgagee without any formal release or discharge and revests the legal title in the mortgagor.) Flye v. **Berry**, 181 Mass. 442, 63 N.E. 1071; **Crowley v. Adams**, 226 Mass. 582, 116 N.E. 241; **Fuller v. Fuller**, 234 Mass. 187, 125 N.E. 499; **Depon v. Shawye**, 263 Mass. 206, 161 N.E. 243; **Bailey v. Way**, 266 Mass. 437, 165 N.E. 388.

Upon the fulfillment of the conditions of the mortgage, the mortgagor is entitled to the note and a discharge of the mortgage in order to remove a cloud upon the record title to his premises). **Saunders v. Dunn**, 175 Mass. 164, 55 N.E. 893; **Hart v. Louis S. Levi Co.**, 303 Mass. 477, 22 N.E.2d 30; **Perry v. Oliver**, 317 Mass. 538, 59 N.E.2d 192.

The question in this case is whether the plaintiff has a title on which he can maintain this suit. His title rests on a mortgage given by Lawrence McGinnis to the Roxbury Brewing Company on September 15, 1898, to secure a note of $1,700 payable one year after that date. On June 15, 1899, the amount due on this note and mortgage was paid by the son of the mortgagor with the mortgagor's money, and the mortgage was assigned to one Bresnahan, who paid nothing for it, but held it for the benefit of the mortgagor. **This performance of the condition of the mortgage before the note became due left the mortgagee with no estate in or title to the premises, and he could convey nothing by an assignment; but the mortgagor, without any assignment or discharge, was in of his former estate**). FLYE v. **BERRY**, 181 Mass. 442 63 N.E. 1071, (May 22, 1902).

*"Whether he knew how the payment was made*, and the course of proceedings by which Bresnahan came to hold it for Lawrence McGinnis, *is immaterial.* It is enough that he knew the mortgagor to be the owner of the note and mortgage which were held for his benefit". *(Emphasis added) Ibid;*

"The mortgage having been satisfied before maturity, it is unnecessary to consider the doctrine of merger, as distinguished from the doctrine already stated, which leaves the mortgage a nullity upon performance of the condition according to the terms of the instrument". *Ibid*

In some jurisdictions it is held that the mere transfer of the debt without any assignment or even mention of the mortgage, carries the mortgage with it, so as to enable the assignee to assert his title in an action at law. 2 Washb. Real Prop. (3d Ed.) 114, 118, and cases there cited. [T]his doctrine **has not prevailed in Massachusetts,** and the tendency of the decisions here has been that in such case the mortgagee would hold the legal title in trust for the purchaser of the debt, and that the latter might obtain a conveyance by a bill in equity. **Wolcott v. Winchester,** 15 Gray, 464; **Young v. Miller,** 6 Gray, 152. But a payment of the debt at or before its maturity divests the mortgagee of his legal estate, and the mortgagor is then in of his old estate, **without any release, and without any process for redemption.** Holman v. **Bailey,** 3 Metc. 55. And under our system of foreclosing mortgages a payment of the debt after its maturity has nearly or quite the same effect. Nothing being thereafter due to the mortgagee, [149 Mass. 115] he could obtain no conditional judgment in an action to foreclose, and therefore cannot maintain a writ of entry to foreclose or enter for breach of condition. Accordingly, upon such payment the mortgagor can assert his title at law against a tenant of the mortgagee, and need not resort to equity. **Baker v. Gavitt,** 128 Mass. 93.) **BARNES v. BOARDMAN,** 149 Mass. 106, 21 N.E. 308 (May 9, 1889).

If you can demonstrate the note was satisfied, and I can, there is no mortgage or a power of sale and nothing to enforce. Title vests in me. Return the purported note to me stamped paid in full.


Yours truly

Bob Marley

Attention Kara Watt:

Attached herewith, kindly find a paper I wrote for a few lawyers. Also attached herewith is a Commitment schedule demonstrating BONY was lending money for loans it would become the trustee. I also have the signed revolving credit agreement for said Commitment. The paper, I sent in a previous e-mail, however, I am forwarding to you personally. Among my other defenses, the paper outlines many of the wrong doings. "the wrong doer

Those who come to the table seeking equitable resolution must come to the table with "*Clean Hands*".

I wrote that paper the day after *Bassman* came down from the corrupt court of appeals.

Not one entity in the Ponzi scheme that is asset-backed securitization comes to the table with clean hands.

BONY is a self-dealing trustee and the evidence I have makes that perfectly clear. Prima Facie Evidence.

M.G.L. c. 106 § 3-407 (b) provides that the any responsibility I might have had was discharge for the fraudulent alteration of the purported Note by way of the forged allonge to the note. In effect, the alteration was an intentional voluntary act of destruction and mutilation of the Note. See § 3-604 (a).

Release the lien and return the note.

My favorite tenet of law.

> "The most elementary conceptions of justice and public policy require that the **wrongdoer shall bear** the risk of the **uncertainty** which his **own wrong has created**". *Package Closure Corp. v. Sealright Co.*, 141 F.2d 972, 979. That principle is an ancient one, *Armory v. Delamirie,* 1 Strange 505, *See Bigelow v. RKO Radio Pictures, Inc.,* 327 U. S. 251, 265 (1946)

The mess that created the financial crisis is a manmade event and all that has transpired lays at the feet of the financial industry and the corrupt people that run said industry. A single Ponzi scheme equitably divested my country and the globe for that matter. You and your ilk will do me no more harm. I had a duty to mitigate harm to myself when I discovered the scheme, and in 2010, that is exactly what I did.

Yours

Bob Marley

ANNEX 1

Commitment Schedule

|  | Commitment |
|---|---|
| **Continuing Lenders** | |
| JPMorgan Chase Bank, N.A. | $260,000,000.00 |
| Bank of America, N.A. | $240,000,000.00 |
| ABN Amro Bank N.V. | $200,000,000.00 |
| Deutsche Bank AG New York Branch | $140,000,000.00 |
| Citicorp USA, Inc. | $132,000,000.00 |
| Barclays Bank PLC | $120,000,000.00 |
| The Bank of New York | $130,000,000.00 |
| Wachovia Bank, National Association | $100,000,000.00 |
| BNP Paribas | $80,000,000.00 |
| Morgan Stanley | $80,000,000.00 |
| Goldman Sachs | $80,000,000.00 |
| Societe Generale, New York Branch | $80,000,000.00 |
| Royal Bank of Canada | $70,000,000.00 |
| Calyon New York Branch | $66,000,000.00 |
| HSBC Bank USA | $60,000,000.00 |
| Dresdner Bank AG, New York Branch | $40,000,000.00 |
| KeyBank National Association | $40,000,000.00 |
| Lehman Brothers Bank, FSB | $40,000,000.00 |
| The Royal Bank of Scotland PLC | $40,000,000.00 |

| | |
|---|---|
| Norddeutsche Landesbank Girozentrale New York and/or Cayman Islands Branch | $22,000,000.00 |
| Union Bank of California, N.A. | $40,000,000.00 |
| WestLB AG, New York Branch | $20,000,000.00 |
| **New Lenders** | |
| Lloyds Bank | $100,000,000.00 |
| UBS | $80,000,000.00 |
| ING Bank N.V. | $80,000,000.00 |
| **TOTAL** | **$2,340,000,000.0(** |

ANNEX 2

Swingline Commitment Schedule

| Continuing Lenders | Swingline Commitment |
|---|---|
| JPMorgan Chase Bank, N.A. | $ 260,000,000.00 |
| Bank of America, N.A. | $ 240,000,000.00 |
| ABN Amro Bank N.V. | $ 200,000,000.00 |
| Deutsche Bank AG New York Branch | $ 140,000,000.00 |
| Citicorp USA, Inc. | $ 132,000,000.00 |
| Barclays Bank PLC | $ 120,000,000.00 |
| The Bank of New York | $ 130,000,000.00 |
| Wachovia Bank, National Association | $ 100,000,000.00 |
| BNP Paribas | $ 80,000,000.00 |
| Morgan Stanley | $ 80,000,000.00 |
| Societe Generale, New York Branch | $ 80,000,000.00 |
| Royal Bank of Canada | $ 70,000,000.00 |

| | |
|---|---|
| KeyBank National Association | $ 40,000,000.00 |
| The Royal Bank of Scotland PLC | $ 40,000,000.00 |
| **TOTAL** | **$ 1,712,000,000.00** |

# SECURITIZATION

## THE TRUST AND TRUSTEE
## NEW YORK LAW AND MASSACHUSETTS LAW
### By Robert P. Marley

*I do not write what I Know. I write to find out what I know*

## INTRODUCTION

Can a Trustee who fails to perform its duties to acquire the trust assets (note and mortgage) in the time proscribed under the trust instruments somehow ratify that failure when there exists a written, purported executed trust instrument, created under the Laws of New York? The answer is NO. Where a trust is expressed in the instrument creating the estate, all acts of trustees in contravention of the trust and not authorized by statute is void, and the only remedy at law is for the Beneficiaries' to file suit for their loss.

The Illinois Appeals Court in *Bassman* committed an error of law when it held that the actions of the Trustee were voidable and not void. *BANK OF AMERICA NAT. v. BASSMAN FBT, LLC*, 981 N.E.2d 1, 366 Ill. Dec. 936 (App. Ct. 2012) Each case cited in the opinion are distinguishable from that matter and the matter of the failure to assign the note and mortgage and the delivery thereof and this court made an egregious error.

Notwithstanding, where all the intermediary parties to the trust instrument failed to transfer, assign, set over, convey and deliver the assets to each other and to the depositor, and then to the trust, this failure destroys the chain of title. Basic law dictates that no purchaser after the break in the chain of title has any rights whatsoever.

Indeed, the Trusts funded, certificates were created and sold on the securities market yet, were backed by nothing, because no bona fide sale, purchase, assignment or lawful conveyance executed relative to the note and mortgage and no notice was given the Mortgagor; the note was not indorsed and negotiated, and the mortgage was not assigned in writing. Physical delivery of the assets is required; a prehistoric rule set forth in, *Wadd v. Hazelton* (1893) cited in 107 cases and never over-ruled.

1

> **"Where an intention to give absolutely is evidenced by a writing which fails because of its non-delivery, the court may not give effect to it by construing it to be a declaration of trust and, therefore, valid without delivery."**
> 137 N.Y. 215, 33 N.E. 143, (1893)

There is no cognitive argument based on any tenet of law that could overcome these monumental failures related to the Trust assets.

In researching NY EPTL 7-2.4 back to its conception, RPL §§ 100-105 part of the repealed Widows and Orphan's Law, the following carried through without change.

Sections 100 and 101, L.1909, c. 52, **provided for trustee of express trust to have whole estate,** and set forth qualification for same, respectively. See EPTL 7-2.1.

Section 105, L.1909, c. 52; amended L.1918, c. 403; L.1930, c. 808; L.1937, c. 141, § 1; L.1964, c. 681, § 7, **provided that acts of trustee in contravention of trust are void, not voidable.** See EPTL 7-2.4.

<u>**"Dirty Rotten Filthy Hands" entitles the schemers to no consideration.**</u>

## I.      THE TRUSTEE

### A)      The Self-Dealing Trustee

NY Article 4-A - TRUST INDENTURES AND INTERESTS THEREIN § 127.
Restrictions on Trustees

1. No trustee shall accept a trust or act as trustee under a trust mortgage affecting any property in which he or any of the officers or directors of the trustee shall have, *directly or indirectly, any financial interest*.

In Many case you will find that the Trustee was lending money for loans it would ultimately become the Trustee. In effect, the concealed lender created a conflict because there is a monetary interest vested in the Trustee. Notwithstanding, the trustee has concealed its attachment to the assets of the Trust. See Marley Exhibit, 364 Revolving Credit Agreement,

2

where trustee Bank of New York ("BONY") *inter alia*, was lending billions for loans it would ultimately become the Trustee.

The term "self-dealing" applies broadly to any act or transaction in which a trustee has a personal interest, which conflicts with the interests of the trust. By acting or engaging in transactions with self-interest as a potential motive, a trustee commits a breach of fiduciary duty, and, specifically, a breach of a trustee's duty to act with undivided loyalty toward the trust and its beneficiaries. See generally, Restatement Second, Trusts § 170.

The general rule is that one acting in a fiduciary capacity for another has the burden of proving that a transaction with himself was advantageous for the person for whom he was acting. *Adelson v. Adelson*, 60 Mass. App. Ct. 753, 806 N.E.2d 108 (2004), review denied, 442 Mass. 1101, 809 N.E.2d 1060 (2004)

One of the most fundamental duties of the trustee is to display throughout the administration of the trust complete loyalty to the interests of the[1] trust; trustee must exclude all selfish interest and also, all consideration of the welfare of third persons. Trustee's duty of loyalty to interests of trust grows out of the fact that the trustee is a representative and out of the well-known inability of human beings to serve two masters at once or to act satisfactorily with conflicting interests *Cummings v. Pitman*, 239 S.W.3d 77 (Ky. 2007).

Trustees are generally prohibited from engaging in self-dealing transactions with the trust and from obtaining personal advantage from their dealings with trust property. *Orud v. Groth*, 708 N.W.2d 72 (Iowa 2006)

The "self-dealing" trustee is one who either purchases trust property for himself individually, *In re Estate of DePlanche*, 65 Misc. 2d 501, 503, 318 N.Y.S.2d194, 196 (Sur. Ct. 1971), or sells to the trust property he held as an individual, *Smith v. Howlett*, 29 A.D. 182, 188-89, 51 N.Y.S. 910, 914-15 (1893). A trustee must act with the highest good faith toward the beneficiary and may not obtain any advantage over the beneficiary, *Allard v. Johnson*, 2006 ND 243, 724 N.W.2d 331 (N.D. 2006).

**Under trust law, self-dealing occurs when the fiduciary has a personal interest in the subject transaction of such a substantial nature that it might have affected his judgment in material connection.** *Stegemeier v. Magness*, 728 A.2d 557 (Del. 1999).

---

[1] For the nonprofessional: cestui que (set-ee kee) one who possesses equitable rights in property; beneficiary/certificate holders.

**If a trustee personally profits from his role as a trustee, that conduct is a breach of the trustee's duty of loyalty, and the law concludes it is intentional.** *Zastrow v. Journal Communications, Inc.*, 2006 WI 72, 291 Wis. 2d 426, 718 N.W.2d 51, 38 Employee Benefits Cas. (BNA) 2843 (2006);

The mere fact that BONY knew it was lending money for loans it would ultimately become the Trustee is Self-Dealing. Further, there was a conflict in the Trustee to grant modifications under HAMP and also in accord with the loss mitigation clause in the trust instruments.

Every entity that participated in the securitization Ponzi scheme comes to the table with "Unclean Hand".

**B)      Duty Of Trustee To Take Possession Of Note and Mortgage**

After a trustee has accepted the trust and qualified as required by the law of the state in question, by filing an oath, giving bond, or taking such other steps as the statute, rule of court, or the trust instrument requires, it becomes his duty to carefully examine the terms of the trust and the trust assets in order to determine exactly what property forms the subject-matter of the trust, who are the beneficiaries and what are the trustee's duties with respect to the trust property and the beneficiaries. By the very definition of a trust, the trustee must have some property interest in the things designated as the trust res, and in nearly all cases this interest is an absolute interest in personalty or a fee interest in realty, and is a present estate or interest entitling the trustee to immediate possession of realty or personalty. The duties of the trustee almost universally require him to take into his possession tangible realty or personalty, and to reduce choses in action to possession. This duty of obtaining physical dominion over the trust estate and the documents representing it is a primary obligation of the trustee toward the beneficiary. Since it comes first in the chronology of trust administration, it may well be treated first in setting forth various specific duties of the trustee.

The plaintiff may establish a breach of duty by showing that the defendant failed to adhere to the applicable standard of care in taking possession of the trust assets. E.g., In re Succession of Dunham, 399 So2d 221 (La App 1981); Parker v Pine, 617 SW2d 536 (Mo App 1981).

4

The defendant as trustee is under the general duty to take reasonable steps to take and keep control of the trust assets, whether or not that duty is expressly stated in the trust instrument. See, e.g., *In re Estate of Crowder*, 75 Ill2d 197, 25 Ill Dec 789, 387 NE2d 665 (1979) [under terms of instrument, trustee was directed to take possession of all trust property, real and personal]; *In re Will of Hartzell*, 43 Ill App2d 118, 192 NE2d 697 (1963) [trustee's first duty is to secure possession of trust property]; Since it is generally acknowledged that the exclusive right and duty of the trustee to collect or reduce to possession the property and assets of the trust must be exercised within a reasonable time [see, e.g., *Central States, Southeast & Southwest Areas Pension Fund v Central Transport Inc*, 472 US 559, 105 SCt 2833, 86 LE2d 447 (1985) reh den 473 US 926 (1985)], it may be sufficient to establish a breach of duty to show that there was an unnecessary or unreasonable delay in taking possession of the property, resulting in a loss or damage to the trust. See, e.g., *In re Will of Hartzell*, 43 Ill App 2d 118, 192 NE2d 697 (1963) [trustee is liable for losses resulting from unnecessary or unreasonable delay in obtaining possession of trust property].

The trustee is under a duty to use reasonable care and skill to preserve and protect the trust property. See, e.g., *Central States, Southeast & Southwest Areas Pension Fund v Central Transport Inc*, 472 US 559, 105 SCt 2833, 86 LEd2d 447 (1985) reh den 473 US 926 (1985) Shriners Hospitals for Crippled Children v Gardiner, 152 Ariz 519, 733 P2d 1102 (App 1986) vac, en banc 152 Ariz 527, 733 P2d 1110 (1987); *Ahuna v Department of Hawaiian Home Lands*, 64 Hawaii 327, 640 P2d 1161 (1982); *McCormick v McCormick*, 118 Ill App3d 455, 74 Ill Dec 73, 455 NE2d 103 (1983) later app 180 Ill App3d 184, 129 Ill Dec 579, 536 NE2d 419 (1988); *In re Succession of Dunham*, 399 So2d 221 (La App 1981); *Ray County v Heath*, 636 SW2d 413 (Mo App 1982); In re Estate of Mead, 90 Misc2d 144, 394 NYS2d 123 (1977); *North Dakota Public Service Commission v Valley Farmers Bean Association*, 365 NW2d 528 (ND 1985); *First National Bank v Gregory*, 13 Ohio App3d 161, 13 Ohio BR 195, 468 NE2d 739 (1983); *In re Estate of Lychos*, 323 Pa Super 74, 470 A2d 136 (1983).

The proper investment of trust assets requires the exercise of sound judgment and discretion and acts requiring the exercise of judgment and discretion cannot be delegated by trustees to other persons. *Matter of Dickson*, 38 Misc. 2d 678, 237 N.Y.S.2d 572 (NY: Surrogate's Court, New York 1963) citing (Cooper v. Illinois Central R. R. Co., 38 App. Div. 22; *Allison & Ver Valen Co. v. McNee*, 170 Misc. 144; *Matter of Palmer*, 132 N. Y. S. 2d 311).

**A trustee breached fiduciary duty by buying a mortgage as a trust investment when taxes on the mortgaged property were delinquent.** In considering whether to buy a mortgage as a trust investment, the trustee should ascertain the status of the mortgagor. Buying a mortgage when the mortgagor is dead and his interest has passed to many heirs, or when the mortgagor is in bad financial condition, is imprudent. *Finley v. Exchange Trust Co.*, 1938 OK 178, 183 Okla. 167, 80 P.2d 296, 117 A.L.R. 162 (1938).

**A fiduciary did not act with reasonable prudence when he bought a mortgage participation in a mortgage under which defaults had already occurred,** *In re Laing's Guardianship*, 167 Misc. 10, 3 N.Y.S.2d 409 (Sur. Ct. 1938).

## II.    Trustee's duty, generally; nature of relationship—Duty to both obligor and oblige

The nature and extent of duties owed by a trustee under a mortgage or similar trust instrument to the holders of bonds or other obligations secured thereby may be affected by the fact that he also owes a duty to the mortgagor, or a subsequent purchaser or lienor.

In applying the rule that a trustee under a trust instrument owes the duty of faithfully caring for the interests of the holders of obligations secured by such instrument, the courts frequently recognized that such duty extends also in favor of the obligor. *Chamberlain v James*, (1936) 294 Mass 1, 200 NE 361 (**a loan sustains a fiduciary relation to the debtor, as well as to the creditor, and he is bound to act impartially toward each**). *Speers Sand & Clay Works, Inc. v American Trust Co.* (1927, CA4 Md) 20 F2d 333, later app 37 F2d 572. *Harvey v Guaranty Trust Co.* (1929) 134 Misc 417, 236 NYS 37, affd 229 App Div 774, 242 NYS 905, affd 256 NY 526, 177 NE 125 (**stating that a trustee under a corporate indenture may for some purposes be regarded as the agent of the mortgagor, but for other purposes it is the representative of the bondholders for whose benefit it holds the mortgaged security**).

As the trustees held a mortgage, not to secure a debt due to themselves, but as trustees for the holders of the bonds of the mortgagor, their duties were regulated by the general rules of law affecting all trustees, and whenever they failed to perform them, either through willfulness, indifference, or error of judgment, the bondholders who were aggrieved by their conduct might obtain relief in equity. *First Nat. F. Ins. Co. v Salisbury*, 130 Mass 303 (1881)

The trustee in a trust deed given as security in connection with a home mortgage loan owes a fiduciary duty to the signatories of the trust deed, i.e., the settlor or debtor and the

beneficiary or creditor. *Lucas v. Fairbanks Capital Corp.*, 217 W. Va. 479, 618 S.E.2d 488
(2005)

Trustees are considered as the agents of both parties—debtor and creditor—and actions in
performing the duties of their trust should be conducted with the strictest impartiality and
integrity. **They are entrusted with the important function of transferring one man's
property to another, and therefore both reason and justice will exact of them the most
scrupulous fidelity.** *Goode v Comfort*, 39 Mo 313 (1866); *West v Axtell* 322 Mo 401, 17 SW2d
328 (1929); *Ewing v McIntosh*, 359 Mo 625, 222 SW2d 738 (1949); *Edwards v Smith*, Mo 322
SW2d 770 (1959)

**A trustee** under a trust deed **is a representative of the mortgagor as well as of the
mortgagee or bondholders,** and he must act fairly and impartially toward both parties to the
instrument and not exclusively in the interest of either. Trustees are required to exercise the care
and prudence which, ordinarily, men would exercise under like circumstances concerning their
own affairs. *Chicago Title & Trust Co. v Chief Wash. Co.*, 368 Ill 146, 13 NE2d 153 (1938)

**A trustee under a deed of trust owes fiduciary duties both to the noteholder and to
the borrower.** *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308 (D.C. 2008).

### A)   Banks Will Alleged The Language of the PSA Alone is Sufficient to Effect a Valid Transfer of the Mortgages to the Trusts without Timely Delivery of Indorsed Notes; It Is Not

Banks usually argue that a general provision in section 2.01(a) of the PSAs purporting to
transfer all interest in the mortgages to the Trust is sufficient, by itself, to transfer the loans to
the Trusts. This argument not only disregards other material provisions of the PSAs, but also
fails as a matter of law.

The notes and mortgages cannot legally be transferred into the trusts merely by the
language in the PSAs. The Court in *Deutsche Bank Nat'l Trust Co. v. Haque* just recently
rejected an RMBS trustee's argument that "the note was transferred to the trust, pursuant to a
pooling and servicing agreement" finding that "such agreement does not establish that [the
depositor] assigned the note to [the trustee]." 36 Misc. 3d 1203(A), at *2 (N.Y. Sup. Ct. Queens
Co. 2012) (quotations omitted). Even the PSAs themselves do not rest on the general provision

purporting to transfer "all interest" in the loans to the Trustees, as many banks argue[2]. Rather, the
PSAs require endorsement and delivery of the notes to the Trustee:

> In connection with the transfer and assignment of each Mortgage
> Loan, the Depositor has delivered or caused to be delivered to the
> Trustee for the benefit of the Certificateholders the following
> documents or instruments with respect to each Mortgage Loan so
> assigned: (i) the original Mortgage Note bearing all intervening
> endorsements showing a complete chain of endorsement from the
> originator to the last endorsee endorsed "Pay to the order of
> _____, without recourse" and signed (which may be by
> facsimile signature) in the name of the last endorsee by an
> authorized officer.

PSA §2.01

Indeed, the Prospectus Supplements for each of the Securitizations filed with the SEC
similarly represented that the notes would be endorsed and delivered to the Trustees by the
depositor.

The PSAs require delivery of endorsed notes because promissory notes evidencing
mortgage loans are generally considered negotiable instruments subject to Article 3 of the
Uniform Commercial Code ("UCC")[3]. Article 3 requires, at a minimum, delivery of the note to
the transferee in order for the transfer to be valid. ("As noted by the Uniform Commercial Code
provisions that have been adopted in all 50 states, a negotiable instrument may be transferred by

---

[2]Even if an external writing could validly transfer without indorsement or delivery, which
the vast weight of authority holds it cannot, such a writing would at a minimum have to
sufficiently describe the particular mortgages and notes being transferred. The PSAs
contain absolutely no description of the mortgages and notes that they purport to transfer. *U.S.
Bank, N.A. v. Ibanez, 458 Mass.* 637, 651-52 (Mass. 2011) (holding that a PSA does not transfer
ownership of notes and mortgages to a RMBS trust if the PSA is not signed and/or does not
specifically refer to the underlying notes and mortgages that are purportedly transferred).

[3]Banks do not dispute that the notes are negotiable instruments, and in fact, they are.
*Slutsky v. Blooming Grove Inn, Inc.*, 542 N.Y.S.2d 721, 723 (2d Dep't 1989) ("The note secured
by the mortgage is a negotiable instrument ...."); *U.S. Bank, N.A. v. Bennett*, No. 11 MA 40,
2012WL 2254189 (Ohio Ct. App. 7th Dist. June 12, 2012) ("[A] note secured by a mortgage is
widely considered to be a negotiable instrument.") (citation omitted); *Leyva v. Nat'l Default
Servicing Corp.*, 255 P.3d 1275, 1279 (Nev. 2011) (footnote omitted) ("The proper method of
transferring the right to payment under a mortgage note is governed by Article 3 of the Uniform
Commercial Code—Negotiable Instruments, because a mortgage note is a negotiable
instrument.").

delivery of the instrument [the note] and a manifestation of an intent to transfer the right to enforce the instrument."); *5-Star Mgmt., Inc. v. Rogers*, 940 F. Supp. 512, 522 (E.D.N.Y. 1996) (holding that unless the note is lost or non-negotiable, delivery of the note must generally accompany a mortgage and note assignment.) In most instances, endorsement is also required. See, e.g., *Nat'l Bank of N. Am. v. Flushing Nat. Bank*, 421 N.Y.S.2d 65, 66 (1st Dep't 1979) ("[w]ithout an indorsement, a transferee cannot be a holder."); *Provident Bank v. Cmty. Home Mortg. Corp.*, 498 F. Supp. 2d 558, 575 (E.D.N.Y. 2007) ("It is the indorsement on the instrument itself, not the right to indorsement, that vests the transferee with the status of holder.") (citing NY UCC 3-202)); *Wells Fargo Bank, N.A. v. Ford*, 418 N.J. Super. 592, 593 (App. Div. 2011) (finding that plaintiff did not demonstrate it could enforce the note because the note was not indorsed properly). These requirements are essential to a valid transfer of the mortgage and note. Without them the transfer is void, not only under the UCC, but also under New York trust law, which governs the Trusts under the express terms of the PSAs. As one court explained:

> Defendants' failure to strictly comply with the terms of the PSA means that the loan at issue was never properly transferred to the trust. Any transfer of mortgage loans, such as Plaintiff's, was mandated to comply with New York Trust law and the terms and conditions of the PSA governing conveyance of mortgage loans into the trust. This the Defendants did not do....Therefore, the purported, transfers, endorsements or assignments are void ab initio or never were properly transferred into the Trust. The only Defendant with standing to proceed [with the foreclosure] is...the originator and original lender of the Note and Mortgage.

*Hendricks v. U.S. Bank N.A.*, No. 10-849-CH, slip op. at 6-7 (Mich. Trial Ct. Washtenaw Co. June 6, 2011) (emphasis added, internal citation omitted) *Horace v. LaSalle Bank, N.A.*, No.57-CV-2008-000362.00, slip op. (Cir. Ct. Russel County Ala. Mar. 25, 2011) (holding that neither a mortgage nor a note is transferred to an RMBS trust if the method of transfer differs from the PSA's terms, and permanently enjoining the trust from foreclosing) A Congressional Oversight Panel, after receiving testimony and evidence from many participants in the RMBS industry, further summarized the implications for investors:

> New York trust law requires strict compliance with the trust documents; any transaction by the trust that is in contravention of the trust documents is void, meaning that the transfer cannot actually take place as a matter of law. Therefore, **if the transfer for [sic] the notes and mortgages did not comply with the PSA,**

9

**the transfer would be void, and the assets would not have been transferred to the trust.**

\* \* \*

Failure to transfer mortgages and notes properly to the trust can affect the holdings of the trust. If transfers were not done correctly in the first place and cannot be corrected, there is a profound implication for mortgage securitizations: it would mean that the **improperly transferred loans are not trust assets and MBS are in fact not backed by some or all of the mortgages that are supposed to be backing them.**

Congressional Oversight Panel, November Oversight Report: Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure at 19, 26 (November 16, 2010)(emphasis added).

Obviously, the delivery or non-delivery of thousands of notes to the Trust are acts which are entirely external to the PSA, and cannot be established by reference to the PSA itself. Nor can the issue of note endorsement be established solely by reference to the PSA.

There are other problems for the Trustee as well; most loans were in default when the purported assignments took place.

A fiduciary did not act with reasonable prudence when he bought a mortgage participation in a mortgage under which defaults had already occurred, and the mortgagor had died leaving no property aside from his equity of redemption. In re Laing's Guardianship, 167 Misc. 10, 3 N.Y.S.2d 409 (Sur. Ct. 1938).

**B)     Banks Continuously Mischaracterize and Largely Ignore Homeowners' Documentary Evidence that Demonstrates Defendants' Failure to Timely Transfer the Notes and Mortgages**

Banks continue to make unsupported assertion that endorsed notes were in fact timely delivered to the Trustee is directly contradicted by the signed and notarized documents attached as exhibits to the Amended Complaint showing that in fact the mortgage and note was transferred to the Trust for the first time years after the PSAs was executed, if at all. For example, most Assignment demonstrates clearly that the mortgage was not assigned to the trust until years after the Securitization closed. The document states that "the undersigned, being

10

the present owner of such secured interest . . . hereby transfers, without recourse, to . . . . Mortgage Pass-Through Certificates, Series . . . .." the mortgage and note. "The undersigned" is "Mortgage Electronic Registration System, Inc. as nominee for . . . . Blank so and so was the originator of the loan, and the document was executed on _____, many years after the closing date of the Securitization, when the Issuer represented that it had been assigned to the Trust. Assignments that Plaintiffs have found demonstrate that mortgages and notes were not timely transferred.

Who issues the satisfaction of mortgage? It is axiomatic that only the holder of a promissory note may declare the debt satisfied. See *Lambert v. Barker*, 232 Va. 21, 25 (Va.1986) ("[P]ayment in satisfaction of the instrument must be made to a party in possession in order to discharge the payor's liability.") Yet numerous examples of loans demonstrate they were discharged by or on behalf of the original lender years after the loans were supposed to have been transferred to the Trusts.

This is strong evidence that these loans were never transferred to the Trusts and that contrary to the scums representations; the Certificates were not mortgage-backed. Faced with the overwhelming evidence submitted by Homeowners, Banks ask the Courts simply to disregard these documents as "pro forma." Banks dismissal of the assignments and satisfactions as pro forma reflects the cavalier attitude towards real property transfer requirements that courts have frequently rejected. See, e.g., *Adams v. Madison Realty & Dev., Inc.*, 853 F.2d 163, 169 (3d Cir. 1988) ("Financial institutions, noted for insisting on their customers' compliance with numerous ritualistic formalities, are not sympathetic petitioners in urging relaxation of an elementary business practice. It is a tenet of commercial law that holdership and the potential for becoming holders in due course should only be accorded to transferees that observe the historic protocol.") (quotations omitted).

In fact, courts regularly interpret such documents according to their plain meaning to arrive at precisely the same conclusions that we allege here – namely, that the mortgage is presumed to be assigned as of the execution date of the Assignment where the present tense language of the Assignment evidences a contemporaneous transfer. For example, in *In re Foreclosure Cases*, the Court dismissed 14 consolidated foreclosure actions for lack of standing because

11

> none of the Assignments show the named Plaintiff to be the owner of the rights, title and interest under the Mortgage at issue as of the date of the Foreclosure Complaint. **The Assignments, in every instance, express a present intent to convey all rights, title and interest in the Mortgage and the accompanying Note to the Plaintiff** named in the caption of the Foreclosure Complaint upon receipt of sufficient consideration **on the date the Assignment was signed and notarized.**

No. 07-Civ-2282, 2007 WL 3232430, at *2 (N.D. Ohio Oct. 31, 2007); see also *LaSalle Bank, N.A. v. Diaz*, No. 08 CH 21809, 2009 WL 1935920 (Ill. Cir. Cook Co. June 1, 2009) ("**The assignment is dated June 20, 2008, and it unambiguously represents a contemporaneous assignment to the bank on that date.** The unavoidable conclusion based on this record is that the bank did not become the assignee of the note until three days after it filed this lawsuit.") (emphasis added).

Although access to valid promissory notes is very limited, investigations have found un-endorsed notes supposedly transferred to the Trusts that were attached as exhibits in many foreclosure related actions; in many case there are more than one note. Most notes found were not endorsed.

As courts have lamented, "[t]ypically, the homeowner who finds himself/herself in financial straits, fails to make the required mortgage payments and faces a foreclosure suit, is not interested in testing state or federal jurisdictional requirements, either pro se or through counsel". *In re Foreclosure Cases*, 2007 WL 3232430 at *3, n.3 ("[U]nchallenged by underfinanced opponents, the [financial] institutions worry less about jurisdictional requirements and more about maximizing returns.").

### C)   Banks' Arguments Concerning Recordation and the Use of MERS Have Nothing to Do with Our Claims

In addition to claiming that the documents attached to Our Complaints are pro forma, Banks make two other attempts to obscure the plain statements in the mortgage documents. First, Banks always assert that no misrepresentation exists because the PSA (though not the Offering Documents) disclosed the use of MERS, and that in fact "MERS held nearly all of these

mortgages on behalf of the actual beneficial owner of the mortgages – the RMBS Trusts." This factual assertion, however, is flatly contradicted by the documents themselves.

In reality, the documents plainly state that MERS was the nominee not of the Trusts, but of the original lenders. [4] As Banks always state in their pleadings, "assignments are tracked electronically by MERS" however, MERS does not actually itself effect assignments. See *Haque*, 36Misc. 3d 1203(A), at *2 ("[T]he mortgage does not specifically give MERS the right to assign the underlying note."); *In re Vargas*, 396 B.R. 511, 517 (Bankr. C.D. Cal. 2008) ("MERS presents no evidence as to who owns the note, or of any authorization to act on behalf of the present owner."). MERS merely acts as the nominee for whomever the owner or holder of the note and mortgage is at any given time. Documentary evidence shows that MERS continued to be the agent of the originators years after the mortgages were supposed to have been assigned to the Trusts. The role of MERS is therefore entirely irrelevant to whether the mortgages and notes were in fact transferred to the Trusts.

Similarly, in *Western & Southern Life Ins. v. DLJ Mortgage Capital Inc.* ("DLJ"), the Court denied defendants' motion to dismiss an RMBS investor's fraud claims based on similar representations that the certificates were backed by residential mortgages and notes timely transferred to the trustee. No. A1105352 (Ohio Ct. of Common Pleas Hamilton Co. Feb. 24, 2012), In DLJ, defendants made exactly the same argument that Defendants make all the time – that the "alleged failure to assign the mortgage loans to the trusts or to MERS are meaningless because the Offering Documents specifically disclosed to Western and Southern that the depositors, at any point in the future and in their sole discretion, might register the mortgage loans with MERS as a substitute for the assign-to-trust requirement". In DLJ, the Court rejected this argument and denied defendants' motion to dismiss. Id., Unpublished Order of May 23, 2012; see also *Western & Southern Life Ins. Co. v. Residential Funding Co. LLC*, No. A1105042, slip op. at 15 (Ohio Ct. of Common Pleas Hamilton Co. June6, 2012), (denying defendants' motion to dismiss RMBS investor's fraud claims based on failure to transfer notes and mortgages); *Western & Southern Life Ins. Co. v. Bank of America*, Nos. A1106524 and

---

[4] See e.g., (Marley Assignment dated July 13, 2011 (6.5years after the closing date) stating that MERS "AS NOMINEE FOR . . . does hereby grant, sell, assign, transfer and convey" the mortgage and note to the Trustee);

A1105563 (Ohio Ct. of Common Pleas Hamilton Co. Aug. 3,2012), Mot. to Dismiss Hearing Tr. at 82.

Often you will find many assignments are back dated. Courts routinely find such self-serving backdating of the "effective date" to be irrelevant, and instead look at the execution date of the assignment absent proof of earlier physical delivery. See *LaSalle Bank, N.A v. Ahearn*,875 N.Y.S.2d 595, 598 (3d Dep't 2009) ("the execution date is generally controlling and a written assignment claiming an earlier effective date is deficient unless it is accompanied by proof that the physical delivery of the note and mortgage was, in fact, previously effectuated"); *Credit-Based Asset Servicing and Securitization, LLC v. Akitoye*, 880 N.Y.S.2d 223 (Table) (N.Y. Sup. Ct. Kings Co. 2009) ("The [mortgage] assignment's language purporting to give it retroactive effect, absent a prior or contemporary delivery of the note and mortgage is insufficient to grant it standing.") (quoting *Deutsche Bank Trust Co. Americas v. Peabody*, 20 Misc.3d 1108[A] (Sup. Ct. Saratoga Co. 2008)).

It is axiomatic that failure to transfer right and title to the mortgages and notes prevents the Trusts from foreclosing on defaulted loans. Clearly, such issues are highly fact-intensive questions not resolvable on a motion to dismiss. See *Pludeman v. Northern Leasing Sys.*, Inc., 10 N.Y.3d 486, 492 (2008) (holding that plaintiffs need only plead facts sufficient to permit a "reasonable inference" of the alleged misconduct). The losses to the Trust are not theoretical; they have occurred and continue to occur. For example, in *Wells Fargo Bank, N.A. as Trustee for Securitized Asset Backed Receivables 2005- FR4 v. Gisonda*, No. 11675/2006, slip op. (Sup. Ct. Nassau Co. March 30, 2007), the Court rejected (for the second time) the Trustee's application for foreclosure because the mortgage had not been timely assigned to the Trustee, finding that

> Plaintiff [Trustee] failed to establish that it is a party in interest or that it had standing to commence this action. . . . Plaintiff has failed to cite any authority entitling Plaintiff to commence this action prior to the execution of the assignment.

Indeed, courts all around the country have prevented RMBS trustees from foreclosing because of the failure to properly transfer the note and mortgage to the trust.[5]

---

[5] See, e.g., *U.S. Bank, N.A. v. Ibanez*, 458 Mass. 637 (2011); **HSBC *Bank USA, N.A. v. Taher***, No. 9320/09,2011 WL 261052532 Misc. 3d 1208(A) (appealed and reversed on other grounds)

### III.   Trustee's Duty to Record Mortgage and Trust Instrument

A trustee's duty to record the mortgage is implied, even though not specifically stated in the trust instrument. *Miles v Vivian* CA2 NY 79 F 848 (1897). In that case it was held that a mortgage trustee who certified on the bonds that they were secured by a mortgage executed and delivered to him was liable to a holder of the bonds for loss resulting from the trustee's failure to record the mortgage, and from the recording of a subsequent mortgage, which thereby obtained priority. The court said that among the implied duties of a mortgage trustee one of the most imperative is to use requisite diligence to protect the security he has taken for the bondholders; that, being the grantee in the trust deed, this duty of vigilance requires him to exercise the care which a prudent grantee would deem to be necessary for his own protection; and that in this behalf he should see to it that the trust deed is duly recorded so that no liens of a subsequent date will attach and obtain priority over the mortgage lien; also that he is chargeable with any loss resulting from his neglect to record the trust deed.

One of the implied duties of a mortgage trustee is to diligently protect the security he has taken for the noteholders, and his most important obligation is to see to it that the trust deed is duly recorded so that no liens of a subsequent date will attach and obtain priority over the mortgage lien. Any provision in the trust deed which exempts the trustee from performing this important duty is against public policy and therefore void. *Benton v Safe Deposit Bank*, 134 Misc 727, 236 NYS 36 (1926), affd 218 App Div 767, 218 NYS 701, in which the court said that the various articles of the trust agreement in the present case which referred to the procedure to be followed in the event that noteholders desired the trustee to institute suit for breach of any of the

(N.Y. Sup. Ct. Kings Co. 2011); *Wells Fargo Bank, N.A. v. Ford*, 418 N.J. Super. 592, 593 (App. Div. 2011); *Beaumont v. Bank of New York Mellon*, 81 So.3d 553, 554 (Fla. Dist. Ct. App. 2012); *Naranjo v. SBMC Mortgage*, No.3:11-cv-02229-L-WVG, Dkt.#20, p. 6 (S.D. Cal. July 24, 2012) *LaSalle Bank, N.A. v. Diaz*, No. 08 CH 21809,2009 WL 1935920 (Ill. Cir. Cook Co. June 1, 2009); *PHH Mortg. Corp. v. Kolodziej*, 798 N.W.2d 319(Wis. Ct. App. Mar. 10, 2011); *Deutsche Bank Nat'l Trust v. Brumbaugh*, 270 P.3d 151 (Okla. 2012); *Inre Wilhelm*, 407 B.R. 392 (Bankr. D. Idaho 2009); *U.S. Bank, N.A. v. Wilder*, No. 11CV7697, 2012 WL2396723 (Kan. Dist. Ct. Johnson Co. June 25, 2012); *Bellistri v. Ocwen Loan Servicing*, LLC, 284S.W.3d 619, 623-4 (Mo. Ct. App. 2009); *In re Bass*, 720 S.E.2d 18 (N.C. Ct. App. 2011); *Wells FargoBank, N.A. v. Lupori*, 8 A.3d 919 (Pa. Super. Ct. 2010); *U.S. Bank, N.A. v. Kimball*, 27 A.3d 1087 (Vt.2011). The list goes on and on.

15

provisions of the trust agreement had no application to a suit brought against the trustee for negligence in performing duties due by it to the noteholders.

The fact that a trust mortgage provides that the trustee shall not be liable for any failure to record the mortgage does not relieve him from liability for failure to record the mortgage, where the trustee makes a special contract independent of, or in substitution for, the provision of the mortgage, upon a valuable consideration, whereby it agrees with the purchaser of a bond secured by such mortgage to record the mortgage. *McCauley v Ridgewood Trust Co.*, 81 NJL 86, 79 A 327 (1911).

In *Green v Title Guarantee & T. Co.*, 223 App Div 12, 227 NYS 252 (1928), affd 248 NY 627, 162 NE 552, reh den 249 NY 600, 164 NE 599, and 267 NY 589, 196 NE 594, it was recognized that if a trustee was the only person who could refile a chattel mortgage constituting part of the trust security it could not excuse itself from doing something which was absolutely essential to the mortgage lien, by relying on an express provision exempting it from liability, but held that a bondholder could not hold the trustee liable for its failure to refile, where the mortgage was void ab initio and no one was injured by the failure to refile.

And, in *Benton v Safe Deposit Bank* 255 NY 260, 174 NE 648 (1931), where a trust indenture provided that it should be no part of the duty of the trustee to record the instrument as a mortgage or conveyance of real or personal property, **and the trustee did not record the instrument**, the court, reversing a judgment in favor of bondholders and against the trustee.

All the Trust instruments state that the Trustee shall within 30-days, record the Mortgage in the land records where the land is located.

Pursuant to M.G.L. c. 203A § 1. "Any individual, corporation or association qualified to act as fiduciary in this state may establish common trust funds for the purpose of furnishing investments to itself as fiduciary or to itself and others, as co-fiduciaries; and may, as such fiduciary or co-fiduciary, invest funds which it lawfully holds for investment in interests in such common trust funds, if such investment is not prohibited by the instrument, judgment, decree or order creating such fiduciary relationship. Each such common trust fund shall be administered in accordance with a written declaration of trust which **shall have been filed in the registry of probate in the county** in which such individual, corporation or association resides or has his or

16

its principal place of business, and such written declaration may provide that premiums paid on the purchase of interest bearing securities need not be amortized".

Pursuant to M.G.L. c. 203§ 2: "If a trust concerning land is created or declared by such instrument, the recording of the instrument, or of a certificate conforming to the requirements of section 35 of chapter 184, **in the registry of deeds or the registration office of the land court,** in either case for the county or district where the land lies, shall be equivalent to actual notice to every person claiming under a conveyance, attachment or execution thereafter made or levied".

G.L. c. 184 § 35: "Notwithstanding section 25 to the contrary, **a certificate sworn to or stated to be executed under the penalties of perjury, and in either case signed by a person who from the records of the registry of deeds or of the registry district of the land court, for the county or district in which real estate owned by a nontestamentary trust lies,** appears to be a trustee thereunder and which certifies as to: (a) the identity of the trustees or the beneficiaries thereunder; (b) the authority of the trustees to act with respect to real estate owned by the trust; or (c) the existence or nonexistence of a fact which constitutes a condition precedent to acts by the trustees or which are in any other manner germane to affairs of the trust, shall be binding on all trustees and the trust estate in favor of a purchaser or other person relying in good faith on the certificate. The certificate most recently recorded in the registry of deeds for the county or district in which the real estate lies shall control".

M.G.L. c. 259 § 1. provides, **No action shall be brought:**

> First, To charge an executor or administrator, or an assignee under an insolvent law of the commonwealth, upon a special promise to answer damages out of his own estate;
> Second, To charge a person upon a special promise to answer for the debt, default or misdoings of another;
> Third, Upon an agreement made upon consideration of marriage;
> Fourth, Upon a contract for the sale of lands, tenements or hereditaments or of any interest in or concerning them; or,
> Fifth, Upon an agreement that is not to be performed within one year from the making thereof;

**Unless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized.**

17

IV.    **The Express Trust: Investment trusts and real estate investment trusts**

There are varying degrees of Trusts. However, the trusts at issue for our cause are Common Law <u>Express Trust</u> created under the laws of New York. However, it is not that simple; the common law trust has REMIC implications whereas the schemers have elected to incorporate the tax shelter they created to dodge a tax bullet under 26 USC 860D by filing Form 1066 with the IRS. See Blacks Law; REMIC's can be organized as corporation, partnerships or <u>Trusts</u>. See also, 860A (a).

See Bogert's Trusts & Trustees § 248: Trusts used primarily for business purposes— Investment trusts and real estate investment trusts. Trusts are sometimes used as a medium for the marketing of investments. The legal entities, sometimes called "investment trusts," may be divided as to legal structure into at least three classes: (1) the corporation which issues its stock or debentures invests the proceeds in securities of widely diversified kinds, sets them apart as a fund, and sells interests in the fund, where no strict trust is involved at all; (2) **the corporation which deposits stocks with a trustee and issues certificates of interest in such stocks, where there is a true trust used as part of the investment arrangement**; and (3) the Massachusetts or business trust which holds securities in trust and issues certificates of participation representing shares that give the owners thereof equitable interests in the deposited securities.

The second type is an investment business in which a corporation ("CWMBS, Inc.") and a trust company (Bank of New York ("BONY")) as trustee participate, the corporation taking the major role and the trustee acting in an auxiliary capacity. The organizing body is an investment corporation and the public buys interests in an investment trust created by the investment corporation. *Id*. See Database updated December 2012: Chapter 14. Various Trust Functions

Because of the REMIC election, only qualified Mortgages can become part of the trust corpus.

1)    860D(4)(a) provides; "as of the close of the 3rd month beginning after the startup day and at all times thereafter, substantially all of the assets of which consist of qualified mortgages and permitted investments". The start-up date is the closing-date set forth in the PSA. The Cut-off date is always the 1st day of each month, the closing-date is usually 27-29 days after the cut-off date in the month.

2)      A qualified mortgage is one that pursuant to 860G (3)(a)(i) "is transferred to the REMIC on the startup day in exchange for regular or residual interests in the REMIC".

In many cases, I have seen courts hold the depositor did not have to assign the assets to the Trust. Ludicrous as that is, it is true. The Depositor in my case, CWMBS, Inc., absolutely had to assign the assets whereas they created the Trust and must sell the assets to the trust and all of the required filings recorded in the SEC are by CWMBS, Inc.

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): December 29, 2004

CWMBS, INC., (**as depositor** under the Pooling and Servicing Agreement, dated as of December 1, 2004, providing for the issuance of the CHL Mortgage Pass-Through Trust 2004-29, Mortgage Pass-Through Certificates, Series 2004-29). CWMBS, INC.

That plain statement "CWMBS as depositor" is unambiguous. However, the 8-K further states:

On December 29, 2004, CWMBS, Inc. (the "Company") entered into a Pooling and Servicing Agreement dated as of December 1, 2004 (the "Pooling and Servicing Agreement"), **by and among the Company, as depositor**, Countrywide Home Loans, Inc., as a seller ("CHL"), Park Granada LLC, as a seller ("Park Granada" and, together with CHL, the "Sellers"), Countrywide Home Loans Servicing LP, as master servicer (the "Master Servicer"), and The Bank of New York, as trustee (the "Trustee"), providing for the issuance of the Company's Mortgage Pass-Through Certificates, Series 2004-29. A Form of Pooling and Servicing Agreement is annexed hereto as Exhibit 99.1.

Who deposited the Assets into the trust? Who certified they deposited the assets into the Trust? Who was required to deposit the assets into the Trust? Oh, oh, oh, I know, CWMBS, Inc., the depositor as stated under oath. Stop the nonsense.

19

But wait:

Before there was a REMIC election, this was a common law trust created under the laws of New York. Therefore, all that led to the REMIC election, first had to comply with New York laws related to an express trust and the laws inherent in the trust created under New York law will forever be present. These are still express trusts created by writing.

Indeed, the Trust had to have executed assignments of the note and mortgage and there had to be a delivery of the assets, *inter vivos gift, res, corpus*, whatever name they would like to use, all the same, to the Trust. No assignments, no delivery, then, no trust over the assets see *Wadd* supra.

## V.    Governing Laws

SECTION 10.03. Governing Law
THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS

## VI.    Intention of Parties

SECTION 10.04
It is the express intent of the parties hereto that the conveyance of the (i) of the Mortgage Loans by the Sellers to the Depositor and (ii) Trust Fund by the Depositor to the Trustee each be, and be construed as, an absolute sale thereof to the Trustee. It is, further, not the intention of the parties that such conveyances be deemed a pledge thereof. However, in the event that, notwithstanding the intent of the parties, such assets are held to be the property of any Seller or the Depositor, as the case may be, or if for any other reason this Agreement is held or deemed to create a security interest in either such assets, then (i) this Agreement shall be deemed to be a security agreement (within the meaning of the

20

Uniform Commercial Code of the State of New York) with respect to all such assets and security interests and (ii) the conveyances provided for in this Agreement shall be deemed to be an assignment and a grant pursuant to the terms of this Agreement (i) by each Seller to the Depositor or (ii) by the Depositor to the Trustee, for the benefit of the Certificateholders, of a security interest in all of the assets that constitute the Trust Fund, whether now owned or hereafter acquired. Each Seller and the Depositor for the benefit of the Certificateholders shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Trust Fund, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of the Agreement. The Depositor shall arrange for filing any Uniform Commercial Code continuation statements in connection with any security interest granted or assigned to the Trustee for the benefit of the Certificateholders.

**Now we must look to the, Mortgage Loan Purchase Agreement**

(c) The Purchaser and the Seller intend that on the Closing Date the conveyance by the Seller to the Purchaser of all its right, title and interest in and to the Mortgage Loans pursuant to this Agreement shall be, and be construed as, a sale of the Mortgage Loans, without recourse. It is, further, not intended that such conveyance be deemed to be a pledge of the Mortgage Loans by the Seller to the Purchaser to secure a debt or other obligation of the Seller. However, in the event that the Mortgage Loans are held to be property of the Seller, or if this Agreement is held or deemed to create a security interest in the Mortgage Loans, then it is intended that (i) **this Agreement shall also be deemed to be a security agreement within the meaning of Articles 8 and 9 of the New York Uniform Commercial Code and the Uniform Commercial Code of any other applicable jurisdiction**; (ii) the conveyances provided for in this Section 1 shall be deemed to be a grant by the Seller to the Purchaser, to secure payment in full of the Secured Obligations (as defined below), of a security interest in all of the Seller's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the Mortgage Loans, including without limitation the Mortgage Notes, the Mortgages, any related insurance policies, the Seller's security interest in any collateral pledged to secure the

21

Mortgage Loans with respect to the Mortgage Loans and all other documents in the related
Mortgage Files, and all accounts, general intangibles, chattel paper, instruments, documents,
money, deposit accounts, certificates of deposit, goods, letters of credit, advices of credit and
investment property constituting part of the assets of the Trust, arising from or relating to (A) the
Mortgage Loans (other than any servicing rights relating to the Mortgage Loans), including with
respect to each Mortgage Loan, the Mortgage Note and related Mortgage, and all other
documents in the related Mortgage Files, and including any Qualifying Substitute Mortgage
Loans; (B) pool insurance policies, hazard insurance policies and any bankruptcy bond relating
to the foregoing, if applicable; (C) all amounts payable on or after the Cut-off Date (other than
any such payments that were due on or prior to such date) to the holders of the Mortgage Loans
in accordance with the terms thereof; (D) all income, payments, proceeds and products of the
conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other
property; and (E) all cash and non-cash proceeds of any of the foregoing;(iii) the possession or
control by the Indenture Trustee or any agent of the Indenture Trustee of Mortgage Notes or such
other items of property as constitute instruments, money, documents, advices of credit, letters of
credit, goods, certificated securities or chattel paper shall be deemed to be possession or control
by the secured party, or possession or control by the Purchaser, **for purposes of perfecting the
security interest pursuant to the Uniform Commercial Code (including, without limitation,
Sections 9-312 or 9-313 thereof)**; and (iv) notifications to persons holding such property, and
acknowledgments, receipts or confirmations from persons holding such property, shall be
deemed notifications to, or acknowledgements, receipts or confirmations from, securities
intermediaries, bailees or agents of, or persons holding for, the Indenture Trustee, as applicable,
for the purpose of perfecting such security interest under applicable law. "Secured Obligations"
means the rights of the Purchaser under this Agreement. The Seller shall, to the extent consistent
with this Agreement, take such reasonable actions as may be necessary to ensure that, if this
Agreement were deemed to create a security interest in the Mortgage Loans and the other
property described above, such security interest would be deemed to be a perfected security
interest of first priority under applicable law and would be maintained as such throughout the
term of this Agreement. **Without limiting the generality of the foregoing, the Seller shall
prepare and deliver to the Purchaser at least two months prior to any filing date, and the
Purchaser shall file, or shall cause to be filed, at the expense of the Seller, all filings**

22

**necessary to maintain the effectiveness of any original filings necessary under the Uniform Commercial Code as in effect in any jurisdiction to perfect the Purchaser's security interest in or lien on the Mortgage Loans**.

VII.   **Issues That Completely Invalidate the Note and That Which Renders the Mortgage Contract Unenforceable**

## § 3-407. ALTERATION.

(a) **"Alteration"** means (i) an unauthorized change in an instrument that purports to modify in any respect the obligation of a party, or (ii) an unauthorized addition of words or numbers or other change to an incomplete instrument relating to the obligation of a party.

(b) Except as provided in subsection (c), an alteration fraudulently made discharges a party whose obligation is affected by the alteration unless that party assents or is precluded from asserting the alteration. No other alteration discharges a party, and the instrument may be enforced according to its original terms.

(c) A payor bank or drawee paying a fraudulently altered instrument or a person taking it for value, in good faith and without notice of the alteration, may enforce rights with respect to the instrument (i) according to its original terms, or (ii) in the case of an incomplete instrument altered by unauthorized completion, according to its terms as completed.

## § 3-604. DISCHARGE BY CANCELLATION OR RENUNCIATION.

(a) A person entitled to enforce an instrument, with or without consideration, may discharge the obligation of a party to pay the instrument (i) by an intentional voluntary act, such as surrender of the instrument to the party, destruction, mutilation, or cancellation of the instrument, cancellation or striking out of the party's signature, or the addition of words to the instrument indicating discharge, or (ii) by agreeing not to sue or otherwise renouncing rights against the party by a signed record.

23

(b) Cancellation or striking out of an indorsement pursuant to subsection (a) does not affect the status and rights of a party derived from the indorsement.

(c) As used in this section, "signed," with respect to a record that is not a writing, includes the attachment to or logical association with the record of an electronic symbol, sound, or process to or with the record with the present intent to adopt or accept the record.

## § 3-302. HOLDER IN DUE COURSE.

(a) Subject to subsection (c) and Section 3-106(d), "holder in due course" means the holder of an instrument if:

(1) the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) the holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in Section 3-306, and (vi) without notice that any party has a defense or claim in recoupment described in Section 3-305(a).

(b) Notice of discharge of a party, other than discharge in an insolvency proceeding, is not notice of a defense under subsection (a), but discharge is effective against a person who became a holder in due course with notice of the discharge. Public filing or recording of a document does not of itself constitute notice of a defense, claim in recoupment, or claim to the instrument.

(c) Except to the extent a transferor or predecessor in interest has rights as a holder in due course, a person does not acquire rights of a holder in due course of an instrument taken (i) by legal process or by purchase in an execution, bankruptcy, or creditor's sale or similar proceeding, (ii) by purchase as part of a bulk transaction

not in ordinary course of business of the transferor, or (iii) as the successor in interest to an estate or other organization.

(d) If, under Section 3-303(a)(1), the promise of performance that is the consideration for an instrument has been partially performed, the holder may assert rights as a holder in due course of the instrument only to the fraction of the amount payable under the instrument equal to the value of the partial performance divided by the value of the promised performance.

(e) If (i) the person entitled to enforce an instrument has only a security interest in the instrument and (ii) the person obliged to pay the instrument has a defense, claim in recoupment, or claim to the instrument that may be asserted against the person who granted the security interest, the person entitled to enforce the instrument may assert rights as a holder in due course only to an amount payable under the instrument which, at the time of enforcement of the instrument, does not exceed the amount of the unpaid obligation secured.

(f) To be effective, notice must be received at a time and in a manner that gives a reasonable opportunity to act on it.

(g) This section is subject to any law limiting status as a holder in due course in particular classes of transactions.

## § 3-305. DEFENSES AND CLAIMS IN RECOUPMENT.

(a) Except as otherwise provided in this section, the right to enforce the obligation of a party to pay an instrument is subject to the following:

(1) a defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings;

25

(2) a defense of the obligor stated in another section of this Article or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract; and

(3) a claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument; but the claim of the obligor may be asserted against a transferee of the instrument only to reduce the amount owing on the instrument at the time the action is brought.

(b) The right of a holder in due course to enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in subsection (a)(1), but is not subject to defenses of the obligor stated in subsection (a)(2) or claims in recoupment stated in subsection (a)(3) against a person other than the holder.

(c) Except as stated in subsection (d), in an action to enforce the obligation of a party to pay the instrument, the obligor may not assert against the person entitled to enforce the instrument a defense, claim in recoupment, or claim to the instrument (Section 3-306) of another person, but the other person's claim to the instrument may be asserted by the obligor if the other person is joined in the action and personally asserts the claim against the person entitled to enforce the instrument. An obligor is not obliged to pay the instrument if the person seeking enforcement of the instrument does not have rights of a holder in due course and the obligor proves that the instrument is a lost or stolen instrument.

(d) In an action to enforce the obligation of an accommodation party to pay an instrument, the accommodation party may assert against the person entitled to enforce the instrument any defense or claim in recoupment under subsection (a) that the accommodated party could assert against the person entitled to enforce the instrument, except the defenses of discharge in insolvency proceedings, infancy, and lack of legal capacity.

(e) In a consumer transaction, if law other than this article requires that an instrument include a statement to the effect that the rights of a holder or transferee are subject to a claim or defense that the issuer could assert against the original payee, and the instrument does not include such a statement: (1) the instrument has

26

the same effect as if the instrument included such a statement; (2) the issuer may assert against the holder or transferee all claims and defenses that would have been available if the instrument included such a statement; and (3) the extent to which claims may be asserted against the holder or transferee is determined as if the instrument included such a statement.

(f) This section is subject to law other than this article that establishes a different rule for underline consumer transactions.

**New York UCC**

**§3-202**

(1) Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery with any necessary indorsement; if payable to bearer it is negotiated by delivery.

(2) An indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof.

(3) An indorsement is effective for negotiation only when it conveys the entire instrument or any unpaid residue. If it purports to be of less it operates only as a partial assignment.

(4) Words of assignment, condition, waiver, guaranty, limitation or disclaimer of liability and the like accompanying an indorsement do not affect its character as an indorsement.

New York's version of UCC 3-202(2) (numbered as 3-204 elsewhere) governs the use of an "allonge". It has been interpreted to render an allonge invalid unless it is "firmly affixed" See, e.g., *Slutsky v. Blooming Grove Inn*, 147 AD2d 208 (2d Dept. 1989), to the instrument, meaning glued or stapled, *Adams v. Madison Realty & Development*, 853 F.2d 163 (3d Cir. 1988) **and is necessary due to lack of space on the original document.** See Lawrence Safran & Joshua

27

Stein, "Getting Attached: When Do Allonges Meet the Requirements of the New York UCC?,"
236 NYLJ, No. 101 at 3, Nov. 27, 2006.13

The reason the statute of frauds exists is to prevent the very thing that has transpired in the securitization scheme. I will not cite the encyclopedic volume of case law that supports this proposition.

## CONCLUSION

In light of the foregoing there is one inescapable fact, these trusts will never own, possess, or have control over any mortgage or note the Trustee failed to acquire by the date certain. The Trustee will never be able to enforce the terms of any mortgage contracts, and there exists no remedial action that can overcome their shortcomings related to the trustee's failure to acquire the notes and mortgages, and the lack of the depositor to assign, set over, convey, or otherwise sell the note and mortgager to the trust. The chain of title is destroyed, whereas MERS could never hold in trust the note or mortgage, because on the cut-off date of the trusts, the trust had to have the whole estate and no entity but the Trustee could hold the assets. See EPTL 7-2.1. The *res/corpus* had to be securely within the Trust vault or there is no trust over the *res/corpus*.

If these Trusts have been reduced to security agreements because of their failure to acquire the trust *res/corpus*, then they are completely doomed because they lost their REMIC status and all these trust are taxable at 100%. In addition, the players never perfected their interest and further, most every assignment took place well after a default had occurred and therefore, they took possession after dishonor.

This conundrum cannot be cured

Just Thinking Out loud

RPM

# FAX COVER

ROBERT MARLEY
18 LAKEVIEW DR.
LYNNFIELD, MA 01940
781-844-3044
robertmarley1958@verizon.net

## ATTENTION KARA WATT

JERRY SCHIANOV
BRUCE WILLIAMS
SAUL SANDERS
LEWIS RANIERI
SCOTT SHAY
YALE STARK
SHELLPOINT MORTGAGE SERVICING
55 BEATTI PLACE, SUITE 110
GRENNVILLE, SC 29601
1-800-3657107
FAX: 1-866-467-1137

DATED: December 15, 2015

SENT VIA: FAX

RE: Case # 151122-000065

Dear Kara Watt:

Kindly find attached herewith my last communication with BONY.  Also, find signatures of purported assignees, Brooks, Meder, and Spector. Clearly, it is not rocket science and a two-year old can discern the real, from the fakes. It would seem that Core logic has many different forgers in their employ.  Nevertheless, the important matter for you is the forged allonge to the note.  I am sure I do not have to explain the ramifications of that FORGED allonge.

Again, kindly resolve this long overdue matter. Any further attempts to defraud me based on what I have included here for you would be a blatant violation of many laws.

As the purported debt collector, I have demanded a full accounting in the purported note and have for over five years. I would like one now. It is the only way to prove money is owed and to whom it might be owed.

In Massachusetts, the only one that can enforce the note is the owner of said not, however, if no money is due, then there is nothing to enforce and like I have demanded many time, that the note be returned to me stamped paid in full and the a satisfaction of mortgage record. In MA it does not matter who satisfied the debt, once satisfied, all bets are off and the lien is released.

For example, if I did a good deed and saved a man from a burning building, which I did, and he wanted to somehow repay me, and he took it upon himself to pay my debt, it matters not who

paid it, it is paid.  The owner of the debt was happy it was paid early. Understand. Just like in this Ponzi scheme.  Which road would you like to traverse in order to rectify this matter?

Sincerely

Bob Marley

Robert P. Marley
18 Lakeview Dr.
Lynnfield, MA 01940
781-844-3044
Marley0685@comcast.net

Dated: January 21, 2014

Bank of New York, Mellon f/k/a
Bank of New York, as Purported Trustee for
CWMBS, Inc., CHL Mortgage Pass-Through Trust 2004-29,
Mortgage Pass-Through Certificates, Series 2004-29
101 Barclay Street 4W
New York, NY 10286

Sent Via: Certified USPS Mail on January 21, 2014

Re:  **Robert P. Marley v. Bank of America, et al, (D.Mass. Civ. No. 10-10885-GAO)(1st Cir. Court of Appeals Case No. 12-2391)**

Mortgage from Robert P. Marley ("Mortgagor") to Omega Mortgage Corp ("Mortgagee") recorded with Southern Essex County Registry of Deeds (said Deeds) in Book 23716, Page 252 as Instrument # 524 ("the Mortgage"), purportedly assigned to Bank of New York, as the purported Trustee of CWMBS, Inc., CHL Mortgage Pass-Through Trust 2004-29, Mortgage Pass-Through Certificates, Series 2004-29 by instrument recorded with said Deeds in Book 30524, Page 335 purported("Note Owner").

## DEMAND LETTER PURSUANT TO M.G.L. C. 183 § 54C

Dear Purported Trustee for Purported Note Owners:

1.  Pursuant to M.G.L. c. 183 § 36, I, Robert Marley, owner in freehold, in actual possession of, 18 Lakeview Drive, Lynnfield, MA, refuse to acknowledge proof of execution by testimony of subscribing witness on the material false assignment of mortgage created on June 30, 2011 and recorded on July 13, 2011 in the Essex County Registry of Deeds (Southern District) recorded at Book 30524 Page 335.

1

2.  I have been demanding for over four-years someone or entity demonstrates their claimed ownership interest in my property and that a debt was owed or owing; all interested parties refused to comply. In 2010, I sent certified mail pursuant to 12 USC 2605(e), a QWR/Debt Validation demanding an accounting on the promissory note purportedly secured by the infra mortgage. Further, in 2010 and 2011, I sent a separate Debt Validation letters to you and Bank of America. In addition, in 2013, I sent another Debt Validation letter to your counsel of record. In this demand letter, I now demand an accounting pursuant M.G.L. c. 244 § 36 and a payoff statement on the note pursuant G.L. c. 183§§ 54C and 55. This includes the loss that was claimed for my 2008 Ch. 7 bankruptcy where the debt discharged and extinguished as a matter of law. This also includes, insurance payouts, IRS 1099A losses, NIM's Insurance payouts, Credit Default Swaps, Enhancement, the advances made by the undisclosed third party co-obligors to the note under the P&S Agreement, inter alia, and all monetary transactions in any form that satisfied the note. I also demand the Note back. It is my Note. There are no endorsements but mine. Return the original note stamped "paid in full" or a certified copy thereof.   You are named in the Registry of Deeds as mortgagee by assignment and there is no one else in the chain of title. Omega Mortgage Corp. went defunct in December of 2010.

3.  Massachusetts law now requires a complete, authentic, unbroken, verifiable chain of title in the Mortgage and Note supported by affidavits, inter alia, for one claiming mortgagee status by assignment prior to a notice of intent to foreclose (Conditions). See in their entirety, M.G.L. c. 244 §§ 14, 35A, 35B and 35C.

4.  Beginning in April of 2009, I made five attempts to modify this purported mortgage loan, two of which were through the Massachusetts Attorney General's Office, all to no avail and in violation of the mandates set forth in HAMP guidelines and relevant laws. You must file an affidavit related to § 35B as a condition. The purported mortgage meets the requirements of G.L. c. 244 § 35B in that, it is a "Certain mortgage loan" with the following features:

    i.   interest-only payments for any period of time;
    ii.  a payment option feature, where any 1 of the payment options is less than principal and interest fully amortized over the life of the loan;
    iii. the loan did not require full documentation of income or assets; the loan was underwritten with a loan-to-value ratio at or above 90 per cent and the ratio of the borrower's debt, including all housing-related and recurring monthly debt, to the borrower's income exceeded 38 per cent;

iv.   and, the loan was underwritten as a component of a loan transaction, in which the combined loan-to-value ratio exceeded 95 per cent.

See also, 209CMR 56:00 and 209 CMR 18:00 et seq. Further, on January 10, 2014, the most important protections of the Dodd Frank Act of 2010 became effective.

5. As, the purported Trustee/Mortgagee by assignment of the material false assignment knowingly recorded on July 13, 2011, you must now demonstrate your legal rights in my property through the demonstration of credible evidence and I demand within 3o-day from the postmark date of this Demand Letter, you do.

6. If you fail to demonstrate your legal rights in my property, your ability to attempt a foreclosure or even notice one, and give a complete accounting, including but not limited to all the legal settlements through the many lawsuits related to CHL 2004-29 and pay downs and overages paid, based on the manipulated LIBOR Index on CHL 2004-29, in the time prescribe supra, I will file a discharge of Mortgage in the Essex County Registry of Deeds in the Commonwealth of MA provided under G.L. c. 183 54C.

7. I have not calculated the year 2012 or 2013, however, as of January 2012, my prorated share of the pool was Approx. $753.000.00. This does not include the many insurance payouts, settlements on the note or credit default swaps. I am entitled to that prorated share because you never owned my note and mortgage when you created and sold mortgage-backed securities backed by a note and mortgage you did not own, or had dominion and control over. Any money gleaned from the unlawful use of my purported note and mortgage, my property, FICO scores, and my identity, belongs to me.[1] See setoff enclosed herewith.

8. Furthermore, you accepted the Note and Mortgage (the mortgage loan) after you noticed a default, after this purported trust funded, and after the cutoff date. You as

---

[1] See, NY EPTL 7-2.1, provides for trustee of express trust to have whole estate, and set forth qualification for same, respectively. The trust at issues is an Express Trust Created under the laws of New York. See P&S Agreement Dated December 1, 2004, Section 10.03 and 10.04. You never had legal possession of the note and mortgage. MERS could not hold in trust the mortgage, only you as purported trustee could hold the asset in Trust.

3

the Trustee could never accept a defaulted loan.[2] You had the duty of a prudent man to protect[3] the beneficiaries of the Trust (Investors) who own a fractional share of the note, and I might add without a fractional share or written assignment of the purported mortgage. You knowingly took the purported Note after dishonor. See any Deal Data Sheet for CHL 2004-29 declaring the loan 360 delinquent prior to the July 13, 2011 assignment. You cannot enforce the purported Note under Article 3 or 9 of the UCC. You also had a duty to protect me and my property and you did not.[4] Furthermore, the note lacks the requisite endorsements or the required named assignees.[5] See My Amicus Brief in, *HSBC BANK USA, NA v. Matt*, 464 Mass. 193

---

[2] A fiduciary did not act with reasonable prudence when he bought a mortgage participation in a mortgage under which defaults had already occurred, and the mortgagor had died leaving no property aside from his equity of redemption. *In re Laing's Guardianship*, 167 Misc. 10, 3 N.Y.S.2d 409 (Sur. Ct. 1938). Trustees are considered as the agents of both parties—debtor and creditor—and actions in performing the duties of their trust should be conducted with the strictest impartiality and integrity. **They are entrusted with the important function of transferring one man's property to another, and therefore both reason and justice will exact of them the most scrupulous fidelity**. Goode v Comfort, 39 Mo 313 (1866); West v Axtell 322 Mo 401, 17 SW2d 328 (1929); Ewing v McIntosh, 359 Mo 625, 222 SW2d 738 (1949); Edwards v Smith, Mo 322 SW2d 770 (1959). The underlying promissory notes serve as financial instruments generating a potential income stream for investors, but the mortgages securing **these notes are still legal title to someone's home or farm and must be treated as such**. *US Bank National Association v. Ibanez*, 458 Mass. 637, 941 N.E.2d 40, 941 N.E. 40 (2011).

[3] The trustee is under a duty to use reasonable care and skill to preserve and protect the trust property. See, e.g., *Central States, Southeast & Southwest Areas Pension Fund v Central Transport Inc.*, 472 US 559, 105 SCt 2833, 86 LEd2d 447 (1985); reh den 473 US 926 (1985); *In re Estate of Mead*, 90 Misc2d 144, 394 NYS2d 123 (1977); The proper investment of trust assets requires the exercise of sound judgment and discretion and acts requiring the exercise of judgment and discretion cannot be delegated by trustees to other persons. *Matter of Dickson*, 38 Misc. 2d 678, 237 N.Y.S.2d 572 (NY: Surrogate's Court, New York 1963) citing (Cooper v. Illinois Central R. R. Co., 38 App. Div. 22; Allison & Ver Valen Co. v. McNee, 170 Misc. 144; *Matter of Palmer*, 132 N. Y. S. 2d 311).

[4] In applying the rule that a trustee under a trust instrument owes the duty of faithfully caring for the interests of the holders of obligations secured by such instrument, **the courts frequently recognized that such duty extends also in favor of the obligor**. *Chamberlain v James*, 294 Mass 1, 200 NE 361(1936). *Harvey v Guaranty Trust Co.* 134 Misc 417, 236 NYS 37, affd 229 App Div 774, 242 NYS 905, affd 256 NY 526, 177 NE 125 (1929), (stating that a trustee under a corporate indenture may for some purposes be regarded as the agent of the mortgagor, but for other purposes it is the representative of the bondholders for whose benefit it holds the mortgaged security).

[5] "Further, the second December 8, 2008 assignment, from AMERIQUEST to "Wells Fargo Bank, N.A., as Trustee," fails to name a beneficiary for the Trustee. **The failure to name a beneficiary for the Trustee renders the assignment without merit**. It is axiomatic that "[t]here are four essential elements of a trust: (1) a designated beneficiary; (2) a designated trustee; (3) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (4)

(2013), for an understanding of what is required for a Trust to have dominion and control over the assets (note and mortgage). The Brief may be viewed here: http://www.ma-appellatecourts.org/display_docket.php?dno=SJC-11101 Amicus Marley Brief.

9. Therefore, pursuant to M.G.L. c. 183 § 54C et seq., I demand a full accounting on the purported Note, secured by a purported mortgage dated, December 3, 2004, recorded at Book 23716 Page 252 in the Southern Essex County Registry of Deeds in the Commonwealth of Massachusetts. That you demonstrate you legal rights through a complete, authentic, verifiable, unbroken chain of title to you, the purported mortgagee (Note Owner) by assignment, that includes the original wet ink note with all endorsements and all the written assignments of the mortgage down through the securitization chain.

10. I demand that you proceed in accordance with M.G.L. c. 183 §§ 54, 54B, 54C, 54D, and 55 and file the required satisfaction of mortgage and return the promissory note to me marked "paid in full" within 30-days from the postmark of this demand letter.

**In the absence of the supporting documents referred to in paragraphs (1) and (2) of G.L. c 183 § 54C and 55, and the accounting demanded, and absent objection received in writing by certified mail within 30 days after the postmark date of this written demand, the affidavits authorized by this subsection will be recorded, and will conclusively discharge the mortgage at issue.**

I reserve all my rights pursuant to applicable law, including but not limited to G.L. c. 93A for a claim of treble damages related to this matter including but not limited to G.L. c. 244 § 35C and G.L. c. 266 § 35A.

If you wish to discuss this matter, I will, however, it will only be with your inside counsel or a person with decision making powers at BONY. I will not speak to outside counsel as it relates to this matter as he has violated the professional code of conduct by representing you, BONY, and Bank of America, whereas you are adverse parties in this matter as well as other including but not limited to the MBIA lawsuit in New York.

---

actual delivery or legal assignment of the property to the trustee, with the intention of passing legal title to such property to the trustee (Brown v. Spohr, 180 NY 201, 209)." (In re Mannara, 5 Misc 3d 556, 558 [Sur Ct, New York County 2004]). (See In re Marcus Trusts, 2 AD3d 640, 641 [2d Dept 2003]; Orentreich v. Prudential Ins. Co. of America, 275 AD2d 675 [1d Dept 2000]). *Wells Fargo Bank, NA v. Farmer*, 19 Misc 3d 1141 (Sup. Ct. 2008).

Enclosed herewith, is a judgment from the United States First Circuit Court of Appeals related to this matter. The moment any Notice issues related to a foreclosure, I will bring the 54 page supplemental complaint however, revised of course, with a motion for an injunction, naming your outside counsel, Neil Raphael, and Brian T. Moynihan, CEO and President of Bank of America, as defendant's, and this matter will remain in state court where it rightfully belongs.

Sincerely yours

Robert P. Marley

CC: Amber A. Villa, Assistant Attorney General for the Commonwealth of Massachusetts

Enclosure: Judgment date, January 8, 2014. Pro-Rated share of the Pool CHL 2004-29 as of year-end 2012.

6

EXHIBIT
"36"

## AFFIDAVIT OF JOHN L. O'BRIEN, REGISTER OF SOUTHERN ESSEX DISTRICT REGISTRY OF DEEDS

I, John L. O'Brien, Register of the Southern Essex District Registry of Deeds, do hereby

swear or aver as follows:

1. Marie McDonnell of McDonnell Property Analytics, our forensic analyst has
   identified and provided me a with a list of known robo and surrogate signers (the
   "Robo-Surrogate Signer's List")and defines a "robo-signer" as follows:

   *The person on a legal document processing assembly line whose only task is to sign
   previously prepared documents affecting title to real property in a robotic-like fashion
   without reading the documents or verifying the facts contained therein by reviewing primary
   source evidence. The robo-signer's mission is to expedite the documents' recordation in the
   public land records or in court proceedings. Additionally, robo-signers regularly fail to
   establish or simply do not have the authority to execute these documents on behalf of the legal
   title holder or principal on whose behalf they purport to act.*

   (See Exhibit A, attached hereto for a copy of the current Robo-Surrogate Signer's

   List.)

2. As of June 2011 it has been my policy to require that all documents sent to the

   Southern Essex District Registry of Deeds for recording that are executed by an

   alleged robo-signer, who has variations of his/her signature on record, be

   independently verified by an affidavit that the signature is in fact the signature of

   the named individual (the "Affidavit in Support of Filing"). (See Exhibit B,

   attached hereto for a copy of an Affidavit in Support of Filing.) I have instituted

   this policy based on the opinion of Ms. McDonnell.

3. The attached Exhibit C is a certified copy of the Assignment of Mortgage created

   on June 30, 2011 and recorded in the Southern Essex District Registry of Deeds in

   Book 30524, Page 335 on July 13, 2011 is signed by Beverly Brooks, a known

   robo-signer (the "Robo-Signed Document").

4. At the time of the recording of the Robo-Signed Document, Beverly Brooks was not on the Robo-Surrogate Signer's List and therefore my Registry accepted the Robo-Signed Document for recording. However, Beverly Brooks has subsequently been added to the Robo-Surrogate Signer's List. Based upon my current policy, if the Robo-Signed Document was submitted to the Southern Essex District Registry today for recording, I would currently require that the signature be verified by an Affidavit in Support of Filing, prior to recording the Robo-Signed Document.

5. I have instituted this current policy because the signatures of the robo-signers are known not to have been the actual signature of the individual claiming to have signed the document.

6. I am familiar with various signatures purporting to be that of Beverly Brooks which are in my opinion, clearly not the same signature.

7. Based upon these facts, I have forwarded a Certified Copy of the Robo-Signed Document to the Commonwealth of Massachusetts Attorney General's Office and the Essex County District Attorney's Office for their review and possible violation of a Crime Against Property, specifically MGL Chapter 266, Section 35A (b) (4) that provides that:

"Whoever intentionally: files or causes to be filed with a registrar of deeds any document that contains a material statement that is false or a material omission, knowing such document to contain a material statement that is false or a material omission, shall be punished by imprisonment in the state prison for not more than 5 years or by imprisonment in the house of correction for not more than 2 and one-half years or by a fine of not more than $10,000 in the case of a natural

person or not more than $100,000 in the case of any other person, or by both such fine and imprisonment."

8.  As the Register of Deeds for the Southern Essex District and the keeper of the records, I truly believe in the integrity of the land recordation system and am very concerned with some lender's business practices and how they may affect homeowner's chains of title

Signed this 7TH day of December 2011, under the penalties of perjury.

John L. O'Brien, Register

Exhibit A

## McDonnell Property Analytics Approved Robo-signers List

| LAST NAME | FIRST NAME | LAST NAME | FIRST NAME |
|---|---|---|---|
| ADAMS | MURIEL | KINGSTON | PAT |
| AGUILAR GREENE | ANGELA | KIST | MARY |
| ALAGIC | SANELA | KNOWLES | RITA |
| ALLEN | CHRISTINA | KOCH | BILL |
| ALLOTEY | LIQUENDA | KOWAL | VICTORIA |
| ANDERSON | EARITHA | LEETE | JESSICA |
| ANDERSON | SCOTT | MARTINEZ | KIM |
| BAGGS | LORAINE | MCGOWAN | MARY JO |
| BAGLEY | BRENT | MEDINA | MONICA |
| BAILEY | KIRSTEN | MOORE | CRYSTAL |
| BAILEY-SLYH | MARTHA | NADEAU | MICHAEL |
| BALDWIN | CHRISTIE | NOLAN | ANGELA |
| BELL | LANCE | NOLAN | FRANCIS |
| BENIO | DONNA | NORD III | HAROLD |
| BENIO | JENNIFER | NORIEGA | MARTI |
| BLACKSTUN | NATE | OHDE | JESSICA |
| BLY | BRYAN | PEREZ | DAVID |
| BOLDUC | LORI | PETERSON | ELENA |
| BROOKS | BEVERLY | PHIDAVANH | VIENGMOR |
| BROWN | CHINA | PIRRITANO | LAURA |
| BROWN | TRACEY | PORTER | KIMBERLY |
| BURTON | LINDA | PRICE | TAMARA |
| CARTER | CHRISTINA | PRINDLE | MICHAEL |
| COLSTON | NORIKO | RIVERA | SILENA |
| COOK | MARY | RYBARCZYK | ROBERT |
| COOK | WHITNEY K. | SCHLEPPY | GREG |
| COTTRELL | BETH | SEIDEL | KEITH |
| COTTRELL | JOHN | SMITH | KATHY |
| CROFT | TOM | SPOHN | STACY |
| DALTON | MARGARET | STEPHAN | JEFFREY |
| DOCX | | THOMAS | CHERYL |
| DUNNERY | JOHN A. | THOMAS | TAWANNA |
| ESPOSITO | THERESA | THORESEN | LINDA |
| FUERSTENBERGER | ANDREW | TURNER | TIAQUANDA |
| GORLEWSKI | CATHERINE M. | VIVEROS | MELISSA |
| GREEN | LINDA | WALSH | THOMAS |
| GREEN | MICHELLE | WEST DALTON | ALLISON |
| HALYARD | MICHELLE | WHITE | CAROLYN |
| HARMON | ANDREW | WILLIAMS | SANDRA |
| HARP | KORELL | WOSNAK | JILL |
| HERTZER | RENEE | WRIGHT | KATHY |
| HESCOTT | LAURA | | |
| HINDMAIN | BARBARA | | |
| HOOD | BETHANY | | |
| HULL | DONA | | |
| HUNTER | ROSE | | |
| ISAACS | MARSHALL | | |
| JOHNSON | ERICA A. | | |
| JOHNSON-SECK | ERICA A. | | |
| KAMINSKI | JOSEPH | | |
| KENNERTY | JOHN HERMAN | | |

Updated: 12/5/2011

Exhibit B

## Affidavit in Support of Filing

I, _____ ("Declarant"), am a resident of
_____, County of _____, State of
_____, and do hereby certify, swear or affirm, and declare that I
am competent to give the following declaration based on my personal knowledge,
and that the following facts and things are true and correct:

1. I am attorney duly licensed to practice law and in good standing in _____.

2. I am representing _____ (the "Client").

3. This Affidavit is in support of the following recording:

4. The purpose of the underlying filing(s) is/are:

5. I have personally communicated on or about _[date]_____ with an
   employee or employees of the Client, whose names are_____, who
   (A) personally reviewed the documents being submitted for filling, (B)
   personally reviewed all required supporting documentation of corporate and
   personal authority ("Supporting Documents"), and (C) confirmed the
   accuracy of all documents and authenticity of all signatures, including the
   notary.

6. I have received and reviewed all Supporting Documentation.

7. Based on such communications, review of documents and my own personal
   inquiry into the Client's past and current standards and practices, I affirm
   that underlying filing(s) contain no false or questionable statements of fact or
   law.

8. Should any of the statements made herein be incorrect and the Recording
   corrupt or cloud the homeowner's chain of title, I will indemnify and hold
   anyone in the chain thereafter harmless.

   PROPERTY ADDRESS: _____

9.  I am fully aware of and understand M.G.L. c. 266 § 35A.

Signed under pains and penalities of perjury.

WITNESS my signature this _____ day of _____ 2011.

_____
Signature of Declarant

STATE or Commonwealth of _____
County _____

On this _____ day of _____, 20____, before me, the undersigned notary public, personally appeared _____ , and proved to me through satisfactory evidence of identification, which was _____, to be the person who signed the preceding or attached document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of (his) (her) knowledge and belief.

_____
Notary Public:
My commission expires: _

(official signature and seal of notary)



Exhibit C



2011071300149 Bk:30524 Pg:335
07/13/2011 11:46 ASGT Pg 1/1

| | This space for Recorder's use | |
|---|---|---|
| DocID# 7657941510074583 | Recording Requested By:<br>Bank of America<br>Prepared By:<br>Danilo Cuenca<br>888-603-9011<br>450 E. Boundary St.<br>Chapin, SC 29036 | When recorded mail to:<br>CoreLogic<br>450 E. Boundary St.<br>Attn: Release Dept.<br>Chapin, SC 29036 |

Property Address:
18 Lakeview Dr
Lynnfield, MA 01940-1459
Property Location:
Township of LYNNFIELD
MAG-AM 16745335            6/29/2011

MIN #:  100115100100007713          MERS Phone #:  838-679-6377

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is 3300 S.W. 34th Avenue, Suite 101 Ocala, FL 34474 does hereby grant, sell, assign, transfer and convey unto THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2004-29, MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2004-29 whose address is 101 BARCLAY ST - 4W, NEW YORK, NY 10286 all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage.

Original Lender:              OMEGA MORTGAGE CORP
Original Borrower(s):         ROBERT P MARLEY, A SINGLE PERSON
Date of Mortgage:            12/3/2004
Original Loan Amount:        $468,000.00
Certificate of Title Number:  N/A

Recorded in Essex/South District, MA on: 12/6/2004, book 23716, page 252 and instrument number 2004120600524

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Mortgage to be executed on
6/30/2011

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

By: _____
Beverly Brooks, Assistant Secretary

State of California
County of Ventura

On 6-30-2011 before me, IRMA DIAZ , Notary Public, personally appeared Beverly Brooks , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public: IRMA DIAZ
My Commission Expires: 9-13-2014

IRMA DIAZ
Commission # 1903988
Notary Public - California
Ventura County
My Comm. Expires Sep 13, 2014

(Seal)

INSTR 4555857 OR 4735 PG 957 RECORDED 10/26/2011 8:45 AM PAGES 1
DWIGHT E. BROCK, CLERK OF THE CIRCUIT COURT, COLLIER COUNTY FLORIDA
REC $10.00 INOX $3.00

Recording Requested By:
Bank of America
Prepared By: Diana DeAvila
888-603-9011
When recorded mail to:
CoreLogic
450 E. Boundary St.
Attn: Release Dept.
Chapin, SC 29036

DocID#     62616071199712106

Property Address:
2375 43rd Ave NE
Naples, FL 34120-7544

FL0-ASI 14832795        9-29-2011

This space for Recorder's use

MIN #: 1003932-2007189731-5        MERS Phone #: 888-679-6377

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is 3300 S.W. 34TH AVENUE, SUITE 101 OCALA, FL 34474 does hereby grant, sell, assign, transfer and convey unto BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOME LOANS SERVICING LP whose address is 8609 WESTWOOD CENTER, VIENNA, VA 22183 all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage.

Original Lender:          MERS, INC., AS NOMINEE FOR CAPITAL ONE HOME LOANS, LLC
Original Borrower(s):     JOAQUIN CALIXTO GARCIA, A SINGL PERSON
Date of Mortgage:         5/4/2007
Original Loan Amount:     $241,000.00

Recorded in Collier County, FL on: 5/24/2007, book 4234, page 0940 and instrument number 4023511

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Mortgage to be executed on
__10/03/11__

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

By: _____          By: _____
    Beverly Brooks Assistant Secretary      Martha Munoz Vice President

Witness: __Maria Medina Rodriguez__     Witness: __Swanapa Slee Assistant Secretary__

State of California
County of Ventura

On __10/03/2011__ before me, ____Jovida Alvarez Diaz____ Notary Public, personally appeared ____Beverly Brooks____ and ____Martha Munoz____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person (s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public: ____Jovida Alvarez Diaz____     (Seal)
My Commission Expires: __1-20-2014__

JOVIDA ALVAREZ DIAZ
Commission # 1877678
Notary Public - California
Los Angeles County
My Comm. Expires Jan 20, 2014

EXHIBIT
"43"

## ALLONGE TO NOTE

Loan Number:  79415100

Borrower Name:  Robert Marley

Property Address: 18 Lakeview Dr., Lynnfield MA 01940

Note Date:     12/03/2004

Loan Amount: $468,000.

Pay to the order of          Countrywide Document Custody Services,          , its
successors and/or assigns        A Division of Treasury Bank, N.A.
  Without recourse on this  03st    day of December                    , 2004.


Omega Mortgage Corp., its successors and/or assigns

By: _____
    Denise H. Bey
    Executive VP


PAY TO THE ORDER OF                    PAY TO THE ORDER OF

COUNTRYWIDE HOME LOANS INC.

WITHOUT RECOURSE                    WITHOUT RECOURSE
                                    COUNTRYWIDE HOME LOANS, INC.
COUNTRYWIDE DOCUMENT CUSTODY SERVICES,
A DIVISION OF TREASURY BANK, NA
                                    BY _____
BY _____                      David A. Spector
   LAUREN MEDER                         Managing Director
   VICE PRESIDENT

PAY TO THE ORDER OF

COUNTRYWIDE HOME LOANS INC.

WITHOUT RECOURSE

COUNTRYWIDE DOCUMENT CUSTODY SERVICES,
A DIVISION OF TREASURY BANK, NA

BY_____

LAURIE MEDER
VICE PRESIDENT

PAY TO THE ORDER OF

WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC.

BY_____

David A. Spector
Managing Director

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

    **25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by *Section 2943 of the Civil Code of California.*

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

**EXHIBIT "47"**

Witnesses:

_____           *Paul F. Meder* (Seal)
                                PAUL F MEDER          -Borrower

_____           *Laurie Meder* (Seal)
                                LAURIE MEDER        -Borrower

_____ (Seal)          _____ (Seal)
              -Borrower                            -Borrower

_____ (Seal)          _____ (Seal)
              -Borrower                            -Borrower

_____ (Seal)          _____ (Seal)
              -Borrower                            -Borrower



_____ (Seal)

PAUL F MEDER                    -Borrower

_____ (Seal)

LAURIE MEDER                    -Borrower

**ALLONGE TO NOTE**

Loan Number: 105 747347

Loan Amount: $460,165.00

Allonge To One Certain Note Dated: OCTOBER 21, 2005

And Executed By: BRUNO CASTELLANO
LINDA CASTELLANO

Property Address: 424092 CAMPTON HILLS RD
ELBURN, IL 60119

Pay to the order of:

COUNTRYWIDE BANK, NA

**EXHIBIT**

**"44"**

Without Recourse

UNIONBANK

By: _Julie Garner_
Name: JULIE GARNER
Title: REAL ESTATE CLOSING SUPERVISOR

PAY TO THE ORDER OF
COUNTRYWIDE HOME LOANS INC.
WITHOUT RECOURSE
COUNTRYWIDE BANK, N.A.
BY: _Laurie Meder_
LAURIE MEDER
SENIOR VICE PRESIDENT

PAY TO THE ORDER OF
WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC
BY
David A. Spector
Managing Director

Page 1 of 1

PAY TO THE ORDER OF

COUNTRYWIDE HOME LOANS INC.

WITHOUT RECOURSE

COUNTRYWIDE BANK, N.A.

BY: _____

LAURIE MEDER
SENIOR VICE PRESIDENT

PAY TO THE ORDER OF

WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC

BY _____

David A. Spector
Managing Director

# CORPORATE CHARTER APPROVAL SHEET
## **EXPEDITED SERVICE**     ** KEEP WITH DOCUMENT **

DOCUMENT CODE __10__     BUSINESS CODE __13__

θ _____

Close _____     Stock __✓__     Nonstock _____

P.A. _____     Religious _____

Merging (Transferor) _____

_____

_____

_____

Surviving (Transferee) _____

_____

_____

_____

EXHIBIT "48"

Affix Barcode Label Here
ID # D13855041 ACK # 1000361998044188
PAGES: 0007
PENNYMAC MORTGAGE INVESTMENT TRUST

05/18/2009  AT 10:34 A WO # 0001723788

New Name _____

_____

_____

_____

### FEES REMITTED

| | |
|---|---|
| Base Fee: | 100 |
| Org. & Cap. Fee: | 20 |
| Expedite Fee: | 50 |
| Penalty: | |
| State Recordation Tax: | |
| State Transfer Tax: | |
| Certified Copies | |
| Copy Fee: | |
| Certificates | |
| Certificate of Status Fee: | |
| Personal Property Filings: | |
| Mail Processing Fee: | |
| Other: | |
| **TOTAL FEES:** | **170** |

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
          and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name

_____

_____ Other Change(s)

_____

_____

Credit Card _____     Check __✓__     Cash _____

_____ Documents on _____ Checks

Approved By: _____

Keyed By: _____

COMMENT(S):

Code __0007__

Attention: _____

THE CORPORATION TRUST INCORPORATED
300 E LOMBARD ST.
SUITE 1400
BALTIMORE MD 21202-3219

_____

Stamp Work Order and Customer Number HERE

SDAT D 8300
AC C 33333 33 33333
CUST ID:0002280750
WORK ORDER:0001723788
DATE:05-18-2009 12:18 PM
AMT. PAID:$170.00

# PENNYMAC MORTGAGE INVESTMENT TRUST

## DECLARATION OF TRUST

### Dated: May 15, 2009

This DECLARATION OF TRUST is made as of the date set forth above by the undersigned Trustees (as defined herein).

## ARTICLE I.

## FORMATION

The Trust is a real estate investment trust within the meaning of Title 8 of the Corporations and Associations Article of the Annotated Code of Maryland, as amended from time to time ("Title 8"). The Trust shall not be deemed to be a general partnership, limited partnership, joint venture, joint stock company or a corporation (but nothing herein shall preclude the Trust from being treated for tax purposes as an association under the Internal Revenue Code of 1986, as amended from time to time (the "Code")).

## ARTICLE II.

## NAME

The name of the Trust is:

### PennyMac Mortgage Investment Trust

Under circumstances in which the Board of Trustees of the Trust (the "Board of Trustees" or "Board") determines that the use of the name of the Trust is not practicable, the Trust may use any other designation or name for the Trust.

## ARTICLE III.

## PURPOSES AND POWERS

Section 3.01.  Purposes.  The purposes for which the Trust is formed are to engage in any businesses and activities that a trust formed under Title 8 may legally engage in, including, without limitation or obligation, engaging in business as a real estate investment trust under the Code.

Section 3.02.  Powers.  The Trust shall have all of the powers granted to real estate investment trusts by Title 8 and all other powers which are not inconsistent with law and are appropriate to promote and attain the purposes set forth in the Declaration of Trust.

2009 MAY 18  A 10: 34
RECEIVED DEPARTMENT OF ASSESSMENTS & TAXATION

NY1 6963318v 3

IN WITNESS WHEREOF, this Declaration of Trust has been executed on this 15th day of May, 2009 by the undersigned Trustees, each of whom acknowledges that this document is his act, that to the best of his knowledge, information, and belief, the matters and facts set forth herein are true in all material respects and that this statement is made under the penalties for perjury.

_____
Stanford L. Kurland, Trustee

_____
David A. Spector, Trustee

I hereby accept the appointment as resident agent:

THE CORPORATION TRUST INCORPORATED

By: _____
   Name:
   Title:

NY1 6865588v 3

information, and belief, the matters and facts set forth
and that this statement is made under the penalties for

Stanford L. Kurland, Trustee

David A. Spector, Trustee

ROBERT MARLEY
18 LAKEVIEW DR.
LYNNFIELD, MA 01940
781-844-3044
robertmarley1958@verizon.net

KARA WATT
JERRY SCHIANOV
BRUCE WILLIAMS
SAUL SANDERS
LEWIS RANIERI
SCOTT SHAY
YALE STARK
SHELLPOINT MORTGAGE SERVICING
55 BEATTI PLACE, SUITE 110
GRENNVILLE, SC 29601
1-800-3657107
1-866-467-1137

DATED: December 11, 2015

SENT VIA: FAX

RE: Case # 151122-000065

Dear Kara Watt:

Kindly find attached herewith my recent communications. Also, find signatures of purported assignees.

Resolve this matter. You have many options. Use one of them to clear my title.

Your letter filed with CFPB is a mere obfuscation at best. Shellpoint may have responded to my demands, but you did not resolve the issue. Nor have you attempted to do so.

BOA could not transfer any rights to you because they had no rights to transfer. BONY is in the same boat.

BONY failed to respond to the attached letter within the time required by law. The reason they did not respond is that they cannot demonstrate a valid, legal chain of title to them. Nor do they want to submit and accounting on the note.

If you are in fact dedicated to compliance, then comply with the national mortgage settlement and release the lien you claim BONY holds.

Keep in mind that the debt was discharged in 2008 and therefore, as BONY has agree with others in the past, do not resolve this matter by way of debt forgiveness whereas, there is nothing to forgive.

Release the lien by recording said release in the Registry of Deeds and certify a note and stamp it paid in full and then return it to me.

I have been trying to reach you by phone with no success.

Thank you for your prompt attention to this long overdue matter

Sincerely

Bob Marley

ROBERT MARLEY
18 LAKEVIEW DR.
LYNNFIELD, MA 01940
781-844-3044
robertmarley1958@verizon.net

JERRY SCHIANOV
BRUCE WILLIAMS
SAUL SANDERS
LEWIS RANIERI
SCOTT SHAY
YALE STARK
SHELLPOINT MORTGAGE SERVICING
P.O.BOX 1410
TROY, MI 48099

DATED: December 6, 2015

SENT VIA: E-Mail

Dear CEO and Board Members:

I am going to this by the numbers for you so there is no misunderstanding and none of you can claim deniability related to your actions. If you indeed did an investigation, you would come up with the same results as I. Notwithstanding; you already know and understand the ramifications for the lack of assignments, negotiation, and delivery of the note and the lack of written assignments of the mortgage to BONY.

When you became the sub-servicer, this matter became one of your troubled assets.  However, the only trouble here is your threats to foreclose on a lien that does not exist.

These failures are the reasons why Countrywide never appeared at my bankruptcy and never file a proof of claim. They also knew that they never perfected a lien, 20-days prior to me filing for bankruptcy protection, and waived that right.

The lien was avoided by and through said bankruptcy.

They figured they would wait until after the bankruptcy and then try to bamboozle the courts and I. That did not work out to well for them. What were the legal fees the last time around? I do not have to pay a lawyer and you cannot wear me into the ground as is the tactic.

M.G.L. c. 244 § 1 provides:

> "A mortgagee may, after breach of condition of a mortgage of land, recover possession of the land mortgaged by an open and peaceable entry thereon, ***if not opposed by the mortgagor*** or other person claiming it, or by action under this chapter; and possession so obtained, if continued peaceably for three years from the date of recording of the memorandum or certificate as provided in section two, shall forever foreclose the right of redemption". (Emphasis added)

1

I oppose any entry. Actually, there is a notice of trespass filed with the local police, the state police, and the AG's Office. You can check your records; the notice is in there somewhere.

G.L. c. 244 § 14 provides in pertinent part:

> "For purposes of this section and section 21 of chapter 183, in the event a mortgagee holds a mortgage pursuant to an assignment, **no notice under this section shall be valid** unless (i) at the time such notice is mailed, an assignment, **or a chain of assignments, evidencing the assignment of the mortgage to the foreclosing mortgagee has been duly recorded in the registry of deeds** for the county or district where the land lies and (ii) **the recording information for all recorded assignments is referenced in the notice of sale required in this section**". (Emphasis added)

A complete chain of assignment is missing from the registry therefore; BONY is not the mortgagee by assignment nor can they claim said status. There is no evidence that Omega assigned the mortgage and negotiated the note to Countrywide. Anything after that is a dead duck. You would have to produce a written assignment to and from every entity that purportedly took possession of the purported mortgage contract. In Massachusetts, the mortgage does not follow the note. This is not to say that there was a valid transfer of the note because there was not for the reasons stated in my previous letters. You know that. You lack standing and authority because none exists. You service nothing and nothing operates in a vacuum. There had to be a true sale from each player in the Ponzi scheme, and that required at a minimum, 4 negotiations and delivery of the note and 4-written assignments of the mortgage. Whereas, the sale of a mortgage is the sale of land in Massachusetts and must be done by writing. Research our statutory law and case law. Do the work. Here is a helping hand.

> "A mortgage of real estate is a conveyance of the title or of some interest therein defeasible upon the payment of money or the performance of some other condition. *Wearse v. Peirce*, 24 Pick. 141. *Bayley v. Bailey*, 5 Gray, 505, 509. *United States Trust Co. v. Commonwealth*, 245 Mass. 75, 78. Where the condition of defeasance is the fulfilment of a promise by the mortgagor, the mortgage depends upon the validity of the mortgagor's obligation. If there is no consideration for the promise, there is no enforceable contract and the mortgage security is not available to the mortgagee." *Wearse v. Peirce*, 24 Pick. 141. *Saunders v. Dunn*, 175 Mass. 164. *Bailey v. Way*, 266 Mass. 437, 441. *Dow v. Poore*, 272 Mass. 223, 226. *Pearson v. Mulloney*, 289 Mass. 508.

> **"Like a sale of land itself, the assignment of a mortgage is a conveyance of an interest in land that requires a writing signed by the grantor.** See G. L. c. 183, § 3; *Saint Patrick's Religious, Educ. & Charitable Ass'n v. Hale*, 227 Mass. 175, 177 (1917). In a "title theory state" like Massachusetts, a mortgage is a transfer of legal title in a property to secure a debt. See *Faneuil Investors Group, Ltd. Partnership v. Selectmen of Dennis*, 458 Mass. 1, 6 (2010). Therefore, when a person borrows money to purchase a home and gives the lender a mortgage, the homeowner-mortgagor retains only equitable title in the home; the legal title is held by the mortgagee. See *Vee Jay Realty Trust Co. v. DiCroce*, 360 Mass. 751, 753 (1972), quoting *Dolliver v. St. Joseph Fire & Marine Ins. Co.*, 128 Mass. 315, 316 (1880) (although "as to all the world except the mortgagee, a mortgagor is the owner of the mortgaged lands," mortgagee has legal title to property); *Maglione v. BancBoston Mtge. Corp.*, 29 Mass. App. Ct. 88, 90 (1990). Where, as here, mortgage loans are pooled together in a trust and converted into mortgage-backed securities, the underlying promissory notes serve as financial instruments generating a

2

potential income stream for investors, but the mortgages securing these notes are still legal title to someone's home or farm and must be treated as such".

Written assignments are required by law and must be recorded, however, nobody followed the law where your predecessors are concerned, and you may not overcome their errors. You are mere debt collectors trying to cash in. I do not know how you have attached yourselves to me but you better unattached yourselves forthwith.

G.L. c. 244 § 35A states in pertinent part:
   "(j) A copy of the notice required by this section and an affidavit demonstrating compliance with this section shall be filed by the mortgagee, or anyone holding thereunder, in any action or proceeding to foreclose on such residential real property.

   (k) A copy of the notice required by this section shall also be filed by the mortgagee, or anyone holding thereunder, with the commissioner of the division of banks. Additionally, if the residential property securing the mortgage loan is sold at a foreclosure sale, the mortgagee, or anyone holding thereunder, shall notify the commissioner of the division of banks, in writing, of the date of the foreclosure sale and the purchase price obtained at the sale".

As a condition prior to a foreclosure, you are required by law to file an affidavit in the Registry that you complied with this section. Any affidavit claiming to have complied would be blatant fraud and a false, perjured affidavit. You cannot cure your predecessor's prior bad acts.

Vicarious liability attaches to you and yours.

You sent me a HAMP application, twice. There is no loan to modify. The mere fact that you sent me those applications, demonstrates your deceptive acts to lull me into reaffirming the discharge debt. You have to get up real early in the morning to pull the wool over my eyes. Do not send me another one. You had your chance to modify this purported loan in April of 2009 when I first applied and four more times after that. Now you want another shot at the apple. Stop the nonsense.

G.L. c. 244 § 35B(b) provides that:

   "A creditor shall not cause publication of notice of a foreclosure sale, as required by section 14, upon certain mortgage loans unless it has first taken reasonable steps and made a good faith effort to avoid foreclosure".

Section (f) provides:

   "Prior to publishing a notice of a foreclosure sale, as required by section 14, the creditor, or if the creditor is not a natural person, an officer or duly authorized agent of the creditor, shall certify compliance with this section in an affidavit based upon a review of the creditor's business records. The creditor, or an officer or duly authorized agent of the creditor, shall record this affidavit with the registry of deeds for the county or district where the land lies".

If you were to attempt to record any chain of title (assignments) or required affidavits in our registry, you would be violating M.G.L.c. 266 § 35A, for knowingly recording a material false and misleading document in said registry.

3

G.L. c. 244 § 35C (b) provides:

> "A creditor shall not cause publication of notice of foreclosure, as required under section 14, when the creditor knows or should know that the mortgagee is neither the holder of the mortgage note nor the authorized agent of the note holder.
>
> Prior to publishing a notice of a foreclosure sale, as required by section 14, the creditor, or if the creditor is not a natural person, an officer or duly authorized agent of the creditor, shall certify compliance with this subsection in an affidavit based upon a review of the creditor's business records. The creditor, or an officer or duly authorized agent of the creditor, shall record this affidavit with the registry of deeds for the county or district where the land lies".

You are not an authorized agent because BONY has no rights in my property therefore, they or any other entity, could not have bestowed any rights upon you because they lacked authority to bestow any rights whatsoever.

Section 35C further provides:

> (c) A creditor violates this chapter if the creditor imposes upon a third party the cost of correcting, curing or confirming documentation relating to the sale, transfer or assignment of a mortgage loan, including, but not limited to, costs related to curative actions taken because a foreclosure was commenced without the creditor's possession of a valid, written, signed and dated assignment evidencing the assignment of the mortgage, in violation of section 14. A third party may recover all of the third party's costs including reasonable attorneys' fees for having to correct, cure or confirm documentation.
>
> (d) *__A creditor violates this chapter if the creditor makes statements to a state or federal court related to foreclosure or compliance with this chapter, orally or in writing, that it knows or should know are false, including, but not limited to, statements about the offering of a loan modification, the borrower's history of payments, the validity of the assignment of the mortgage loan, that the creditor is the record holder of the mortgage loan or the creditor's compliance with any other requirements of this chapter__*.  (Emphasis added)
>
> (e) A creditor violates this chapter if the creditor imposes a fee upon a borrower for goods not rendered or services not performed in connection with a foreclosure.

I have demonstrated clear evidence and proof of the legally invalid assignment recorded in my registry.

If you persist, I will be coming after the money. The amount would be substantial whereas, the purported note was satisfied many times over through the Ponzi scheme that is asset-backed securitization. The mortgage should have been discharged long ago but you and your ilk aren't happy with double dipping, you want to quadruple dip tenfold.

G.L. c. 244 § 36 provides that:

> "If a mortgagee or person claiming or holding under him ***receives from rents and profits of the land***, or upon a tender made to him, ***or in any other manner***, ***more than is due on the mortgage***, and no suit for redemption is brought against him, ***the mortgagor or other person entitled to such excess may recover it in a civil action***". (Emphasis added)

M.G.L.c. 260 § 33 provides in pertinent part:

> "A power of sale in any mortgage of real estate ***shall not be exercised*** and an entry shall not be made nor possession taken nor proceeding begun for foreclosure of any such mortgage after the expiration of .... , 5 years from the expiration of the term or from the maturity date, unless an extension of the mortgage, or an acknowledgment or affidavit that the mortgage is not satisfied, is recorded before the expiration of such period".

> "Upon the expiration of the period provided herein, ***the mortgage shall be considered discharged for all purposes without the necessity of further action by the owner of the equity of redemption or any other persons having an interest in the mortgaged property and, in the case of registered land***, upon the payment of the fee for the recording of a discharge, the mortgage shall be marked as discharged on the relevant memorandum of encumbrances in the same manner as for any other mortgage duly discharged". (Emphasis strongly added)

The note was accelerated in 2010, while BOA was dual tracking the Mod and their attempts to foreclose. There was a demand for full payment more than five-years ago without extension of the purported mortgage and no affidavit or acknowledgement recorded in a timely manner in my registry. You are done. I will not even get into the UCC, however, pursuant to the UCC; your predecessors' waived any claims you might have had long ago.

The Acts of 2015 c. 141, which amended c. 244 § 15, is not applicable here yet however, I would read the text. Especially, (f) A material misrepresentation contained in an affidavit shall constitute a violation of section 2 of chapter 93A.

Also, see *Eaton v. Federal National Mortgage Association*, 462 Mass. 569, 969 N.E.2d 1118 (2012).

> Note 2 is very important for you to understand. "The term "mortgage note" is used in this opinion to refer to the promissory note or other form of debt or obligation for which the mortgage provides security; ***and the term "note holder" is used to refer to a person or entity owning the "mortgage note***." (Emphasis added) I filed an Amicus Brief in that case.

> Note 3 " We acknowledge the amicus briefs filed by Adam J. Levitin, pro se; WilmerHale Legal Services Center, National Consumer Law Center, and Paul Collier; Marie McDonnell; Real Estate Bar Association for Massachusetts, Inc., and Abstract Club (collectively REBA); John L. O'Brien, Jr., pro se; Ablitt Scofield, P.C.; American Land Title Association; Mortgage Bankers Association; Suchand Reddy Pingli, pro se; Katherine McDonough, pro se; ***Robert P. Marley, pro se***; Federal Housing Finance Agency; and Robert Napolitano, pro se".

I also lobbied for and gave testimony for the Acts of 2010 c. 258, an act relative to foreclosures.

5

In Massachusetts, you must demonstrate your ownership in the note. Period. I have already stated and demonstrated the reasons why, no one owns the Note and why you cannot enforce the purported Note.

You cannot initiate any legal action whereas you are not a real party in interest.
I check my registry of deeds regularly. If I see any new recordings, I will immediately notify the AG and go to the Essex County District Attorney's Office to file a criminal complaint.

I cannot make it any clearer for you. Your attempts to defraud me must cease immediately.
Your threats to take my property without a legal right must stop immediately.
You have threatened to take a legal action that you cannot legally initiate.
You have threatened to foreclose on my property to enforce a lien that does not exist.

See 940 CMR 7.00 et seq.

7.04 provides that:

> (1) It shall constitute an unfair or deceptive act or practice for a creditor to contact a debtor in any of the following ways: (a) Threatening to sell or assign to another the obligation of a debtor with an attending representation or implication that the result of such sale or assignment would be that a debtor would lose any defense to the claim or would be subjected to harsh, vindictive or abusive collection attempts; (b) Threatening that nonpayment of a debt will result in: 1. Arrest or imprisonment of any debtor; or

> 2. Seizure, garnishment, attachment, or sale of any property or wages of any person or the taking of other action requiring judicial order without informing the debtor that there must be in effect a judicial order permitting such action before it can be taken or unless such action is lawful and the creditor intends to take such action; or

> 3. Any action that cannot legally be taken or that is not intended to be taken.

> (m) Stating that the creditor will take any action, including legal action, which in fact is not taken or attempted on such debtor's account, unless an additional payment or a new agreement to pay has occurred within the stated time period. For purposes of 940 CMR 7.04(1)(m), the time period in connection with such statement shall be presumed to expire 14 days from the date the statement is made, unless otherwise indicated by the creditor;

7.07: General Unfair or Deceptive Acts or Practices

> It shall constitute an unfair or deceptive act or practice to engage in any of the following practices to collect or attempt to collect any debt:

> (1) Any false representation that the creditor has information in his or her possession or something of value for the debtor.

> (2) Any knowingly false or misleading representation in any communication as to the character, extent or amount of the debt, or as to its status in any legal proceeding, provided, however, that an incorrect or estimated bill submitted by a gas or electric utility company regulated by M.G.L. c. 164, and the Department of Public Utilities shall not be prohibited by 940 CMR 7.07.

6

(5) The use, distribution or sale of any written communication which simulates, or which is falsely represented to be, or which otherwise would reasonably create a false impression that it was, a document authorized, issued or approved by a court, a government official or other governmental authority.

(6) Any representation that an existing obligation of a debtor may be increased by the addition of attorney's fees, investigation fees, service fees, or any other fees or charges, if in fact such fees or charges may not legally be added to the existing obligation.

**(7) Any solicitation or obtaining of any written statement or acknowledgement in any form containing an affirmation of any obligation by a debtor who has been adjudicated bankrupt, without clearly and conspicuously disclosing the nature and consequences of such affirmation.**

(8) Any false, deceptive, or misleading representation, communication, or means in connection with the collection of any debt or to obtain information concerning a debtor.

(9) Any false or misleading representation or implication that a sale, referral, or other transfer of any interest in a debt shall cause the debtor to: (a) lose any claim or defense to payment of the debt; or (b) become subject to any practice prohibited by 940 CMR 7.00.

(11) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false including, without limitation, the failure to communicate that a disputed debt is disputed.

(15) Using any business, company or organization name other than the true name of the creditor's business, company or organization.

(16) The collection of any amount (including interest, fees, charges or expenses incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

(18) Taking or threatening to take any non-judicial action to effect dispossession or disablement of property if: (a) there is no present right to possession of the property claimed as collateral through a court order or an enforceable security interest; (b) there is no present intention to take possession of the property; (c) the creditor knows or has reason to know that demands for payment and/or legal notices were not directed to the debtor's current address; or (d) the property is exempt from seizure on execution because its value does not exceed the value for exemption set forth in M.G.L. c. 235, § 34, or the property is otherwise exempt by law from such dispossession or disablement; 940 CMR 7.07(18)(d) shall not apply to first mortgage foreclosures properly conducted in accordance with Massachusetts law.

(19) Taking possession of or selling upon execution property that is exempt from seizure on execution because its value does not exceed the value for exemption set forth in M.G.L. c. 235, § 34, or the property is otherwise exempt by law from such dispossession or disablement; 940 CMR 7.07(19) shall not apply to first mortgage foreclosures properly conducted in accordance with Massachusetts law.

7

(21)   Reporting to a consumer reporting agency on transactions or experiences with a debtor in a name other than that of the creditor.

(23) Requesting any information about the debtor or the debtor's accounts or assets other than information the creditor, in good faith, believes will assist in the collection of the debt owed to the creditor.

(24) Collecting or attempting to collect from any person payment of any debt that the creditor knows, or has reason to know based on a good faith determination, is a time-barred debt, or seeking or obtaining from any person an admission, affirmation, acknowledgement of a new promise to pay, or any waiver of legal rights or defenses with regard to any debt that the creditor knows or has reason to know is a time-barred debt, unless the creditor discloses that the debt may be unenforceable through a lawsuit because the time for filing suit may have expired, and that the debtor is not required by law to sign any admission, affirmation, or acknowledgement of, or new promise to pay the debt, or to make any payment on the debt, or to waive any rights with regard to the effect of the running of the applicable statute of limitations. (a)  A creditor who makes the following disclosure shall be deemed to have complied with the requirements of 940 CMR 7.07(24):

See also, 209 CMR 18.00 et seq. attached herewith. Read it in its entirety. You are violating our CMR's.

Here is the bottom line. No valid transfer of the note or mortgage ever took place and you know that. However, in order to steal my money and my property through deceptive acts and practices, your predecessors' set out to commit fraud by creating and manufacturing a bogus note, a bogus allonge to the bogus note and one bogus assignments of the mortgage and the note and recorded that bogus assignment knowing it was bogus.

In addition, the only documentation you have to rely, are forged. No authority can pass to you because BONY has no authority over the purported note and mortgage. No authority was granted to any party claiming an interest because Omega did not transfer any rights, title or interest. Omega no longer exists and did not exist when the July 13, 2011 assignment recorded. The assignment is invalid for many reasons the least of which is that no entity had authority to create, manufacture or record said fraudulent assignment. And those who recorded that document commit fraud on the public and all the world with the intent to defraud me.

A forged document conveys nothing and it is void *ab initio*.  A document created without authority is also void *ab initio*.

Moreover, the fraudulent allonge to the note was not attached to the note in the time proscribed by law.

The U.S. Bankruptcy Court for the District of Massachusetts held that an allonge must be physically affixed to the original promissory note to be effective.

I have the purported original and no allonge is attached.

In *In re: Lilia Shapoval*, Case No. 10-30175-HJB (Bankr. D. Mass. 2010), a debtor filed a Chapter 13 bankruptcy case in the Bankruptcy Court. Among her debts was a mortgage held by Wells Fargo. During the proceedings, the debtor objected to Wells Fargo's proof of claim for the

8

outstanding amount owed on the mortgage note, noting that the note attached to the proof of claim did not contain an indorsement to Wells Fargo.

After Wells Fargo filed a motion to lift the automatic stay under 11 U.S.C. § 362 (d)(1) and (2), the debtor filed an objection to the motion claiming that Wells Fargo lacked standing to pursue the claim because the original mortgage note was not properly indorsed to Wells Fargo. In response, Wells Fargo presented a copy of an allonge to the note that had been indorsed in blank. The debtor then argued that the allonge was ineffective because it had not been properly affixed to the original mortgage note.

The Bankruptcy Court reviewed the pertinent provisions of the Uniform Commercial Code as adopted by the Massachusetts legislature, looking specifically at Mass. Gen. Laws c. 106, § 3-204, which defines what constitutes an indorsement to a negotiable instrument. The statute states that a signature on a paper affixed to the negotiable instrument may be considered a part of the instrument. Citing prior decisions in other jurisdictions, the Court held that an allonge must be physically attached to the original note to be effective. The Court, accordingly, concluded that a separate evidentiary hearing would be needed to determine whether the Wells Fargo allonge had properly been affixed to the note, and, therefore, whether Wells Fargo had standing to proceed with the Motion for Relief.

Read the case and subsequent case law.

"Under Mass. Gen. Laws ch. 106, § 3-204 (a), an indorsement of an allonge is invalid unless "affixed" to the mortgage note". *IN RE HARBORHOUSE OF GLOUCESTER, LLC*, 505 B.R. 365 (Bankr. D. Mass. 2014).

BONY does not own a mortgage or a promissory note related to me. To assert such a claim is a deceptive act. To make such a false and misleading statement is intended to defraud me.

Notwithstanding the above, the mortgage contract is void as a matter of law for fraud.

I hope this letter helps you in your efforts to resolve this matter as you claim in your previous letter.

Yours truly

Bob Marley

ROBERT MARLEY
18 LAKEVIEW DR.
LYNNFIELD, MA 01940
781-844-3044
robertmarley1958@verizon.net

JERRY SCHIANOV
BRUCE WILLIAMS
SAUL SANDERS
LEWIS RANIERI
SCOTT SHAY
YALE STARK
SHELLPOINT MORTGAGE SERVICING
P.O.BOX 1410
TROY, MI 48099

DATED: NOVEMBER 30, 2015

SENT VIA: FAX TO 866-467-1137

RE: ANOTHER FALSE AND MISLEADING LETTER DATED NOVEMBER 25, 2015

Dear CEO and Board Members:

Today I received another false and misleading communication from your employees, attached herewith.

I am not wasting my time sending you any documentation. You will demonstrate a complete unbroken chain of title to BONY. Period. You will demonstrate and prove your claim.

I have cited the pertinent laws concerning what is required in Massachusetts prior to any notice from you. You cannot meet the condition precedent to send me any legal notices whatsoever concerning a loan that might have once been due, but no longer.

Moreover, BONY has no valid lien on my property because none perfected.

The fraud department at BOA agreed the signatures on the Allonge to the Note are forgeries and therefore, of no moment and void as a matter of law. Therefore, no valid transfer of the note ever took place. More importantly, there was no valid assignment of the mortgage.

Your in-house counsel can peruse the record and exhibits in the docket from the previous action. All the evidence is there.

When you produce for me the chain of title to BONY, then and only then, will we have discussions related to the fraud in the contracts.

When there is a break in the chain of title all rights revert to the assignee prior to the break and that would be Omega Mortgage, however, they went defunct in December of 2010. The dead can perform no acts from the grave.

1

No entity perfected a lien on my property. That is a legal fact. No lien was perfected through the PSA. The schemers failed to file a financial statement in New York and in Massachusetts as require by law and pursuant to the PSA, inter alia, to perfect a security interest or a lien. You can check for yourself. I have the records from the UCC in NY and MA. Moreover, BONY failed to Record the mortgage 30-days from receiving the purported mortgage loan as required by law and the PSA, inter alia, in my Registry. That should have been done in January of 2005 and was not.

The package I received today is not evidence and merely copies of some purported contract; forgeries at best. I did not sign those documents. Produce the wet ink originals with proof of negotiation and release of dominion and control over the Note and Mortgage to the Trust and produce all the written assignments of the mortgage contract down through the securitization chain. Do not create them whereas they must already exist. Business records and all that. Do not alter them. That would conflict with what is already in the public record and the court.

One more thing about the Allonge to the Note; I have received three different versions of the Note. Two by way of a QWR pursuant to RESPA in 2010. It wasn't until we were in court that counsel produced the fraudulent allonge to the note. However, what is remarkable is that, there were no staple holes or any holes at all in the Note they claimed to be a true copy of the original nor were there any holes in the Allonge. The package you sent me has holes in the Note and the Allonge. Please explain that. The Allonge must be permanently affixed to the Note or it is of no moment and worthless. Further, I got Lauri Meder's signature from her mortgage, recorded in the Ventura County Land Records in California and David Spector's, from the Secretary of State's Office in Maryland. They are completely different from the signatures on the Allonge. I also sent those for analysis. Forgeries. Moreover, pursuant to the national Mortgage Settlement, rubber stamps are invalid. You are bound by that settlement.

The assignment in which MERS also purportedly assigned the Note is void as a matter of law for Fraud.

I have 14 different variations of Beverley Brooks' signature that I submitted to the court. I have dozens of assignments from across the country with Irma Diaz's signature. The thing is, Irma's are all exactly the same; an impossibility. Again, I had those analyzed and they are computer generated. Therefore, no one appeared before anyone to sign anything. Moreover, the Note cannot be assigned and must be negotiated for a price and MERS is not a party to the Note and had no authority to assign anything, much less the Note. The July 13, 2011 assignment is a forgery and was knowingly recorded as a forgery to demonstrate some fictitious interest in my property.

I am nobody's fool and I educate lawyers on the minute detail of the Ponzi scheme that is asset-backed securitization.

The Milestones report from MERS demonstrates the no assignment to BONY ever took place in a timely manner and therefore, the players committed securities fraud when they sold mortgage-backed securities backed by a loan they never owned or had dominion and control over the said mortgage loan. Once Omega registered the loan on MERS, it just sat there for years. Neither Omega nor any other party sent a batch transfer to BONY within the 14 day of registering the

2

purported mortgage as required . BONY never accepted said transfer or rejected said transfer after an inspection of the loan doc's for fraud or any other problems as required by law and the PSA.

I have put you on notice of the fraud and have given you more information than I intended.

Produce the evidence required to demonstrate a valid lien that you claim BONY has or stop harassing me.

I am having the mortgage discharged judicially. Neither you or BONY are respondents in the Petition whereas, you have no legal standing to enter a court of law in Massachusetts. You have not suffered injury in fact nor has BONY and you are not real parties in interest. You can make no claim against my property or me and to attempt such a claim would be tantamount to fraud upon the court. The undisclosed third party co-obligators to the contracts satisfied the debt long ago. Moreover, your only move legally would be to file an in rem action in court. You cannot initiate a non-judicial foreclosure for the reasons I have already stated and pointed out for you unequivocally. Read the laws in Massachusetts.

If you would like to get down to the nuts and bolts of the money you claim was due which was secured by the lien, then in the end this is what I will be seeking. M.G.L.c. 244 § 36  provides;

" If a mortgagee or person claiming or holding under him receives from rents and profits of the land, or upon a tender made to him, *or in any other manner*, more than is due on the mortgage, and no suit for redemption is brought against him, the mortgagor or other person entitled to such excess may recover it in a civil action".

When we add up all the Overages paid, the manipulated LIBOR, the Insurance payouts, the loss claimed with the IRS, the Credit Default Swaps, The money from the Nims insurer, no money is due, and has been due for a long time. Therefore, there is no lien to enforce and the normal course of action when the Note is satisfied; a satisfaction of mortgage is recorded in our Registry and the Note is returned stamped paid in full.

I demand that you produce a valid chain of title making BONY mortgagee by assignment in accordance with Massachusetts Law.  Nothing else will suffice. What you have sent to me, means nothing and carries no legal weight. I want every document certified and I want all the affidavits required under our laws.  Let me know when I can view the wet ink originals. Furthermore, once I review them, I want them tested for age, ink, and paper, inter alia. We can agree in writing that the documents, Note and Mortgage are the originals, make certified copies and send the original for analysis to the FBI lab or the Secret Service, either will oblige.

Pick one of the blood-sucking lawyers here in MA to use as your go between and send the doc's to them. Make sure you track all documents from wherever they are purportedly stored to the law firm. I want a verifiable custodial record from 2004 to present date. I want to know everywhere the Note and Mortgage went and when.

3

My biggest question is, if the Note was not securely within the trust vault in 2004, then where was it and what did they use it for? It certainly wasn't used to back the certificates. What may I ask? That is the 64-million dollar question. Who would not protect Trillions of dollars' worth of Promissory Notes? Systemic.  My situation is not unique but alas, the general public is oblivious. I am not. Let me open this can of worms, I dare you.

The only attempt to transfer the mortgage loan to BONY was after I filed suit and after the District Court denied BOA et al's, motion to dismiss. That is when the fraud began related to the transfer of the Note and Mortgage, on December 17, 2010, and ended with the fraudulent assignment created on June 30, 2011 and recorded on July 13, 2011. If an assignment existed in 2004, one would not have been created on June 30.

To put you on further notice of your attempts to defraud me read infra.

You are violating inter alia, M.G.L. c. 266 § 30; M.G.L.c. 266 § 35A; M.G.L. c. 266 § 53A. See also, G.L. c. 271A et seq. which incorporates 18, U.S.C. s. 1961(1)(A)(B) and (D)

Again, M.G.L.c. 266 § 35A provides in pertinent part,

"(4) files or causes to be filed with a registrar of deeds any document that contains a material statement that is false or a material omission, knowing such document to contain a material statement that is false or a material omission, shall be punished by imprisonment in the state prison for not more than 5 years or by imprisonment in the house of correction for not more than 2 and one-half years or by a fine of not more than $10,000 in the case of a natural person or not more than $100,000 in the case of any other person, or by both such fine and imprisonment.

Any person who engages in a pattern of residential mortgage fraud shall be punished by imprisonment in the state prison for not more than 15 years or by a fine of not more than $50,000, in the case of a natural person, or not more than $500,000 in the case of any other person, or by both such fine and imprisonment

You are also violating inter alia, 18 USC c. 63 § 1349 which provides, "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy".

You are violating 18 USC c. 1341 which provides, "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes

4

to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both".

You are violating 18 U.S.C. § 1342 which provides, "Whoever, for the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 of this title or any other unlawful business, uses or assumes, or requests to be addressed by, any fictitious, false, or assumed title, name, or address or name other than his own proper name, or takes or receives from any post office or authorized depository of mail matter, any letter, postal card, package, or other mail matter addressed to any such fictitious, false, or assumed title, name, or address, or name other than his own proper name, shall be fined under this title or imprisoned not more than five years, or both".

You are violating 18 U.S.C. § 1343 which provides, "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both".

All documents related to this matter have been transmitted inter alia, through the wire and mail service.

You have violated 18 U.S. Code § 513 which provides in pertinent part,

"(a) Whoever makes, utters or possesses a counterfeited security of a State or a political subdivision thereof or of an organization, or whoever makes, utters or possesses a forged security of a State or political subdivision thereof or of an organization, with intent to deceive another person, organization, or government shall be fined under this title [1] or imprisoned for not more than ten years, or both.

(b) Whoever makes, receives, possesses, sells or otherwise transfers an implement designed for or particularly suited for making a counterfeit or forged security with the intent that it be so used shall be punished by a fine under this title or by imprisonment for not more than ten years, or both.

(c) For purposes of this section—

5

(1) the term "counterfeited" means a document that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety;

(2) the term "forged" means a document that purports to be genuine but is not because it has been falsely altered, completed, signed, or endorsed, or contains a false addition thereto or insertion therein, or is a combination of parts of two or more genuine documents; And,

You have violated 18 USC § 514 which provides,

(a) Whoever, with the intent to defraud—

(1) draws, prints, processes, produces, publishes, or otherwise makes, or attempts or causes the same, within the United States;

(2) passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States; or

(3) utilizes interstate or foreign commerce, including the use of the mails or wire, radio, or other electronic communication, to transmit, transport, ship, move, transfer, or attempts or causes the same, to, from, or through the United States,  any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization, shall be guilty of a class B felony.

(b) For purposes of this section, any term used in this section that is defined in section 513 (c) has the same meaning given such term in section 513 (c).

(c) The United States Secret Service, in addition to any other agency having such authority, shall have authority to investigate offenses under this section.

The balls in your court, no pun intended.

Sincerely Yours

Bob Marley

ROBERT MARLEY
18 LAKEVIEW DR.
LYNNFIELD, MA 01940
781-844-3044
robertmarley1958@verizon.net

JERRY SCHIANOV
BRUCE WILLIAMS
SAUL SANDERS
LEWIS RANIERI
SCOTT SHAY
YALE STARK
SHELLPOINT MORTGAGE SERVICING
P.O.BOX 1410
TROY, MI 48099

DATED: NOVEMBER 29, 2015

SENT VIA: FAX TO 866-467-1137

RE: FALSE AND MISLEADING LETTER

Dear CEO and Board Members:

This is my response to your false and misleading letter that I received on November 28, 2015. See attached letter.

1. There is no mortgage loan outstanding.

2. BNY does not own anything belonging to me, much less a mortgage loan. Therefore, you are making false statements when you state that BNY is the owner of my loan.

3. There is no loan, and none with the loan number set forth on the attached letter.

4. You do not service any loan related to me because none exists in any legal form.

5. I did not request any information from you.

6. I demanded that you stop your predatory attempts to collect a debt that is not due or owed.

7. The only way BNY would be the mortgagee by assignment would be if an assignment legally existed, one does not. BNY has no rights or interest in my property.

8. I am glad you realize the difference between the rest of the states in this country and MA, whereas, in MA it is not the holder in due course but the owner that matters in the legal sense, which would convey legal standing.

9. The signatures on the assignment are forgeries and Irma Diaz committed perjury and violated her oath of office when and if she acknowledged Beverley Brooks signature, whereas Brooks never appeared before Diaz and signed any document related to my property. Moreover, the Milestones Report demonstrates that no assignment ever took

1

place in a timely manner to BNY giving them legal standing in any mortgage related to me. The assignment created on June 30, 2011 and recorded on July 13, 2011, is void as a matter of law for fraud.

10. You cannot send me any valid notices related to the discharged debt whereas, you cannot meet the condition precedents pursuant MA Laws prior to any notice.

11. The assignment that BNY would rely is void as a matter of law for fraud. Anyone acting on that assignment fraudulently recorded in the Registry would be guilty of attempted larceny, inter alia.

12. Any attempt to record in my registry, a complete chain of title evidencing some legal right will be met with the appropriate measures.

13. The note is unenforceable for many reasons but one of import is that the allonge to the note was not permanently affixed to the note and it is undated with rubber stamped forged signatures. Once your cohorts forged those signatures on the note, the note became unenforceable and void because of the forgery and alteration.

14. BOA already admitted the signatures were fraudulent.

15. BOA already admitted that no party perfected an interest in my property in a timely manner.

16. Stop harassing me. Stop your unlawful attempts to collect on a nonexistent debt; Stop making false claim and misleading statements; Stop telling me that BNY owns my mortgage loan when no loan exists; and Stop telling me you service some loan for BNY when no loan exists.

17. Have Bank of New York produce a chain of title, pursuant to M.G.L. that would demonstrate they are mortgagee by assignment, with all the required affidavits, forthwith.

18. I want a certified copy of the wet ink note and mortgage, that you claim is due, and then I want to review the original wet ink documents (**the Contracts**) in person, at a location of my choosing. This will be a nifty feat if you can somehow sneak in all the missing assignments and endorsement's that are missing from the documents I have through discovery and somehow create a chain of title in the Registry of Deeds.

19. A mere copy of the Promissory Note is counterfeit, carries no weight, and is of no moment. Would you accept a pile of copied hundred dollar bills to satisfy one of you outstanding owed debts? I think not. The Note has the same protections as a one-hundred dollar bill and if you alter that note, or make copies to pass off as the original, that is a crime, that comes under the control of the United States Secret Service.

20. There can only be one Note. In addition, if you somehow converted that note into electric form and destroyed the original, you did so without my consent, which said consent is required by law.

21. I could go on and on and point out the many violations, but will not, whereas, I have communicated enough information to you so that you can make an informed decision on how you should proceed. If you refer this matter to your outside counsel and they

2

attempt any legal action, I will have them disbarred for continuing to perpetrate your fraud and their attempts to commit larceny. See the Rules of Professional Conduct, Rule 307 et seq. Particularly see the following:

### Rule 4.1: Truthfulness in Statements to Others

In the course of representing a client a lawyer shall not knowingly:

(a) make a false statement of material fact or law to a third person; or

(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.

Adopted March 26, 2015, effective July 1, 2015.

Comment

### Misrepresentation

[1] A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts. A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements. For dishonest conduct that does not amount to a false statement or for misrepresentations by a lawyer other than in the course of representing a client, see Rule 8.4.

### Statements of Fact

[2] This Rule refers to statements of fact. Whether a particular statement should be regarded as one of fact can depend on the circumstances. Under generally accepted conventions in negotiation, certain types of statements ordinarily are not taken as statements of material fact. Estimates of price or value placed on the subject of a transaction and a party's intentions as to an acceptable settlement of a claim are ordinarily in this category, and so is the existence of an undisclosed principal except where nondisclosure of the principal would constitute fraud. Lawyers should be mindful of their obligations under applicable law to avoid criminal and tortious misrepresentation.

### Crime or Fraud by Client

[3] Under Rule 1.2(d), a lawyer is prohibited from counseling or assisting a client in conduct that the lawyer knows is criminal or fraudulent. Paragraph (b) states a specific application of the principle set forth in Rule 1.2(d) and addresses the situation where a client's crime or fraud takes the form of a lie or misrepresentation. Paragraph (b) recognizes that substantive law may require a lawyer to disclose certain information to avoid being deemed as having assisted the client's crime or fraud. In paragraph (b) the word "assisting" refers to that level of assistance which would render a third party liable for another's crime or fraud, i.e., assistance sufficient to render one liable as an aider or

abettor under criminal law or as a joint tortfeasor under principles of tort and agency law. The requirement of disclosure in this paragraph is not intended to broaden what constitutes unlawful assistance under criminal, tort or agency law, but instead is intended to ensure that these Rules do not countenance behavior by a lawyer that other law marks as criminal or tortious.

[4] Paragraph (b) requires a lawyer in certain circumstances to disclose material facts to a third person "unless disclosure is prohibited by Rule 1.6." Rule 1.6(a) prohibits disclosure of confidential information relating to the representation of a client unless the client consents or the disclosure is impliedly authorized to carry out the representation. Rule 1.6(b), however, gives the lawyer permission to disclose confidential information without client consent in certain circumstances. For example, under Rule 1.6(b)(2), a lawyer may reveal confidential information to prevent a criminal or fraudulent act that is likely to result in substantial injury to the property of another. If Rule 1.6(b) gives a lawyer permission to make disclosure, then disclosure is not prohibited by Rule 1.6, and disclosure under paragraph (b) of this Rule is mandatory. If Rule 1.6(b) does not give permission to disclose – as in the previous example when the injury from a criminal or fraudulent act is not "substantial" – then the disclosure requirement of Rule 4.1(b) does not apply. See Rule 1.6, Comment 6A. Even if Rule 1.6 prohibits disclosure, the lawyer may have other duties, such as a duty to withdraw from the representation. See Rule 1.2(d) and Rule 1.16(a)(1).

There are other Rules your counsel must abide by and more often than not, do not, because no one holds their feet to the fire, but I will, make no mistake.


Kindly resolve this matter forthwith.


Yours

Bob Marley

4

Robert P. Marley
18 Lakeview Drive
Lynnfield, MA 01940
781-844-3044
robertmarley1958@verizon.net

Jack Navarro
Jerry Schianov
Bruce Williams
Saul Sanders
Lewis Ranieri
Scott Shay
Yale Stark

Shellpoint Mortgage Servicing
55 Beattie Place, Suite 110
Greenville, SC 29601
P: 866-316-4706
F: 866-467-1137

Shellpoint Partners
*Two Grand Central Tower*
*140 E. 45th Street, 37th Floor*
*New York, NY 10017*
P. 212-850-7700
F: 212-850-7770

Sent VIA Fax

Dated: January 3, 2016

RE:  **Lack of perfection of security interest or lien**

Dear Officials:

Furthermore, out of the CWMBS individual trusts that BONY is the purported trustee for, there were only 21 UCC recordings. Out of the 21, only 5, had a continuation statement recorded. None of which include CWMBS 2004-29. As I stated many time, there is no perfected security interest or lien. There is no legal way to perfect one now. Nor was there any legal way to perfect one prior to my bankruptcy. The requirement is waived and time barred.

See attached UCC recordings for the Depositor CWMBS Inc. and then read my paper if you have not. There are no filings for CHL 2004-29. However, more importantly, the MA UCC is complete void of filings.  Your predecessors were required as a matter of law to perfect in both states. UCC Last visited today.

1

# New York State Department of State
## Uniform Commercial Code
Filing Data Report

This system is based on records that were compiled to make it available for searching and is intended to act as an aid to assist in the conduct of searches. The actual filing records on file may differ. The New York State UCC observes the rules set down in Article 9 of the New York State Law. Since neither this Department nor Software has any liability for reliance on this data.

---

Name of Secured Party Organizaton Searched:

CONTAINS CWMBS  *All Filings

---

Your name selection(s) has returned 21 filing histories.

Back Button

View First Page(s)

Filing histories 1 to 21.

| | 1. Debtor Names: | COUNTRYWIDE HOME LOANS, INC. | | 4500 PARK GRANADA, CALABASAS, CA 91302-0000, USA | | |
|---|---|---|---|---|---|---|
| | Secured Party Names: | CWMBS, INC. | | 4500 PARK GRANADA, CALABASA, CA 91302-0000, USA | | |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 127045 | 06/03/2002 | 06/03/2007 | Financing Statement | 2 | NA * |
| 200612291026749 | 12/29/2006 | 06/03/2012 | Continuation | 1 | View |
| 200701195073029 | 01/19/2007 | 06/03/2012 | Continuation | 1 | View |
| 201201240048009 | 01/24/2012 | 06/03/2017 | Continuation | 1 | View |
| 201205215588858 | 05/21/2012 | 06/03/2017 | Continuation | 1 | View |

| | 2. Debtor Names: | COUNTRYWIDE HOME LOANS, INC. | | 4500 PARK GRANADA, CALABASAS, CA 91302-0000, USA | | |
|---|---|---|---|---|---|---|
| | Secured Party Names: | CWMBS, INC. | | 45 PARK GRANADA, CALABASAS, CA 91302-0000, USA | | |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 222997 | 10/01/2002 | 10/01/2007 | Financing Statement | 2 | NA * |
| 200704275437428 | 04/27/2007 | 10/01/2012 | Continuation | 1 | View |
| 200709055714158 | 09/05/2007 | 10/01/2012 | Continuation | 1 | View |
| 201206205712930 | 06/20/2012 | 10/01/2017 | Continuation | 1 | View |

2

### 3.

| | |
|---|---|
| Debtor Names: | COUNTRYWIDE HOME LOANS, INC. |
| | 4500 PARK GRANADA, CALABASAS, CA 91302-0000, USA |
| Secured Party Names: | CWMBS, INC. |
| | 4500 PARK GRANADA, CALABASAS, CA 91302-0000, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 247961 | 11/01/2002 | 11/01/2007 | Financing Statement | 2 | NA * |
| 200710120802040 | 10/12/2007 | 11/01/2012 | Continuation | 1 | View |
| 201210090573770 | 10/09/2012 | 11/01/2017 | Continuation | 1 | View |

### 4.

| | |
|---|---|
| Debtor Names: | COUNTRYWIDE HOME LOANS, INC. |
| | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |
| Secured Party Names: | CWMBS, INC. |
| | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200301220160802 | 01/22/2003 | 01/22/2008 | Financing Statement | 2 | View |

### 5.

| | |
|---|---|
| Debtor Names: | COUNTRYWIDE HOME LOANS, INC. |
| | 4500 PARK GRANADA, CALABASAS, CA 93102, USA |
| Secured Party Names: | CWMBS, INC. |
| | 4500 PARK GRANADA, CALABASAS, CA 93102, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200303030461739 | 03/03/2003 | 03/03/2008 | Financing Statement | 2 | View |
| 200802290156950 | 02/29/2008 | 03/03/2013 | Continuation | 1 | View |
| 201301075023159 | 01/07/2013 | 03/03/2018 | Continuation | 1 | View |

### 6.

| | |
|---|---|
| Debtor Names: | COUNTRYWIDE HOME LOANS, INC. |
| | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |
| Secured Party Names: | CWMBS, INC. |
| | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200303040475968 | 03/04/2003 | 03/04/2008 | Financing Statement | 2 | View |

### 7.

| | |
|---|---|
| Debtor Names: | COUNTRYWIDE HOME LOANS, INC. |
| | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |
| Secured Party Names: | CWMBS, INC. |
| | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200303270673170 | 03/27/2003 | 03/27/2008 | Financing Statement | 2 | View |

### 8.

| | |
|---|---|
| Debtor Names: | COUNTRYWIDE HOME LOANS, INC. |
| | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |
| Secured Party Names: | CWMBS, INC. |
| | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200303270674033 | 03/27/2003 | 03/27/2008 | Financing Statement | 2 | View |

3

| | | |
|---|---|---|
| 9. **Debtor Names:** | **COUNTRYWIDE HOME LOANS, INC.** | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |
| **Secured Party Names:** | **CWMBS, INC.** | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200303280687056 | 03/28/2003 | 03/28/2008 | Financing Statement | 2 | View |

| | | |
|---|---|---|
| 10. **Debtor Names:** | **COUNTRYWIDE HOME LOANS, INC.** | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |
| **Secured Party Names:** | **CWMBS, INC.** | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200303280686941 | 03/28/2003 | 03/28/2008 | Financing Statement | 2 | View |

| | | |
|---|---|---|
| 11. **Debtor Names:** | **COUNTRYWIDE HOME LOANS, INC.** | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |
| **Secured Party Names:** | **CWMBS, INC.** | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200303280687119 | 03/28/2003 | 03/28/2008 | Financing Statement | 2 | View |

| | | |
|---|---|---|
| 12. **Debtor Names:** | **COUNTRYWIDE HOME LOANS, INC.** | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |
| **Secured Party Names:** | **CWMBS, INC.** | 4500 PARK GRENADA, CALABASSAS, CA 91302, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200304160821489 | 04/16/2003 | 04/16/2008 | Financing Statement | 2 | View |

| | | |
|---|---|---|
| 13. **Debtor Names:** | **COUNTRYWIDE HOME LOANS, INC.** | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |
| **Secured Party Names:** | **CWMBS, INC.** | 4500 PARK GRENADA, CALABASAS, CA 91302, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200304220863353 | 04/22/2003 | 04/22/2008 | Financing Statement | 2 | View |

| | | |
|---|---|---|
| 14. **Debtor Names:** | **COUNTRYWIDE HOME LOANS, INC.** | 4500 PARK GRANADA, CALABASAS, CA 91302, USA |
| **Secured Party Names:** | **CWMBS, INC.** | 4500 PARK GRANADA, CALABASAS, CA 91302, USA |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200305161013857 | 05/16/2003 | 05/16/2008 | Financing Statement | 2 | View |

| | | |
|---|---|---|
| 15. **Debtor Names:** | **COUNTRYWIDE HOME LOANS, INC.** | 4500 PARK GRANADA, CALABASAS, CA 91302, USA |
| **Secured Party Names:** | **CWMBS, INC.** | 4500 PARK GRANADA, CALABASAS, CA 91302, USA |

4

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200305201031246 | 05/20/2003 | 05/20/2008 | Financing Statement | 2 | View |

| | | | |
|---|---|---|---|
| 16. Debtor Names: | COUNTRYWIDE HOME LOANS, INC. | 4500 PARK GRANADA, MS CH-143, CALABASAS, CA 91302, USA | |
| Secured Party Names: | CWMBS, INC. | 4500 PARK GRANADA, MS CH-143, CALABASAS, CA 91302, USA | |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200507010749662 | 07/01/2005 | 07/01/2010 | Financing Statement | 2 | View |

| | | | |
|---|---|---|---|
| 17. Debtor Names: | COUNTRYWIDE HOME LOANS, INC. | 4500 PARK GRANADA, MS CH-143, CALABASAS, CA 91302, USA | |
| Secured Party Names: | CWMBS, INC. | 4500 PARK GRANADA, MS CH-143, CALABASAS, CA 91302, USA | |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200510031064078 | 10/03/2005 | 10/03/2010 | Financing Statement | 2 | View |
| 201009235930827 | 09/23/2010 | 10/03/2015 | Continuation | 1 | View |
| 201509166037502 | 09/16/2015 | 10/03/2020 | Continuation | 1 | View |

| | | | |
|---|---|---|---|
| 18. Debtor Names: | COUNTRYWIDE HOME LOANS, INC. | 4500 PARK GRANADA, MS CH-143, CALABASAS, CA 91302, USA | |
| Secured Party Names: | CWMBS, INC. | 4500 PARK GRANADA, MS CH-143, CALABASAS, CA 91302, USA | |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200510271153243 | 10/27/2005 | 10/27/2010 | Financing Statement | 2 | View |

| | | | |
|---|---|---|---|
| 19. Debtor Names: | COUNTRYWIDE HOME LOANS, INC. | 4500 PARK GRANADA, MS CH-143, CALABASAS, CA 91302, USA | |
| Secured Party Names: | CWMBS, INC. | 4500 PARK GRANADA, MS CH-143, CALABASAS, CA 91302, USA | |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 200610020791612 | 10/02/2006 | 10/02/2011 | Financing Statement | 2 | View |

| | | | |
|---|---|---|---|
| 20. Debtor Names: | COUNTRYWIDE HOME LOANS, INC. | 4500 PARK GRANADA, CALABASAS, CA 91302, USA | |
| Secured Party Names: | CWMBS, INC. | 4500 PARK GRANADA, CALABASAS, CA 91302, USA | |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|
| 201002170088791 | 02/17/2010 | 02/17/2015 | Financing Statement | 2 | View |

| | | | |
|---|---|---|---|
| 21. Debtor Names: | COUNTRYWIDE HOME LOANS, INC. | 4500 PARK GRANADA, CALABASAS, CA 91302, USA | |
| Secured Party Names: | CWMBS, INC. | 4500 PARK GRANADA, CALABASAS, CA 91302, USA | |

| File no. | File Date | Lapse Date | Filing Type | Pages | Image |
|---|---|---|---|---|---|

| 201004160200666 | 04/16/2010 | 04/16/2015 | Financing Statement | 2 | View |

**Back Button**

View First Page(s)

\* Images marked NA are not available on this webpage.
[ Division of Corporations, State Records and UCC Home Page ] [ NYS Department of State Home Page ]

6

Robert P. Marley
18 Lakeview Drive
Lynnfield, MA 01940
781-844-3044
robertmarley1958@verizon.net

Jack Navarro
Jerry Schianov
Bruce Williams
Saul Sanders
Lewis Ranieri
Scott Shay
Yale Stark

Shellpoint Mortgage Servicing
55 Beattie Place, Suite 110
Greenville, SC 29601
P: 866-316-4706
F: 866-467-1137

Shellpoint Partners
Two Grand Central Tower
140 E. 45th Street, 37th Floor
New York, NY 10017
P. 212-850-7700
F: 212-850-7770

Sent VIA Fax

Dated: January 4, 2016

Dear Officials:


In addition, Saul Sanders, your own documents filed under oath, which you signed, recognize the defects were my matter is concerned. See your Form S-3/A. Specifically see pages S-8 to S-36.

I hope you did not buy this toxic waste for pennies on the dollar and re-securitized said toxic waste. That would invoke all kinds of new violations of law.


Yours



Bob Marley

Robert P. Marley
18 Lakeview Drive
Lynnfield, MA 01940
781-844-3044
robertmarley1958@verizon.net

Jack Navarro
Jerry Schianov
Bruce Williams
Saul Sanders
Lewis Ranieri
Scott Shay
Yale Stark

Shellpoint Mortgage Servicing
55 Beattie Place, Suite 110
Greenville, SC 29601
P: 866-316-4706
F: 866-467-1137

Shellpoint Partners
Two Grand Central Tower
140 E. 45th Street, 37th Floor
New York, NY 10017
P. 212-850-7700
F: 212-850-7770

Sent VIA Fax

Dated: January 3, 2016

RE:  **Assignment Referred to in Your December 28, 2015 Letter**

Dear Officials:

I am aware of the assignment and assumption agreement and had it before you made reference
to it. See attached Assignment and Assumption Agreement signed by you on June 13, 2014.
However, as I have previously stated and proved, BOA had no authority to assign anything
related to me, to you. More skullduggeries and a fraudulent attempt to create a fictitious paper
trail.


Yours

Robert P. Marley

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") is entered into as of 7/1/2014 by and between Bank of America, National Association ("Assignor") and New Penn Financial, LLC dba Shellpoint Mortgage Servicing ("Assignee"). All terms used, but not defined, herein shall have the meanings ascribed to them in the Underlying Agreement (defined below).

WHEREAS, Assignor and Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), are parties to a Commitment to Purchase Financial Instrument and Servicer Participation Agreement, a complete copy of which (including all exhibits, amendments and modifications thereto) is attached hereto and incorporated herein by this reference (the "Underlying Agreement");

WHEREAS, Assignor has agreed to assign to Assignee all of its rights and obligations under the Underlying Agreement with respect to the Eligible Loans that are identified on the schedule attached hereto as Schedule 1 (collectively, the "Assigned Rights and Obligations"); and

WHEREAS, Assignee has agreed to assume the Assigned Rights and Obligations.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignment. Assignor hereby assigns to Assignee all of Assignor's rights and obligations under the Underlying Agreement with respect to the Assigned Rights and Obligations.

2. Assumption. Assignee hereby accepts the foregoing assignment and assumes all of the rights and obligations of Assignor under the Underlying Agreement with respect to the Assigned Rights and Obligations.

3. Effective Date. The date on which the assignment and assumption of rights and obligations under the Underlying Agreement is effective is 7/1/2014.

4. Successors. All future transfers and assignments of the Assigned Rights and Obligations transferred and assigned hereby are subject to the transfer and assignment provisions of the Underlying Agreement. This Assignment and Assumption Agreement shall inure to the benefit of, and be binding upon, the permitted successors and assigns of the parties hereto.

5. Counterparts. This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be an original, but all of which together constitute one and the same instrument.

Last updated: 04/25/12

IN WITNESS WHEREOF, Assignor and Assignee, by their duly authorized officials, hereby execute and deliver this Assignment and Assumption Agreement, together with Schedule 1, effective as of the date set forth in Section 3 above.

ASSIGNOR:  Bank of America, National Association

By: _____

Name: Justin Dahl

Title: SVP

Date: 6/9/14

ASSIGNEE:  New Penn Financial, LLC dba Shellpoint Mortgage Servicing

By: _____

Name: Debbie Thayer

Title: Vice President

Date: 6/13/2014

**verizon**
**Verizon Message Center**

Friday, Dec 4 at 6:14 AM

| | |
|---|---|
| **From:** | Bob Marley <robertmarley1958@verizon.net> |
| **To:** | Lossmitigation@shellpointmtg.com |
| **Subject:** | Foreclosure Manual |

Dear CEO and Board Members:

I forgot to demand one important item from you. I demand a copy of your foreclosure manual and your manual for outside counsel.

Do not tell me you do not have one whereas, I have BOA's and Wells Fargo's. And, I must say, those manuals are outrageous. A road map for blatant fraud.

I would like to see what your procedures call for when there exists no valid chains of title or proof of a valid lien. Especially as it relates to missing assignments, negotiations and delivery of the assets to the Trust. I would like to know what company you use to create the missing documents.

Perhaps you use Core Logic. There would have to be a minimum of four proof of negotiation and deliveries and four written assignments of the purported mortgage. Keep in mind the record was submitted to a court of law and to me through 12 USC sec 1605(e).  One forged assignment is in the record.

Bob Marley

---

**verizon**
**Verizon Message Center**

---

Wednesday, Dec 2 at 5:46 AM

**From:**        Bob Marley <robertmarley1958@verizon.net>

**To:**          Lossmitigation@shellpointmtg.com

**Subject:**     Read the attached paper

Dear CEO and Board Members:


I wrote some musings for the lawyers in my circle to educate them. Kindly read the attached Paper.
It was not written per-se for the laymen
Pay close attention to what I have written because that is what you have to overcome.
I see by your profiles that you are all or were participant's in the Ponzi scheme that is asset-backed securities.
No certificate was ever backed by any mortgage purportedly place in some bogus trust.


Bob Marley

✓ *verizon*
**Verizon Message Center**

| | |
|---|---|
| **From:** | Bob Marley <robertmarley1958@verizon.net> |
| **To:** | Lossmitigation@shellpointmtg.com |
| **Subject:** | Forged Promissory Note |

Dear CEO:

This is to put you on notice that you are in possession of a forged and altered promissory note and a forged and false assignment of the note and the purported mortgage.

I want you to be aware of the Laws in Massachusetts concerning you attempts to defraud me and your attempts to commit larceny.

M.G.L.c. 267 Section 1 provides that: "Whoever, with intent to injure or defraud, falsely makes, alters, forges or counterfeits a public record, or a certificate, return or attestation of a clerk or register of a court, public register, notary public, justice of the peace, town clerk or any other public officer, in relation to a matter wherein such certificate, return or attestation may be received as legal proof; or a charter, deed, will, testament, bond or writing obligatory, power of attorney, policy of insurance, bill of lading, bill of exchange or promissory note; or an order, acquittance or discharge for money or other property or a credit card or an instrument described as a United States Dollar Traveller's Check or Cheque, purchased from a bank or other financially responsible institution, the purpose of which is a source of ready money on cashing the instrument without identification other than the signature of the purchaser; or an acceptance of a bill of exchange, or an endorsement or assignment of a bill of exchange or promissory note for the payment of money; or an accountable receipt for money, goods or other property; or a stock certificate, or any evidence or muniment of title to property; or a certificate of title, duplicate certificate of title, certificate issued in place of a duplicate certificate, the registration book, entry book, or any indexes provided for by chapter one hundred and eighty-five, or the docket of the recorder; shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two years".

Section 5 provides that: "Whoever, with intent to injure or defraud, utters and publishes as true a false, forged or altered record, deed, instrument or other writing mentioned in the four preceding sections, knowing the same to be false, forged or altered, shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two years".

Section 10 provides that: "Whoever utters or passes or tenders in payment as true any such false, altered, forged or counterfeit note, certificate or bill of credit for any debt of the commonwealth, or a bank bill or promissory note payable to the bearer thereof or to the order of any person, issued as aforesaid, or an instrument described as a United States Dollar Traveller's Check or Cheque, purchased from a bank or other financially responsible institution, the purpose of which is a source of ready money on cashing the instrument without identification other than the signature of the purchaser, knowing the same to be false, altered, forged or counterfeit, with intent to injure or defraud, shall be punished by imprisonment in the state prison for not more than five years, or by a fine of not more than one thousand dollars and imprisonment in jail for not more than one year".

This is a big one for you. Section 16 provides that: "If a fictitious or pretended signature, purporting to be the signature of an officer or agent of a corporation, is fraudulently affixed to an instrument or writing purporting to be a note, draft or other evidence of debt issued by such corporation, with intent to pass the same as true, it shall be a forgery, although no such person may ever have been an officer or agent of such corporation, or ever have existed".

M.G.L. c. 274 Section 6 provides that: "Whoever attempts to commit a crime by doing any act toward its commission, but fails in its perpetration, or is intercepted or prevented in its perpetration, shall, except as otherwise provided, be punished as follows:

First, by imprisonment in the state prison for not more than ten years, if he attempts to commit a crime punishable with death.

Second, by imprisonment in the state prison for not more than five years or in a jail or house of correction for not more than two and one half years, if he attempts to commit a crime, except any larceny under section thirty of chapter two hundred and sixty-six, punishable by imprisonment in the state prison for life or for five years or more.

Third, by imprisonment in a jail or house of correction for not more than one year or by a fine of not more than three hundred dollars, if he attempts to commit a crime, except any larceny under said section thirty, punishable by imprisonment in the state prison for less than five years or by imprisonment in a jail or house of correction or by a fine.

Fourth, by imprisonment in a jail or house of correction for not more than two and one half years or by a fine, or by both such fine and imprisonment, if he attempts to commit any larceny punishable under said section thirty".

M.G.L.c. 266 Section 34 provides that: "Whoever, with intent to defraud and by a false pretense, induces another to part with property of any kind or with any of the benefits described in sections 33 and 33A shall be guilty of larceny".

Section 35A (b) provides that: "Whoever intentionally: (1) makes or causes to be made any material statement that is false or any statement that contains a material omission, knowing the same to be false or to contain a material omission, during or in connection with the mortgage lending process, with the intent that such statement be relied upon by a mortgage lender, borrower or any other party to the mortgage lending process; (2) uses, or facilitates the use of, any material statement that is false or any statement that contains a material omission, knowing the same to be false or to contain a material omission, during or in connection with the mortgage lending process, with the intent that such statement be relied upon by a mortgage lender, borrower or any other party to the mortgage lending process; (3) receives any proceeds or any other funds in connection with a residential mortgage closing, knowing such proceeds or funds were obtained in violation of clause (1) or (2); or (4) files or causes to be filed with a registrar of deeds any document that contains a material statement that is false or a material omission, knowing such document to contain a material statement that is false or a material omission, shall be punished by imprisonment in the state prison for not more than 5 years or by imprisonment in the house of correction for not more than 2 and one-half years or by a fine of not more than $10,000 in the case of a natural person or not more than $100,000 in the case of any other person, or by both such fine and imprisonment.

Any person who engages in a pattern of residential mortgage fraud shall be punished by imprisonment in the state prison for not more than 15 years or by a fine of not more than $50,000, in the case of a natural person, or not more than $500,000 in the case of any other person, or by both such fine and imprisonment".

M.G.L. c. 266 Section 30 provides that: "(1) Whoever steals, or with intent to defraud obtains by a false pretense, or whoever unlawfully, and with intent to steal or embezzle, converts, or secretes with intent to convert, the property of another as defined in this section, whether such property is or is not in his possession at the time of such conversion or secreting, shall be guilty of larceny, and shall, if the property stolen is a firearm, as defined in section one hundred and twenty-one of chapter one hundred and forty, or, if the value of the property stolen exceeds two hundred and fifty dollars, be punished by imprisonment in the state prison for not more than five years, or by a fine of not more than twenty-five thousand dollars and imprisonment in jail for not more than two years; or, if the value of the property stolen, other than a firearm as so defined, does not exceed two hundred and fifty dollars, shall be punished by imprisonment in jail for not more than one year or by a fine of not more than three hundred dollars; or, if the property was stolen from the conveyance of a common carrier or of a person carrying on an express business, shall be punished for the first offence by imprisonment for not less than six months nor more than two and one half years, or by a fine of not less than fifty nor more than six hundred dollars, or both, and for a subsequent offence, by imprisonment for not less than eighteen months nor more than two and one half years, or by a fine of not less than one hundred and fifty nor more than six hundred dollars, or both.

(2) The term "property", as used in the section, shall include money, personal chattels, a bank note, bond, promissory note, bill of exchange or other bill, order or certificate, a book of accounts for or concerning money or goods due or to become due or to be delivered, a deed or writing containing a conveyance of land, any valuable contract in force, a receipt, release or defeasance, a writ, process, certificate of title or duplicate certificate issued under chapter one hundred and eighty-five, a public record, anything which is of the realty or is annexed thereto, a security deposit received pursuant to section fifteen B of chapter one hundred and eighty-six, electronically processed or stored data, either tangible or intangible, data while in transit, telecommunications services, and any domesticated animal, including dogs, or a beast or bird which is ordinarily kept in confinement.

(3) The stealing of real property may be a larceny from one or more tenants, sole, joint or in common, in fee, for life or years, at will or sufferance, mortgagors or mortgagees, in possession of the same, or who may have an action of tort against the offender for trespass upon the property, but not from one having only the use or custody thereof. The larceny may be from a wife in possession, if she is authorized by law to hold such property as if sole, otherwise her occupation may be the possession of the husband. If such property which was of a person deceased is stolen, it may be a larceny from any one or more heirs, devisees, reversioners, remaindermen or others, who have a right upon such deceased to take possession, but not having entered, as it would be after entry. The larceny may be from a person whose name is unknown, if it would be such if the property stolen were personal, and may be committed by those who have only the use or custody of the property, but not by a person against whom no action of tort could be maintained for acts like those constituting the larceny.

(4) Whoever steals, or with intent to defraud obtains by a false pretense, or whoever unlawfully, and with intent to steal or embezzle, converts, secretes, unlawfully takes, carries away, conceals or copies with intent to convert any trade secret of another, regardless of value, whether such trade secret is or is not in his possession at the time of such conversion or secreting, shall be guilty of larceny, and shall be punished by imprisonment in the state prison for not more than five years, or by a fine of not more than twenty-five thousand dollars and imprisonment in jail for not more than two years. The term "trade secret" as used in this paragraph means and includes anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement.

(5) Whoever steals or with intent to defraud obtains by a false pretense, or whoever unlawfully, and with intent to steal or embezzle, converts, or secretes with intent to convert, the property of another, sixty years of age or older, or of a person with a disability as defined in section thirteen K of chapter two hundred and sixty-five, whether such property is or is not in his possession at the time of such conversion or secreting, shall be guilty of larceny, and shall, if the value of the property exceeds two hundred and fifty dollars, be punished by imprisonment in the state prison for not more than ten years or in the house of correction for not more than two and one-half years, or by a fine of not more than fifty thousand dollars or by both such fine and imprisonment; or if the value of the property does not exceed two hundred and fifty dollars, shall be punished by imprisonment in the house of correction for not more than two and one-half years or by a fine of not more than one thousand dollars or by both such fine and imprisonment. The court may order, regardless of the value of the property, restitution to be paid to the victim commensurate with the value of the property".

You should consider carefully what you are attempting to do and who you are attempting to do it to.

Yours

Bob Marley

verizon
**Verizon Message Center**

Saturday, Nov 21 at 6:14 PM

| | |
|---|---|
| **From:** | Bob Marley <robertmarley1958@verizon.net> |
| **To:** | Lossmitigation@shellpointmtg.com |
| **Subject:** | HAMP |

To the no name person that sent me a HAMP application by certified mail:

There is no mortgage to modify.

Today (November 21, 2015) I received a certified letter from you acting on behalf of BNY. I have no obligation to BNY and never have.

Once again you have sent me a threatening letter in which you threatened to take a legal action you can not legally take, namely a foreclosure.

You state that the purported loan is 60-days past due. I stopped making mortgage payments when I rescinded a purported mortgage entered into with Omega Mortgage 5-years ago, prior to the court declaring that no mortgage loan is outstanding and no money is due.

Again you are making false statements and false claims which rise to deceptive acts and practices and a clear violation of M.G.L. c. 93A.

I demand you stop sending me threatening communication forthwith.

I have no knowledge of the loan which you speak and am not contract bound to you or BNY.

You cannot foreclose on a mortgage that does not exist.

One more threatening letter and I will file suit and move for an injunction enjoining you from further harassing me.

And before I do I am taking the fraudulent and altered note that you would be claiming hold to the secret service for investigation and criminal prosecution.

Thirty years in prison and a million dollar fine for that offense.

Good day

Bob Marley

ꝟerꝥꝫ⳹

**Verizon Message Center**

Wednesday, Nov 18 at 5:52 AM

**From:**      Bob Marley <robertmarley1958@verizon.net>

**To:**          Lossmitigation@shellpointmtg.com

**Subject:**   Abusive Debt Collection

Dear CEO Shellpoint:

I assert that you are in violation of the very practices outlined in the announcement below.

# FTC Partners with Federal, State, and Local LawEnforcement Agencies to Announce Nationwide "Crackdown" on Abusive DebtCollection

On November 4, the FTC announced the first coordinated federal, state, and local initiative to combatalleged abusive and deceptive debt collection practices, Operation CollectionProtection. This announcement included authorities listing 30 new actions,including five enforcement actions by the FTC. These actions targeted thefollowing practices: (i) extracting payments from consumers by usingintimidation and inaccurate representations; (ii) impersonating servers orattorneys and threatening arrest or litigation; and (iii) collecting on debtsthat never existed or had already been paid. These cases bring the total numberof actions taken under the Operation Collection Protection initiative this yearto 115 and the total number of participating law enforcement partners to 70.

Yours

Bob Marley

verizon
**Verizon Message Center**

Saturday, Nov 7 at 9:21 AM

| | |
|---|---|
| **From:** | Bob Marley <robertmarley1958@verizon.net> |
| **To:** | Lossmitigation@shellpointmtg.com |
| **Subject:** | Misleading Letter |

This letter isto address the deceptive, false, and misleading statements made in the attachedletter sent to me from your firm.

Shellpoint holdsno lien on my property as stated in the attached letter.

Massachusetts isa title theory state and the mortgage serves as the lien. The mortgage is defaceableupon the payment of the debt or otherwise and in Massachusetts; it matters notwho pays of the debt, the mortgagor, or a stranger. Once the debt is satisfied,as is the case here, the normal course of action as a matter of law is asatisfaction of mortgage shall, within 45-days, record in the Registry ofDeeds, period.

Through your ownscheme, the mortgage was satisfied the moment it was securitized without myknowledge.

Isn't true that *prior*to the issuance of the toxic loan purportedly granted to me, it had alreadybeen slated for a specific pool of assets and that the true undisclosed lender(investors) already paid off the debt?

One of thereason BNY has no standing is that they are a self-dealing trustee and violatedNew York Trust Laws when they were funding loan for Countrywide and knewultimately they would become the trustee for those toxic assets.

With limited exceptions, a trustee is strictly prohibitedfrom entering into transactions involving the trust property, or affecting itsinvestment or management, if the transaction is for the trustee's personalaccount, by self-dealing, or otherwise involves or creates a conflict betweenthe fiduciary duties and personal interests of the trustee, unless authorizedby a proper court, expressly or impliedly by the terms of the trust, or by allof the beneficiaries.

I have the 364-day revolving credit agreement between BNYand Countrywide from 2004. Not very flattering.

You are violating M.G.L. c. 93A et seq. inter alia, byasserting false claims making false statements, and for your deceptive acts andpractice's.

Although you have no interest in my property, it would seemthat whereas BNY is the only entity attempting to advance a claim, and BNY isthe mortgagee by the fraudulent assignment, a simple recording of the releaseof lien would end this

mess. Does it clear my title? Well if no other is makinga claim, I would say so if I waive any claims I have against BNY in lieu of therecording.  Something for you people tothink about.

However, the longer you continue on your current path andallow me to build a record of evidence of you bad behavior will only work in myfavor.

Yours

Bob Marley

# Shellpoint
Mortgage Servicing
P.O. Box 7050, Troy, MI 48007-7050

Robert P Marley
18 Lakeview Dr
Lynnfield, MA 01940

October 30, 2015

| | |
|---|---|
| Loan Number: | 0535444565 |
| Borrower Name: | Robert P Marley |
| Co-Borrower: | |
| Property Address: | 18 LAKEVIEW DR |
| | LYNNFIELD, MA 01940 |
| Policy Number: | HP009917611 |

Dear Robert P Marley:

We need your help in getting your lender's name, Shellpoint Mortgage Servicing, added to your insurance policy.  A bank/mortgage servicing company, in the insurance industry, is referred to as the "mortgagee".  The below "mortgagee clause" needs to be on the policy as part of your mortgage agreement.  Due to privacy laws, Shellpoint Mortgage Servicing is unable to request this change from your insurance agent or carrier.

Please contact your insurance agent to have the mortgagee clause (as shown below) added to your policy.  When speaking to your agent, please inform them that Shellpoint Mortgage Servicing holds a lien on the property and the mortgagee clause must be added to the policy.

 **Shellpoint Mortgage Servicing**
ISAOA/ATIMA
P.O. Box 7050
Troy, MI 48007-7050
Loan Number: 0535444565

This will help ensure we receive the appropriate documentation and help to expedite any and all insurance related matters, including documentation required at the time of a loss.  Your prompt response in handling this matter is greatly appreciated.

Please contact us at the number below if you have difficulty providing this information or if you have any questions.

Thank you.

Shellpoint Mortgage Servicing
Insurance Division

Phone: (877) 491-7277 Monday - Friday, 8 am to 6 pm EST
Fax:    (248) 878-2370
Email:  insdocs@shellpointmtg.com

**⌐⌐ verizon**
**Verizon Message Center**

Wednesday, Nov 4 at 8:46 PM

**From:**      Bob Marley <robertmarley1958@verizon.net>

**To:**        Lossmitigation@shellpointmtg.com

**Subject:**   Rescission

Dear CEO, Shellpoint:

One more important fact; I rescinded the purported mortgage in 2010 and the rescission was effective the moment
I put the notice in the mail.

No one responded within the 20-days and therefore, no matter what you may think or claim, the note and
mortgage were voided 5-years ago as a matter of law.

For so many reasons, no entity, real or imagined, has any legal standing where I am concerned.

Yours

Bob Marley

verizon
**Verizon Message Center**

Wednesday, Nov 4 at 7:14 PM

**From:**      Bob Marley <robertmarley1958@verizon.net>

**To:**        Lossmitigation@shellpointmtg.com

**Subject:**   Also see attached


CEO, Shellpoint:

Attached herewith is the servicing standards which you are bound by law to abide. See section IV (A).
Notwithstanding, you should read the entire ten pages as these standards are applicable to you and yours and as a
matter of fact, these standards have been codified. Bank of America was required to release the purported lien long
ago and did not and you are as culpable as them whereas, vicarious liability attaches to you. BOA is still the master
servicer and you are merely the sub-servicer for the purported trustee, or the predatory debt collector.

Yours

Bob Marley

---

*verizon*
**Verizon Message Center**

---

Tuesday, Nov 3 at 8:43 PM

| | |
|---|---|
| **From:** | Bob Marley <robertmarley1958@verizon.net> |
| **To:** | Lossmitigation@shellpointmtg.com |
| **Subject:** | Unlawful attempts to collect a fictitious debt |

To whom it may concern:

This letter is in response to the nonsensical letter I received on November 3, 2015. The letter is attached herewith.

I did not request anything except that you comply with the National Mortgage Settlement. Release the bogus lien on my property.

Furthermore, do not send me written communications without someone's name on it, whereas, if I am forced to file under the FDCPA inter alia,

I want the name of the person attempting to collect on this fictitious debt. Let me state again unequivocally that there is no debt due to you or any other party

for that matter and I demand you stop your unlawful attempts to collect on said fictitious debt.

You do not service any loan that is related to me whereas, one does not exist. There is no mortgage loan outstanding nor any money due as stated by the United States Court, District

of Massachusetts. Moreover, you are violating the United States Bankruptcy Code and the FDCPA inter alia.

Stop harassing me.

Yours

Bob Marley

P.O. BOX 1410
TROY, MI 48099-1410
RETURN SERVICE REQUESTED



**Shellpoint**

Mon - Thurs: 8:00AM-10:00I
Fri: 8:00AM-10:00I
Sat: 8:00AM-3:00P.

Mortgage Servicing



Phone Number: 866-316-4706
Fax: 866-467-1137
www.shellpointmtg.com

S-SFRECS20 L-158 R-117
P506WI00200044 - 673362734 I00088
ROBERT P MARLEY
18 LAKEVIEW DR
LYNNFIELD MA 01940-1450

10 29 2015

RE:  Loan Number: 0535444565
     Borrower:     Robert P Marley

Dear Robert P Marley:

This letter is in response to your recent inquiry regarding the above-referenced loan serviced by Shellpoint Mortgage Servicing .

We are working to gather the requested information and will forward it to you within the allotted time frame.

If you have any additional questions or concerns, please contact our Customer Service department at 866-316-4706.

Si usted no entiende el contenido de esta carta, por favor contacte a uno de nuestros representantes que hablan español al número 866-316-4706.

**Customer Service**
***Shellpoint Mortgage Servicing***

SEE REVERSE SIDE OR ATTACHED FOR AN IMPORTANT STATEMENT OF YOUR RIGHTS.

P I000001 A-0535444565 12709-15 17 41

**⌐ verizon**
**Verizon Message Center**

Friday, Oct 23 at 7:20 PM

| | |
|---|---|
| **From:** | Bob Marley <robertmarley1958@verizon.net> |
| **To:** | Lossmitigation@shellpointmtg.com |
| **Subject:** | Violation of the Massachusetts Consumer Protection Act |

Attention Ashley Smith:

My name is Robert Marley. I do not have a contract with you or BNY. I never entered into a contract with either at any time.

On October 20, 2015, I received a communication from Shellpoint in regards to a loan number (0535444565) that I am unacquainted with which has no legal bearing

on me whatsoever. Notwithstanding, I have told the officials at your firm, including you CEO, never to contact me or threaten me with a legal action you can never take.

No lawful assignment of any debt was ever perfected with any party that may have included me as a party.

No amendment to any contract was entered into by any lawful parties to any transaction whatsoever.

A fraudulent document resides in the Essex County Registry of Deeds and if any party affiliated with you or your firm tries to act upon that fraudulent assignment

that was recorded knowing it was fraudulent when recorded, I will notify the proper authorities, inter alia.

In the last conversation I had with a representative from your firm, I stated I would not write a response to your last communication. However, based on

your predatory, unyielding, threatening and unlawful attempts to collect a fictitious debt, I am now responding.

There is no debt owed now or ever, to you or BNY. BNY never perfected any interest in anything belonging to me.

BNY has no valid lien on my property and the purported mortgage I may have had, was discharged in 2008. Moreover, even if it were not, the purported contracts,

the purported note and mortgage, are void as a matter of law for fraud.

Kindly read the attached letter I sent to BNY last year which they did not respond and owe me $2500.00 for failing to respond.

All you need do, is file a satisfaction of mortgage and a release of the lien pursuant to the National Mortgage Settlement.

Furthermore, the purported trust you mention in your communication was settled along with five hundred plus trust by way of the MBIA lawsuit in NY.

I believe no money is due on any of the toxic waste in those trust and if you force me, I shall put the theory to the test.

If you have any thing constructive to add after reading the attachment, feel free to e-mail me as this is the only way I will communicate.

Sincerely

Bob Marley

**Attachment**
**Minimum Standards for Prioritization and Handling**
**Borrower Files with Imminent Foreclosure Sale**
(April 23, 2013)

---

**Operating standards for scheduled foreclosure sales**

The minimum standards set forth in this guidance reflect sound business practices that should be part of a mortgage servicer's ongoing collections, loss mitigation and foreclosure processing functions. Accordingly, the Federal Reserve requires that all state member banks, bank and savings and loan holding companies (including their non-bank subsidiaries), and U.S. branches and agencies of foreign banking organizations that service residential mortgage loans incorporate this guidance into their ongoing business processes. Failure to comply with this guidance may result in unsafe and unsound banking practices, non-compliance with foreclosure related consent orders, as applicable, and/or require rescission of completed foreclosures.

| | |
|---|---|
| **Purpose** | This guidance confirms the minimum standards for the handling and prioritization of borrower files that are subject to an imminent (within 60 days) scheduled foreclosure sale. The purpose of this guidance is to ensure that borrowers will not lose their homes without their files receiving, at a minimum, a pre-foreclosure sale review conducted under the standards listed in this guidance, which also help to ensure loan modifications were considered as appropriate. |
| | Servicers of residential mortgages should use these review and validation standards to determine whether a scheduled foreclosure sale should be postponed, suspended or cancelled due to critical foreclosure defects in a borrower's file. These minimum review criteria are intended to ensure a level of consistency across servicers, not to supplant review and validation procedures that go beyond these minimums. Servicers that currently apply more than these minimum standards as part of their own pre-foreclosure sale review and validation procedures are expected to continue to do so. |
| | These standards are not intended to incorporate the final rules amending Regulation X and Regulation Z issued by the Consumer Financial Protection Bureau (CFPB) on January 17, 2013, and effective on January 10, 2014, which govern mortgage servicers' loss mitigation and foreclosure processing functions. The Federal Reserve expects that all servicers will undertake appropriate action in a timely manner to ensure their practices will be compliant with the new rules by the effective date. |

| Overview | Servicers of residential mortgages should monitor all borrower files in the foreclosure process on at least a weekly basis to determine if a foreclosure sale is scheduled within the next 60 days. The servicer should implement procedures to perform and document a timely pre- foreclosure sale review according to the criteria set out in this guidance and appropriately postpone, suspend or cancel the scheduled foreclosure sale when warranted. |
|---|---|
| | The servicer will promptly determine whether the borrower is currently in an active loss mitigation program or is being actively considered for or has requested consideration under the Home Affordable Modification Program (HAMP) or other modification or loss mitigation program as further defined in standard number 9 below, and whether further foreclosure proceedings and/or the scheduled foreclosure sale should be postponed, suspended or cancelled as required by program standards as applicable. |
| | The following standards are a non-exhaustive list of criteria for which an exception would warrant postponement, suspension or cancellation of a foreclosure sale until the Minimum Pre-Foreclosure Sale Review Standards are satisfied.  As noted above, individual servicers may apply additional standards/criteria to postpone, suspend or cancel a scheduled foreclosure sale. |
| | Any negative response to the Minimum Pre-Foreclosure Review Standards detailed below will be considered a critical defect (except for standard number 7 where a positive response is a defect) and should cause the servicer to postpone, suspend or cancel a scheduled foreclosure sale. |
| | Independent control functions (such as audit, compliance, and risk management) should confirm and document servicer adherence to their own servicing standards/criteria and the minimum standards in this guidance through a program of monitoring, sampling, and testing of scheduled and completed foreclosure sales. |

| **Minimum Pre-Foreclosure Sale Review Standards** | Date of the scheduled foreclosure sale: _____ |
|---|---|
| | Once the date of foreclosure is established, the servicer needs to confirm the following information before foreclosing: |

1. Is the loan's default status accurate?

2. Does the servicer have and can demonstrate the appropriate legal authority to foreclose (documented assignments, note endorsements, and other necessary legal documentation, as applicable)? *No such doc. exists*

*Can't Meet Cond. Pre.*

3. Have required foreclosure notices or other required communications to the borrower or others, as applicable, been provided in a timely manner?

4. Has the servicer taken all steps necessary to confirm whether the borrower, co-borrower, and all obligors on the mortgage, trust deed, or other security in the nature of a mortgage are entitled to protections under the Servicemembers Civil Relief Act (SCRA), including running queries through the Department of Defense database? If the borrower, co-borrower, or other obligor is subject to SCRA protections, has the servicer complied with all applicable legal requirements to foreclose?

*Lost this one*

5. Determine whether the borrower is in an active bankruptcy. If so, does the servicer have documented legal authority to foreclose?

6. Determine whether the loan is currently under loss mitigation or other retention review or such review has been requested by the borrower as part of the foreclosure process. If so, did the servicer notify the borrower that all conditions necessary to effect the loss mitigation or retention action have not been met, what is needed to meet those conditions, and the date necessary to cure the deficiencies to avoid further foreclosure action? If a borrower submitted a complete loan modification application after the foreclosure referral, did the servicer comply with any applicable dual track restrictions?

7. Is the borrower currently in an active trial loss mitigation plan?

8. Determine whether the servicer accepted any payment from the borrower in the preceding 60 days (that is, were borrower payments, including interest, principal, fees, or escrow payments, applied to the borrower's account or retained in a suspense account). If so, did the servicer clearly communicate to the borrower that he or she is neither in nor being considered for a loss mitigation program, and that the servicer's acceptance of the payment in no way affected the status of the foreclosure that is proceeding?

9. As applicable, was the borrower solicited for and offered a loss mitigation option, such as, those required by HAMP, government-sponsored enterprises (GSEs), Federal Housing Administration (FHA), U.S. Department of Veterans Affairs (VA), state-level government programs under U.S. Department of Treasury, other third party investor, or the servicer's loss mitigation and modification programs? To the extent applicable, has the servicer complied with its loss mitigation obligations detailed in the National Mortgage Settlement? Have any borrower complaints, appeals, or escalations been considered and addressed?

10. Was the fully executed loan modification application submitted by the borrower, as defined by the applicable modification program, and reviewed by the servicer as required, including any timeline or notice requirements?

11. Was the modification decision correct and validated as required by the applicable modification program (to include, as applicable; compliance with program requirements and accuracy of calculations and application of the net present value (NPV) test) along with appropriate resolution and communication of any borrower complaint, appeal, or escalation?

12. Was the borrower or the borrower's representative (such as, housing counselor or attorney) notified of the loan modification decision and rationale as required by the applicable loss mitigation program or these standards?

13. If required by the GSE or other investor, has the servicer certified to the attorney conducting the foreclosure that all delinquency management requirements have been met, including that there is neither an approved payment plan arrangement nor a foreclosure alternative offer pending or accepted?

# United States Court of Appeals
## For the First Circuit

No. 12-2391

ROBERT P. MARLEY,

*Plaintiff, Appellant,*

v.

BANK OF AMERICA, N.A., a/k/a BAC HOME LOANS SERVICING LP., ET AL.,

*Defendants, Appellees,*

JOHN DOE REPORTING SERVICES, ET AL.,

*Defendants.*

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

## JUDGMENT
### Entered: January 8, 2014

The appellant, Robert Marley ("Marley"), appeals pro se from the district court's dismissal of all counts in his amended complaint under Fed. R. Civ. P. 12(b)(6), and from the district court's decision denying Marley's motion to supplement his amended complaint. For the following reasons, we affirm the judgment of dismissal of Marley's amended complaint, and the district court's decision to deny Marley's motion to supplement his amended complaint.

In his opening brief, Marley has not challenged the district court's dismissal of any of the federal statutory claims asserted in Counts II, III, VI and VII of the amended complaint, and these claims are therefore waived. See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 239 (1st Cir. 2013) ("We have repeatedly held, with a regularity bordering on the monotonous, that arguments not raised in an opening brief are waived.") (internal quotation marks and citation omitted); DeCaro v. Hasbro, Inc., 580 F.3d 55, 64 (1st Cir. 2009) ("It is common ground that contentions not advanced

in an appellant's opening brief are deemed waived."). Likewise, Marley's brief advances a single sentence regarding claims for unjust enrichment, fraud and violations of Mass. Gen. L. ch. 93A. See Appellant's Brief at 31. We therefore also deem these claims waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Marley's brief mainly challenges the district court's decision dismissing Count VIII, which sought a declaration that none of the defendants in this action has the authority to foreclose on Marley's residential property, and Count IX, which sought to quiet title on the property. "We review an order of dismissal for failure to state a claim de novo, and may affirm on any basis apparent in the record." Lemelson v. U.S. Bank Nat'l Ass'n, 721 F.3d 18, 21 (1st Cir. 2013).

We affirm the district court's dismissal of Marley's quiet title action substantially for the reasons stated by the district court in its decision dated March 13, 2012. See Marley v. Bank of America, No. 10-cv-10885-GAO, 2012 WL 847374, at *5 (D. Mass. Mar. 13, 2012). Even if we construed the claim as one asserted under the Massachusetts try-title statute, see Mass. Gen. L. ch. 240, §§ 1-5, as Marley suggests, we have recently held that "[u]ncertainty as to who holds a valid mortgage does not provide the requisite adversity to cloud a mortgagor's claim of equitable title" under the try-title statute. Lemelson, 721 F.3d at 24 n.7.

Otherwise, Marley sought in Count VIII a declaration that the defendants lacked the authority to foreclose based, among other things, on his allegation that no defendant possesses the promissory note. We acknowledge that the holding in Eaton v. Fed. Nat'l Mortg. Ass'n, 462 Mass. 569, 969 N.E.2d 1118 (2012), would govern any future efforts to foreclose: in Eaton, the Massachusetts Supreme Judicial Court determined that its interpretation of the term "mortgagee" in Mass. Gen. L. ch. 244, § 14, and related statutory provisions would apply prospectively "only to mortgage foreclosure sales for which the mandatory notice of sale has been given after the date of [the Eaton] opinion." Id. at 588-89, 969 N.E.2d at 1133 (footnote omitted). Here, the parties do not dispute that the mandatory notice of sale required under Mass. Gen. L. ch. 244, § 14 has not been given in this case. Still, Eaton also reiterated the settled principles under Massachusetts law that "a mortgage and the underlying note can be split." Id. at 576, 969 N.E.2d at 1124. See also Culhane v. Aurora Loan Servs. of Nebraska, 708 F.3d 282, 292 (1st Cir. 2013) ("In Massachusetts, the note and the mortgage need not be held by the same entity."). After Eaton, then, there remains nothing actionable under Massachusetts law about separate parties holding the two instruments as long as the mortgage and note are reunited at the time that a foreclosing entity gives the mandatory notice of sale required under Mass. Gen. L. ch. 244, § 14. Cf. U.S. Bank Nat'l Ass'n v. Ibanez, 458 Mass. 637, 651, 941 N.E.2d 40, 53 (2011) ("The key . . . is that the foreclosing entity must hold the mortgage at the time of the notice and sale in order accurately to identify itself as the present holder in the notice and in order to have the authority to foreclose under the power of sale (or the foreclosing entity must be one of the parties authorized to foreclose under G.L. c. 183, § 21, and G.L. c. 244, § 14)."). Because the appellant concedes that no notice of sale has been given under Mass. Gen. L. ch. 244, § 14, we conclude that any challenge to the defendants' authority to foreclose is premature at this juncture under Eaton. Accordingly, we affirm the judgment of dismissal. We clarify, however, that the dismissal of Count VIII is without prejudice to the claim being brought again when it is ripe, but with prejudice to any effort to assert the same unripe claim.

"We review a district court's denial of a request for leave to amend a complaint for abuse of discretion," Villanueva v. United States, 662 F.3d 124, 127 (1st Cir. 2011), and "defer to the court's denial if any adequate reason for the decision is apparent on the record," id. Here, we conclude that the district court did not abuse its discretion in denying Marley's motion to amend his complaint. To the extent that Marley sought to amend his complaint to challenge the validity of the mortgage assignment dated June 30, 2011, such a challenge would have been premature, for the reasons stated above. To the extent that Marley sought to revive claims arising from the loan origination process, any such amendment would have been futile. Bypassing Marley's argument on appeal that these claims had not yet accrued by the time of his bankruptcy filing, Marley was on notice under the clear terms of the mortgage agreement that the note was subject to transfer. Moreover, "[t]he type of sophisticated transactions leading up to the accumulation of the notes and mortgages . . . and their securitization, and, ultimately the sale of mortgage-backed securities, are not barred nor even burdened by the requirements of Massachusetts law." Ibanez, 458 Mass. at 655, 941 N.E.2d at 56 (Cordy, J., concurring). Thus, the fact that his loan was securitized does not by itself provide a basis, as Marley seems to suggest, for voiding his mortgage.

Having considered the remaining motions, we deny them.

Affirmed. See 1st Cir. Loc. R. 27.0(c).

By the Court:

/s/ Margaret Carter, Clerk.

cc:
Neil David Raphael
Robert P. Marley

 

*Loan Number:* 79415100

MIN: **100115100100007713**

**(A) Change Dates**

The interest rate I will pay will change on the 1st day of February, 2005, and on that day every month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE EIGHTH percentage points (2.125%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to (i) pay the accruing monthly interest at my new interest rate for all payments prior to the First Principal and Interest Payment Due Date, or (ii) repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments for all payments prior to the First Principal and Interest Payment Due Date. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

My interest rate will never be greater than 12.000% or less than 2.125%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after January 1, 2015.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payments unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist of only interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

MULTISTATE Interest Only ADJUSTABLE RATE NOTE – ONE MONTH LIBOR INDEX
FE-4268(0311)
Page 2 of 5

IDS, Inc. - (800) 554-1872

Borrower(s) Initials

 

*Loan Number: 79415100*                                      MIN: 100115100100007713

immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND AND SEAL OF THE UNDERSIGNED.

_____ (Seal)
Robert P Manley                          -Borrower

_____ (Seal)
                                         -Borrower

*(Sign Original Only)*

*Loan Number:* 79415100

MIN: 100115100100007713

Pay to the order of
Without Recourse

This _____ day of _____, _____

By : _____

Its: _____

IDS, Inc. - (800) 554-1872

Page 5 of 5

FROM:

Robert P Marley

18 Lakeview Dr

Lynnfield MA 01940



U.S. POSTAGE
PAID
SOMERVILLE, MA
02145
FEB 10 16
AMOUNT
**$12.90**
R2304M110231-99

1006    61834

CERTIFIED MAIL®



7015 1730 0001 5371 1077

TO:

Mortgage Elec Reg, Systems

1901 E Voorhees St

Suite C

Danville, IL 61834

Attn: Legal Dept.



PRIORITY
★ MAIL ★

TRACKED
★ ★ ★
INSURED
★

UNITED STATES
POSTAL SERVICE®

For Domestic Use Only        Label 107R, July 2013